UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| FRANCES DENNEY and ARTHUR TERHUNE, on behalf of themselves and all others similarly situated, | ) ) ) | Case No. 1:19-CV-04757 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMPHENOL CORP., BORGWARNER, INC., BORGWARNER PDS (PERU), INC. f/k/a FRANKLIN POWER PRODUCTS, INC., and 400 FORSYTHE, LLC, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | **JURY TRIAL DEMANDED** |

## PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT

Plaintiffs bring this civil action on their own behalf and on behalf of the classes they seek to represent, to obtain damages, both compensatory and punitive, injunctive relief, and costs of suit from Defendants (all references to which include their affiliates, predecessors, and agents), and complain and allege, as follows:

### INTRODUCTION

1.      This is a civil action to secure redress from the Defendants for damages suffered by Plaintiffs and the class as a result of the Defendants' wrongful emission, release, discharge, handling, storage, transportation, processing, disposal and failure to remediate toxic and hazardous waste, which was generated as a by-product of Defendants' (including their respective predecessors Franklin Power Products and Bendix Corp.) processing, casting, production and recovery operations in Franklin, Indiana, and/or their failure to identify, remove and/or properly

remediate contamination and toxic substances related to such operations from Plaintiffs' properties.

2.     Plaintiffs and their properties have been exposed to toxic and hazardous substances released as a result of Defendants' conduct associated with their ownership and operations located at 980 Hurricane Road in the town of Franklin, Johnson County, Indiana ("the Former Amphenol Site") and at 400 North Forsythe Street in the town of Franklin, Johnson County, Indiana ("the Former Franklin Power Products Site") (collectively "the Sites").

3.     Defendants processed, handled, stored, generated, emitted, released, discharged, disposed of and failed to remediate large quantities of toxic and hazardous materials at the Sites including chlorinated solvents and other volatile organic solvents ("VOCs") including, but not limited to, trichloroethylene ("TCE"), tetrachloroethylene ("PCE"), tricholoroethane, tetrachloroethane, dichloroethylene, chloroform, 1,1,1-Trichloroethane ("1,1,1 TCA"), and 1,4 dioxane as well as heavy metals, and cyanide (collectively "Site Contaminants"). The Site Contaminants include multiple substances that are known carcinogens.

4.     These toxic and hazardous materials discharged into the soil, air, and groundwater in and around the Site and flowed through the environment such that Plaintiffs, Class Members, and their properties in Franklin were, and continue to be, exposed to toxic and hazardous materials from Defendants' Sites. Defendants' unlawful discharges created numerous pathways for the Site Contaminants to enter Plaintiffs' and the Class Members' properties, including through the groundwater, soil, outdoor air, indoor air, soil gas, sewer bedding gas, and sewer VOC gas.

5.     Beginning in the early-to-mid 1980s, Defendants became aware of the soil and groundwater contamination in, on, and around the Sites including the potential for off-site contamination.

6.     Prior to this time, Defendants had knowledge of mishandling, storage, and improper disposal of the Site Contaminants, including disposal directly into sewer lines from Defendants' activities at the Sites.

7.     Despite this knowledge, neither Defendants nor their successors or agents notified Plaintiffs and the surrounding residents living in the proposed Class Area, and such notice was provided only for the first time in or around late 2018. This is over 30 years from the time the contamination and the threat of an off-site plume were identified by Defendants and their predecessors. Thus, Defendants knowingly hid the ultrahazardous conditions caused by the Site Contaminants that are harmful to Plaintiffs and the Class Members.

8.     Prior to this time, Plaintiffs were unaware, and had no basis to be aware, of the existence of such contamination in, under, and around their properties, including in their groundwater and in the sewer systems under their homes and throughout their neighborhoods, and the need for remediation of their properties and the impacts on their property values.

9.     The Site Contaminants have been and continue to be a source of hazardous substance exposures within and around Plaintiffs' properties and persons in Franklin and negatively impact property values therein.

10.     The decades of time that have elapsed since Defendants negligently, recklessly, intentionally and improperly disposed of hazardous chemicals at, on and around the Sites, have led to these chemicals migrating further away from the Sites as well as deeper and deeper into the groundwater aquifer, an aquifer that is, was, or has been used for public and private water supplies in Franklin.

11.     Defendants' disposal of Site contaminants directly and indirectly into the city sewer system has amplified the impacts of the mishandling of these chemicals by targeting a preferential

pathway, the sewer piping, lines, including the pathway outside the sewer lines, to reach and infiltrate homes far from the Site.

12.     The toxic and ultra-hazardous Site Contaminants were, and continue to be, transported by groundwater and sewer line migration and other natural and human processes under, into, and around Plaintiffs' homes, properties and persons.

13.     As a result of Defendants' release, discharge, handling, storage, transportation, processing, disposal and failure to properly identify, treat, contain and remediate Site Contaminants, Plaintiffs have suffered and will continue to suffer serious injury.

14.     Large amounts of Defendants' Site Contaminants remain today in Franklin and the full nature and extent of the contamination has not been adequately delineated by the Defendants.

15.     The presence of Site Contaminants presently impacts Plaintiffs, causes a diminution in their property values, is a blight on Plaintiffs' community, causes annoyance, anxiety, and inconvenience and deprives Plaintiffs of their free use and enjoyment of their property, including, but not limited to, the inability to fully use, enjoy and recreate, freely perform certain work and repairs on their property; and requires that their property be disrupted, causing unreasonable and significant inconvenience and disturbance. In addition, the Site Contaminants pose a risk to human health.

16.     Despite their knowledge of the dangers associated with their past and ongoing conduct, Defendants failed to properly determine the true nature and extent of their Site Contaminants within the community or to provide Plaintiffs with proper notice or warning of the true nature and extent of these toxic substances, or even the known nature and extent of these toxic substances.  Defendants did not disclose the full extent of their historic operations in Franklin and did not fully delineate the extent of the contamination in the Class Area.

4

17.    Because Defendants knowingly concealed the dangers associated with and attendant to their conduct, Plaintiffs did not know, nor could they have known, of the presence, nature and extent of the Site Contaminants.

18.    Defendants' concealment of these dangers and resulting contamination of the community continues to this day. Defendants have actively conspired and engaged in a campaign of concealment and misinformation concerning the nature and extent of the location and hazard posed by these contaminants, and have failed to timely warn the Franklin community concerning same, such that reasonable members of the Community would be unaware of the presence, nature, and extent of Defendants' contamination.

## PARTIES

19.  Plaintiff Frances Denney is a citizen of the State of Indiana who resides at 730 N. Forsythe St., Franklin, Indiana 46131. Plaintiff Denney owns the residential property located at 730 N. Forsythe St., Franklin, Indiana 46131 with her husband and has lived there for eight years. As a result of the actions of the Defendants, toxic and ultra-hazardous substances have entered onto their property, have contaminated their property, water, air, land, dwelling and surrounding environment, thereby causing Plaintiffs to suffer damage to their property and personal finance, loss of the use and enjoyment of their residence, unreasonable and substantial annoyance, anxiety, and inconvenience, including, but not limited to, the inability to fully use, enjoy and recreate on their outdoor spaces; freely perform certain work and repairs on their property; and requiring their property to be dug up, excavated and otherwise disrupted causing inconvenience and disruption. Plaintiffs additionally suffer fear of adverse health effects, including cancer and other serious illness.  As a result of the actions of the Defendants, toxic and hazardous substances entered onto

their persons, property, air, land, and dwelling, thereby causing Plaintiffs to suffer an increased risk of serious future illness necessitating medical monitoring.

20.   Plaintiff Arthur Terhune is a citizen of the State of Indiana who resides 1030 Ross Ct., Franklin IN 46131. Plaintiff Terhune owns the residential property located at 1030 Ross Ct., Franklin IN 46131 and has lived there for the past 22 years.  As a result of the actions of the Defendants, toxic and hazardous substances have entered onto his property, have contaminated his property, water, air, land, dwelling and surrounding environment, thereby causing Plaintiff to suffer damage to his property and personal finance, loss of the use and enjoyment of his residence, unreasonable and substantial annoyance, anxiety, and inconvenience, including, but not limited to, the inability to fully use, enjoy and recreate on his outdoor spaces; freely perform certain work and repairs on his property; and requiring his property to be dug up, excavated and otherwise disrupted causing inconvenience and disruption.  Plaintiff additionally suffers fear of adverse health effects, including cancer and other serious illness.  As a result of the actions of the Defendants, toxic and hazardous substances entered onto his person, property, air, land, and dwelling, thereby causing Plaintiff to suffer an increased risk of serious future illness necessitating medical monitoring.

21.   More than two-thirds of the members of the proposed Classes are citizens of the State of Indiana.

22.   No other class action asserting the same or similar factual allegations against any of the Defendants has been filed.

23.   Defendant Amphenol Corp. is a Delaware corporation registered to do business in the state of Indiana, with its principal place of business in Wallingford, Connecticut. Amphenol can be served with process by serving its registered agent, CT Corporation System, 150 W. Market St., Suite 800, Indianapolis, IN 46204. Amphenol formerly owned and operated (through its

predecessor Bendix Corp.) the facility located at 980 Hurricane Road, Franklin, Indiana and utilized and improperly stored and disposed of hazardous and toxic chemicals. From 1963 to 1983, Amphenol's predecessor, Bendix, owned and operated this facility to conduct various operations, including electroplating, machining, assembling and storing manufactured components, and inventorying raw materials and compounds required for production. During this time period, from these operations, including TCE and PCE, was unlawfully discharged into the soil, groundwater, and directly into the Franklin municipal sanitary sewer. Although Amphenol previously accepted responsibility for, and agreed to clean up, the Site Contaminants through a 1990 Resource Conservation and Recovery Act consent order with the EPA, which was subsequently amended in 1998, after 30 years, Amphenol and its contractors have wholly failed to remediate the Site Contaminants and have caused damages to Plaintiffs and the Class. Amphenol is publicly traded on the New York Stock Exchange and is part of the S&P 500 index. Amphenol's revenue for the twelve months ending September 30, 2019 was $8.299 billion and its total assets for the quarter ending September 30, 2019 were $10.684 billion. As of November 27, 2019, Amphenol's market cap was nearly $31 billion.

24.   Defendant BorgWarner PDS (Peru), Inc. ("BorgWarner Peru") f/k/a Franklin Power Products, Inc. is an Indiana corporation with its principal place of business in Auburn Hills, Michigan. BorgWarner Peru can be served with process by serving its registered agent, CT Corporation System, 150 W. Market St., Suite 800, Indianapolis, IN 46204. BorgWarner Peru is the successor of, and formerly conducted business as, Franklin Power Products, Inc., which formerly owned and operated the facility at 400 North Forsythe Street in the town of Franklin, Johnson County, Indiana from 1985 to 2006 where it disassembled and rebuilt diesel and gasoline engines. During the course of these operations, Franklin Power Products also unlawfully

discharged waste, including TCE and PCE, into the soil, groundwater, and directly into the Franklin municipal sanitary sewer. Defendant BorgWarner acquired Franklin Power Products as a wholly owned subsidiary in 2015 and changed its named to BorgWarner Peru. According to documents submitted by BorgWarner to the IDEM, BorgWarner Peru is not currently an active company and exists on paper only.

25. Defendant BorgWarner, Inc. ("BorgWarner") is a Delaware corporation with its principal place of business in Auburn Hills, Michigan. BorgWarner can be served with process by serving its registered agent, The Corporation Trust Company, 1209 West Orange St., Wilmington, DE 19801. As the corporate parent/successor/alter ego of BorgWarner Peru f/k/a Franklin Power Products, BorgWarner is liable for the acts and omissions of Franklin Power Products. BorgWarner is publicly traded on the New York Stock Exchange and is part of the S&P 500 index. BorgWarner's revenue for the twelve months ending September 30, 2019 was $10.183 billion. BorgWarner's total assets for the quarter ending September 30, 2019 were $10.199 billion. As of November 27, 2019, BorgWarner's market cap was nearly $9 billion.

26. Defendant 400 Forsythe, LLC is an Indiana limited liability company with its principal place of business at 1800 Churchman Ave., Indianapolis, IN 46203. 400 Forsythe can be served with process by serving its registered agent, Carrie Lawrence, 1800 Churchman Ave., Indianapolis, IN 46203. 400 Forsythe purchased the Former Franklin Power Products Site in October 2006 from Franklin Power Products.

27. Through their wrongful acts and omissions, including the emission, release, discharge and failure to properly control, curb, contain and remediate Site Contaminants, Defendants have caused, and continue to cause, Site Contaminants to enter onto Plaintiffs' and the Class Members' properties, have contaminated their property, air, land, dwelling and surrounding environment, and

8

thereby caused Plaintiffs and the Class Members to suffer damage to their property and personal finance, loss of the use and enjoyment of their property and destruction of their community. As a result of Defendants' acts and omissions, Site Contaminants have unreasonably interfered with Plaintiffs' and the Class Members' exclusive use and enjoyment of their property and remain on their properties causing them significant harm to this day.

28.   Defendants have failed, and/or continue to fail, to prevent the Site Contaminants from causing harm, or threatened harm, to the health, safety, and welfare of Plaintiffs as well as Plaintiffs' use and enjoyment of their properties.

## JURISDICTION AND VENUE

29.   This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy exceeds the sum or value of $5 million and the action is between multiple members of the class who are citizens of the State of Indiana on the one hand, and two defendants who are citizens of the States of Delaware, Connecticut, and Michigan on the other hand. The number of members of all proposed plaintiff classes in the aggregate is more than 100.

30.   This Court has personal jurisdiction over Defendants pursuant to IND. TRIAL R. 4.4 because Plaintiffs' claims arise out of Defendants' contacts, acts, and omissions within the State of Indiana such that the exercise of such jurisdiction is consistent with due process under the United States Constitution.

31.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, acts, and omissions that give rise to the claims at issue in this case occurred in Franklin, Johnson County, Indiana.

## FACTUAL ALLEGATIONS

32. Plaintiffs and their properties have been exposed to ultra-hazardous substances released as a result of Defendants' intentional conduct. Defendants created, generated, emitted, released, discharged, handled, stored, transported, disposed and failed to fully identify, contain, or remediate Site Contaminants in Franklin, Indiana.

33. These toxic and hazardous Site Contaminants migrated so that persons and their properties in Franklin were, and continue to be, exposed to hazardous materials. Plaintiffs, the Class Members, and their properties have been exposed to toxic and hazardous substances contained within the groundwater, soil, and sewer system and/or other releases caused by Defendants.

34. In late 2018 and early 2019, state and federal agencies first notified Plaintiffs and the Class Members for the first time, that groundwater, sewer systems, and vapor at and around their properties contain hazardous and toxic substances associated with Defendants' operations and conduct in Franklin. The concentrations exist above safe levels, requiring excavation, treatment, and removal. Prior to this time, Plaintiffs were unaware, and had no basis to be aware, of the presence of these contaminants on their properties and the threats and damages that this presence caused and continues to cause. Thus, Defendants knowingly hid the ultrahazardous conditions caused by the Site Contaminants that are harmful to Plaintiffs and the Class Members.

35. For the first time, Plaintiffs and the Class Members discovered from the EPA that the Site Contaminants have been, and continue to be, a source of hazardous substance exposures on and within Plaintiffs' and Class Members' properties and persons through numerous pathways, including through the groundwater, soil, outdoor air, indoor air, soil gas, sewer bedding gas, and sewer VOC gas.

36. Migration in the groundwater and through and along preferential pathways such as the sewer system has caused these toxic and hazardous substances to spread within Franklin. The toxic and hazardous substances were, and are, transported by groundwater flow and other natural and human processes onto and into Plaintiffs' homes, properties and persons.

37. As a result of Defendants' release, discharge, handling, storage, transportation, processing, disposal and failure to reasonably contain and remediate toxic and hazardous substances both indoors and outdoors, Plaintiffs and the Class Members are at an increased risk of developing serious latent disease and other adverse medical conditions.

38. Large amounts of Defendants' Site Contaminants remain today in Franklin and the full nature and extent of the contamination has not been delineated by the Defendants.

39. Defendants' contamination has impacted Plaintiffs' properties, caused a diminution in their property values, is a blight on Plaintiffs' community and deprives Plaintiffs and the Class Members of the free use and enjoyment of their property.

40. The EPA classifies TCE as "carcinogenic to humans."

41. The EPA classifies PCE as "likely to be carcinogenic to humans."

42. The EPA classifies 1,4-dioxane as "likely to be carcinogenic to humans."

43. The factual record in this case demonstrates that Defendants knew of the dangers associated with Site Contaminants and the potential impact on Plaintiffs and the Members of the proposed Classes.

44. Despite this knowledge, Defendants engaged in a campaign to mislead environmental and health regulators as well as members of the public, Plaintiffs and the Class Members of the presence of, the off-site migration of, and the threat posed by Site Contaminants, in the past up to

11

and through to the present.  Defendants downplayed, hid, and obfuscated the actual threat posed by their past conduct and the contaminants migrating from their properties and into the Class Area.

45.  Defendants collectively, intentionally and/or negligently concealed and failed to disclose, and continue to conceal and fail to disclose, to Plaintiffs, Class Members and/or public agencies, material facts concerning the nature, extent, magnitude, and effects of the exposure of Plaintiffs, Class Members and/or their property, to these toxic and hazardous substances.

46.  Defendants knew and/or reasonably should have known that Plaintiffs, Class Members and/or their properties, would be impacted by Site Contaminants and that they would likely be exposed to hazardous materials and contaminants. Defendants knew and understood, and/or reasonably should have known and understood, that their concealment of such information would subject and continue to subject Plaintiffs, Class Members and/or their property in Franklin, to continued exposure to hazardous materials and contaminants.

47.  Plaintiffs and the Class Members reasonably believed that the water, soil, and are in and around the Class Area their properties and the Class Area did not pose any potential health hazard.

48.  Plaintiffs and the Class Members have each been exposed to Site Contaminants due to Defendants' negligence in handling, containing, identifying, storing, use, disposal and/or failure to properly remediate said hazardous substances.

49.  As a proximate result of the exposure to Site Contaminants, Plaintiffs and the Class Members have a significantly increased risk of contracting serious latent diseases, including, without limitation, various forms of cancer.

50.  Plaintiffs and the Class Members seek redress and damages for: economic losses, such loss of property value; medical monitoring, punitive damages and other damages as the result of

the carelessness, recklessness, negligence and willful and wanton violation of law by the Defendants.

**Toxic History of Former Amphenol Facility (980 Hurricane)**

51.   The main manufacturing building on the site was built in 1961 by Dage Electric, Inc. for the manufacture of electric connectors. The operation was acquired in 1963 by Bendix Corporation for its Bendix Connector Operations plant. Processes included electroplating, machining, assembling and storing manufactured components, and inventorying raw materials and compounds required for production. Electroplating operations occurred in a room in the extreme southwestern portion of the building. From 1961 to 1981, wastewater from plating operations at the facility was discharged directly into a municipal sanitary sewer.

52.   Wastes from these processes included cyanide, 1,4-dioxane, as well as the chlorinated solvents TCE, PCE, and TCA, all of which are denser than water.  Given the densities of these chlorinated solvents, they sink when released to the groundwater and form what is known as dense, non-aqueous phase liquids, or "DNAPLs" which amplify the problems typically associated with improper disposal by creating a source of contamination that plunges deeper in to the surrounding environment and is not readily remediated through traditional means.

53.   In 1981, a wastewater pre-treatment system was installed in a separate building for treatment of cyanide and chromium bearing wastewaters from the plating room. New wastewater lines were installed from the plating room to the pretreatment building, and the effluent from the pretreatment plant was routed to a sanitary sewer manhole just south of the main manufacturing building. In conjunction with the construction of the pretreatment building, a small addition was added to the southwest comer of the manufacturing building, adjacent to the plating room.

54. In 1983, the Bendix Corporation was acquired by Amphenol. As a result of this acquisition, manufacturing at the Franklin facility ceased in September 1983, and the plant was closed at that time. Closure of RCRA units began in February 1984. Knowledge of the hazardous nature of the operations, disposal, and impacts on the site and threats to the surrounding community were well-established by this early stage.

55. By February of 1984, a hydrogeologic investigation had identified significant hazardous volatile organic compound ("VOC") contamination of the soil and groundwater in the area surrounding the former metal plating facility. That investigation found:

> **Concentrations of tetrachloroethene (PCE) and trichloroethene (TCE) *up to several thousand micrograms per liter* (ug/1) were detected in wells adjacent to the main facility building, particularly along the southwest comer adjacent to the plating room.**

56. VOC contaminants were also found in Hurricane Creek at the storm sewer outfall and at a point downstream. No VOC contaminants were found upstream, indicating that the Former Amphenol Facility and the hazardous wastes disposed of therein and on, were also impacting surface waters in the community.

57. The sewer line on site was found to have several gaps and thus in 1985, Bendix/Amphenol replaced portions of the line; however, they did so without removing the existing line and soil so as to avoid removing the hazardous soils that had been impacted by their disposal.

58. Amphenol sold the facility to Franklin Power Products on June 15, 1989.

59. In 1990, EPA brought Franklin Power Products and Amphenol under a consent order. This order required both Franklin Power and Amphenol to submit a remedial investigation and plan for corrective measures.

60.  A memorandum on the characterizing of the hazardous chemical plume at the facility drafted in 1992 provided the following conclusions:

- **A soil gas survey conducted at the Former Amphenol site indicates two separate soil gas plumes on site: A TCE plume centered near the crossing of the old sanitary sewer line and the storm sewer, and a PCE plume centered near an old concrete pad at the southwest corner of the facility parking lot. The TCE plume appears to follow the trend of the old sewer line and the PCE plume has a well- defined northwest-southeast direction from the old concrete pad.**
- **The major components of the plume are determined to be TCE, PCE and TCA.  All three compounds are denser than water.**
- **A ground water plume defined by the summed values of the major plume components has its highest values along the old sanitary sewer line. *The plume appears to extend southerly and off the site*, and easterly along the storm sewer line. The values at MW-3 adjacent to the plating room are assumed to be attributed to former plating room contamination, and not directly related to the rest of the plume.**
- ***The ground water plume cannot be delineated with the information available.***

61.  By this time, it was well-established that there were high levels of toxic and potentially carcinogenic substances at the facility, that they were migrating off-site, that they were moving in the direction of Plaintiffs and Class Members, that they were migrating farther and faster with the help of the sewer lines, and that the extent of the plume had not been delineated.  Thus, the owners and operators of the Former Amphenol Facility were well-aware of the threat that their contamination posed to the neighboring residents, Plaintiffs, and the Class Members.

62.  In fact, the same memorandum made multiple recommendations to further characterize the extent of the plume as well as the risks that it posed, including characterizing the reach of the plume off-site and along the sewer lines:

- **Additional sampling points to delineate the plume boundary in Unit B south of the storm sewer (off site).**
- **Evaluation of the storm sewer and storm sewer trench as a possible pathway for contaminant migration, and delineation of any plume extension along the storm sewer.**

63.  On August 19, 1997, the Regional EPA Administrator signed a RCRA Interim Final Decision for the Facility which prescribed corrective measures including

- Continued operation and upgrading of on-site groundwater recovery system
- Implementation of an air sparge/soil vapor extraction system
- A monitoring system to evaluate the results of the corrective measures
- Investigation of possible contaminant migration from the Facility to a public water supply well field, and appropriate corrective action if such contaminant migration is confirmed

64.  Although an air sparging and groundwater treatment system was installed at the Former Amphenol Facility,  unfortunately, upon information and belief, the system did not initially include treatment of the air used to strip hazardous VOCs from the water, and thus those VOCs were simply emitted into the atmosphere providing another pathway by which to assault the local community.

65.  Despite years of actual knowledge of hazardous chemicals migrating off-site, any and all efforts made by Bendix, Amphenol and/or Franklin Power Products were completely insufficient, in that they failed to contain and/or adequately treat the presence of hazardous chemicals at the property and these chemicals have continued to disperse and migrate into the surrounding environment, including throughout the Class Area and Plaintiffs' properties.

66.  As a result of the contamination at the Former Amphenol Facility, a deed restriction was placed on the real property located at 980 Hurricane Road prohibiting any residential use of the property.

**Toxic History of Former Franklin Power Products Site (400 Forsythe)**

67.  Franklin Power Products took over the 400 Forsythe Facility 1985 where it disassembled and rebuilt diesel and gasoline engines until the fall of 2006.  These operations included disassembling the engines, cleaning, machining, repair, and re-assembly. 400 Forsythe

purchased the Former Franklin Power Products Site in October 2006 from Franklin Power Products.

68.  A 1996 Phase I Report identified both petroleum hydrocarbon contamination as well as VOC contamination of groundwater at the Facility.  This contamination includes VOC contamination including chlorinated solvents. This contamination remains at the Facility to this day.

69.  The Indiana Department of Environmental Management ("IDEM") sent a number of information requests regarding the Site in August of 2018 to BorgWarner Peru and the current owner, 400 Forsythe LLC.

70.  In a response dated October 26, 2018, counsel for 400 Forsythe responded to IDEM and the public denying any past use of chlorinated solvents and suggested that any groundwater impacts at the Site were the result of migration from 980 Hurricane. But 400 Forsythe had the 1996 Phase I Report, as well as additional Environmental Site Assessments, when it purchased the Former Franklin Power Products Site that confirm the presence of Site Contaminants that originated at 400 Forsythe. In addition, 400 Forsythe either commissioned or should have commissioned its own Environmental Site Assessment prior to purchasing the Site that confirmed or would have confirmed the presence of Site Contaminants. Thus, 400 Forsythe knew of VOC contamination at the Former Franklin Power Products Facility dating back to October 2006 and failed to disclose its knowledge of contamination to the Class Members who live immediately adjacent to the Former Franklin Power Products Site.

71.  In a response dated October 26, 2018, BorgWarner, through its counsel, responded (the "BorgWarner Response") that it was answering on behalf of BorgWarner Peru because "Franklin Power, now known as BorgWarner Peru, is not an active company. It exists on paper

17

only." BorgWarner further claimed that "there have been no reported spills at the facility" and referencing unpreventable oil staining and drippage at the property.

72.   The BorgWarner Response also stated that it "was not aware of any use, purchase, generation, storage, treatment, disposal, or other handling of solvents containing PCE or TCE by Franklin Power at the Property."

73.   However, around the same time, a former worker, Steve Brummett, from the Franklin Power Products site, described the activities that took place in the disassembly of those engines. *See   https://www.wthr.com/article/evidence-hazardous-toxins-discovered-former-franklin-plant-former-worker-breaks-silence.*

74.   According to this eyewitness, for at least 13-years, the disassembly included dumping chemicals into a large hole in the floor, thousands of gallons every day as well as 55-gallon drums of waste chemicals uncovered and not secured during storage and handling.

75.   Further, concrete pads were used to cover past evidence of chemical handling and disposal.

76.   One of the primary industrial uses of chlorinated solvents is the cleaning and degreasing of metal parts, an operation that was central to Franklin Power Products' business operations at the Site.

77.   Upon information and belief, Franklin Power Product's roughly 20-year operation at the 400 Forsythe location included the use and improper disposal of chlorinated solvents, including, but not limited to, TCE, TCA, and PCE. As a result of the contamination at the Former Franklin Power Products Facility, a deed restriction was placed on the real property located at 400 Forsythe Street prohibiting any residential use of the property.

78. Defendants have had actual and/or constructive knowledge of the threat of impacts on the environment, including the Class Area.

79. Defendants have had actual and/or constructive knowledge of actual impacts on the environment, including the Class Area.

80. Despite back-and-forth with state and federal agencies, Defendants and their consultants kept the public in complete darkness while concerns mounted regarding public health and the alarming rate of cancers, including rare childhood cancers, occurring in the surrounding community.

## CLASS ACTION ALLEGATIONS

81. This Class Action is being filed by the Plaintiffs, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and others similarly situated.

82. Plaintiffs seek to certify the following classes defined as:

> **Property Damages Class:** Current residents of Indiana who, on or after the date of the filing of this Complaint, own or owned any real property identified as residential property located within the following area:



**Carcinogen Exposure Medical Monitoring Class**: Current and former residents of Indiana who lived within the Class Area as depicted above for at least five-years and are 65-years old or less.

83. To the extent revealed by discovery and investigation, there may be additional appropriate classes and/or subclasses from the above class definition which is broader and/or narrower in time or scope.

84. Excluded from the classes are Defendants' officers, directors, agents, employees and members of their immediate families; and the judicial officers to whom this case is assigned, their staff, and the members of their immediate families.

85. Plaintiffs, members of the Classes and/or their property have been exposed to and continue to be exposed to toxic and hazardous substances at, around, and emanating from 980 Hurricane and 400 Forsythe.

86. This Court may maintain these claims as a Class Action pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3) and/or 23(c)(4).

87. Numerosity – Fed. R. Civ. P. 23(a)(1): The members of each class are so numerous that joinder of all members is impractical.

88. The number of properties and residents located within the Class Area exceeds 100 and, therefore, the number of members of the classes also exceeds 100 people, in satisfaction of Fed. R. Civ. P. 23 (a)(1).

89. The number of persons in the Carcinogen Exposure Monitoring Class who have been exposed to hazardous substances exceeds 100 in satisfaction of Rule 23(a)(1).

90. Commonality – Fed. R. Civ. P. 23(a)(2): There are common questions of law and fact that affect the rights of every member of each respective class, and the types of relief sought are common to every member of each respective class. The same conduct by Defendants has injured or will injure every member of the Class.

91.   There are common questions of law and fact that affect the rights of every member of the respective Classes, and the types of relief sought are common to every member of the respective Classes.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy, in satisfaction of Fed. R. Civ. P. 23(a)(2). The same conduct by Defendants has injured each respective Class Member.  Common questions of law and/or fact common to the respective Classes include, but are not limited to:

a.   Whether Defendants, through their acts or omissions, proximately caused Site Contaminants to be released into the Class Area;

b.   Whether Defendants were negligent in their handling, storing, transporting, use, release, discharge, emission, disposal and/or failure to properly investigate, remediate and abate TCE, PCE, TCA, methylene chloride, or other Site Contaminants.

c.   Whether Defendants violated applicable standards concerning handling, storing, transporting, use, release, discharge, emission, disposal and/or failure to investigate and remediate TCE, PCE, TCA, methylene chloride, or other Site Contaminants.

d.   Whether Defendants' releasing, discharging, emitting or depositing TCE, PCE, TCA, methylene chloride, or other Site Contaminants onto Plaintiffs' properties, or their failure to remove or abate such contamination from Plaintiffs' properties, constitutes a private nuisance;

e.   Whether Defendants' releasing, discharging, emitting or depositing TCE, PCE, TCA, methylene chloride, or other Site Contaminants onto Plaintiffs' properties, or their failure to remove such contamination, constitutes a trespass;

f.   Whether Defendants proximately caused TCE, PCE, TCA, methylene chloride, or other Site Contaminants to be released into the environment, where Plaintiffs' properties have been exposed to such contaminants;

g.   Whether, as a proximate result of the exposure to TCE, PCE, TCA, methylene chloride, or other Site Contaminants, Plaintiffs and the members of the Medical Monitoring Classes have an increased risk of contracting serious latent diseases or other serious illness;

h.   Whether the increased risk of disease makes periodic medical examinations and screening of the Plaintiffs and members of the Medical Monitoring Classes reasonable;

i.      Whether a monitoring procedure exists that makes early detection of the diseases associated with exposure to lead, arsenic and other contamination related to Site Contaminants possible;

j.      Whether the prescribed monitoring regimen is reasonable according to contemporary medical and scientific principles; and

k.      Whether, as a proximate result of the exposure to TCE, PCE, TCA, methylene chloride, or other Site Contaminants, Plaintiffs' properties and the properties of the members of the Property Damage Class have suffered a loss in value.

92. These questions of law and/or fact are common to the respective Classes and predominate over any questions affecting only individual class members.

93. Typicality – Fed. R. Civ .P. 23 (a)(3): The claims of Plaintiffs Denney and Terhune are typical of the claims of their respective Classes as required by Rule 23(a)(3), in that all claims are based upon the same factual and legal theories. It is the same conduct by each Defendant that has injured each member of the respective Classes. The principal issue in this matter involves Defendants' conduct in wrongfully handling, storing, transporting, using, releasing, discharging, emitting, disposing and/or failing to remediate their toxic and hazardous Site Contaminants related to their operations in Franklin which impacts all members of the respective Classes.

94. Adequacy – Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the respective Classes, as required by Rule 23(a)(4). Plaintiffs have retained counsel with substantial experience in the prosecution of class actions and environmental litigation. Plaintiffs and their counsel are committed to the vigorous prosecution of this action on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor counsel has any interest adverse to those of the Classes.

95. Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for

Defendants and/or because adjudications respecting individual members of the Classes would, as a practical matter, be dispositive of the interests of the other members or would risk substantially impairing or impending their ability to prosecute their interests.

96. Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to all Members of the respective Classes, thereby making relief in the form of an injunction requiring Defendants to abate the nuisance and for the prompt and thorough investigation, identification, excavation and removal of all Site Contaminants, from the properties of plaintiffs and the Members of the Classes appropriate.

97. Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to all Members of the Medical Monitoring Classes, thereby making relief in the form of an injunction requiring Defendants to establish a fund for the costs of medical monitoring appropriate.

98. In addition, Plaintiffs and the Medical Monitoring Class members allege that:

- Plaintiffs and the members of the respective Classes have each been exposed to TCE, PCE, TCA, methylene chloride, and other Site Contaminants due to Defendants' negligence in handling, storing, use, disposal and/or failure to properly remediate hazardous substances.

- TCE, PCE, TCA, methylene chloride, and other Site Contaminants are hazardous substances.

- The Plaintiffs' and the Class Members' exposure to TCE, PCE, TCA, methylene chloride, and other hazardous substances was caused by Defendants' negligence in the handling, storing, use, disposal and/or failure to properly remediate hazardous substances.

- As a proximate result of the exposure to TCE, PCE, TCA, methylene chloride, and other hazardous substances, Plaintiffs and the respective Medical Monitoring Class Members have a significantly increased risk of contracting serious latent diseases, including, without limitation, various forms of cancer, including leukemia, liver, bladder, brain and kidney cancer.

24

- A monitoring procedure exists that makes early detection of the diseases possible.

- The prescribed monitoring regiment is different from that normally recommended in the absence of exposure to TCE, PCE, TCA, methylene chloride, and other hazardous substances contained in Site Contaminants to which plaintiffs and Class Members were exposed.

- The prescribed monitoring regimen is reasonable according to contemporary medical and scientific principles.

99.   Plaintiffs and members of the respective Classes have suffered, and will continue to suffer, harm and damages as a result of Defendant's unlawful and wrongful conduct.

100.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy under Fed. R. Civ. P. 23 (b)(3). Absent a class action, most members of the Classes likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

101.   Class certification is also appropriate because this Court can designate particular claims or issues for class-wide treatment and may designate one or more subclasses pursuant to Fed. R. Civ. P. 23(c)(4).

102.   Maintenance of this action as a class action is a fair and efficient method for adjudication of this controversy.  It would be impracticable and undesirable for each member of each putative class who has suffered harm to bring a separate action.  In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all putative class members.

103.  No unusual difficulties are likely to be encountered in the management of this action as a class action.

104.  Plaintiffs and the members of the Classes were not in any way responsible for the Site Contaminants discharged in Franklin, Indiana.

## CAUSES OF ACTION

105.  Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs of this complaint as if set forth in full herein.

### COUNT 1: Private Nuisance

106.  Defendants' past, present and/or continuing acts and/or omissions constitute a nuisance in that Defendants used, have used, and/or continue to use their former property in a manner that is to the detriment of Plaintiffs' and Class Members' use and enjoyment of their own property.

107.  Pursuant to Ind. Code § 32–30–6–6, the Site Contaminants that have impacted Plaintiffs and the Class Members and their real property are injurious to the Plaintiffs' and Class Members' health and an obstruction to the free use of Plaintiffs' and the Class Members' properties, so as essentially to interfere with the Plaintiffs' and Class Members' comfortable enjoyment of life and property.

108.  Defendants' past, present and/or continuing activities, acts and/or omissions at and near the Site constitute a private nuisance resulting in unreasonable interference with Plaintiffs' and the Class Members' right to the exclusive use and enjoyment of their properties through the invasion of hazardous and toxic Site Contaminants at and around their properties and the surrounding environment, thereby exposing Plaintiffs and the Class Members to hazardous and

toxic substances and substantially interfering with Plaintiffs' and the Class Members' free use and enjoyment of their properties.

109.  Defendants' past, present and/or continuing acts and/or omissions, resulting in the deposition of Site Contaminants onto and/or failure to remove or properly investigate and remediate the Site Contaminants, and allowing such contamination to remain on Plaintiffs' and Class Members' properties and surrounding environment, constitutes a nuisance in that Defendants have used their property in a manner that has unreasonably interfered with Plaintiffs' and the Class Members' property interests, health and safety.

110.  Defendants' contamination presently impacts and continues to impact Plaintiffs and Class Members, who are entitled to damages under Ind. Code § 32-30-6-8. Defendants' acts and omissions constituting a nuisance has caused a diminution in Plaintiffs' and the Class Members' property values, are a blight on Plaintiffs' and the Class Members' community, and has caused inconvenience, annoyance, discomfort, and fear for the Plaintiffs' and Class Members' personal safety and the safety of their properties including, but not limited to, the inability to fully use, enjoy and recreate on their outdoor spaces, freely perform certain work and repairs on their property; and requiring their property and public and common areas in the community to be dug up, excavated, handled with extreme caution and otherwise disrupted causing inconvenience and disruption.  Plaintiffs additionally suffer fear of adverse health effects, including cancer and other latent, serious illness, including childhood health issues. In addition, to the extent that Defendants have failed to remediate the Site Contaminants under the EPA Consent Decrees, Plaintiffs and Class Members hereby request that Defendants' nuisance be enjoined or abated under Ind. Code § 32-30-6-8.

111.   As a result of Defendants' acts and omissions, Plaintiffs' and the Class Members' properties are unmarketable and their health is at risk due to contamination from the carcinogenic Site Contaminants. Therefore, a substantial financial loss, combined with whatever health risks and consternation Plaintiffs and Class Members have suffered due to the possible contamination of their properties with carcinogens have caused and continue to cause Plaintiffs and Class Members physical discomfort.

112.   In the alternative, Defendants' disposal of and/or failure to remove lead, arsenic and other Site Contaminants from residential areas violates applicable standards and/or regulations, which constitutes a nuisance *per se*.

113.   Defendants knew that the invasion of contaminants onto Plaintiffs' and the Class Members' properties was substantially certain to result from their actions and/or omissions. Yet Defendants knowingly hid the ultrahazardous conditions caused by the Site Contaminants that are harmful to Plaintiffs and the Class Members.

114.   This interference with Plaintiffs' and the Class Members' use and enjoyment of their property is substantial, unreasonable, unwarranted and unlawful.

115.   As a result of Defendants' wrongful acts and omissions, Plaintiffs and the Class Members have suffered exposure to hazardous substances, annoyance, inconvenience, discomfort, displacement, fear of adverse health effects and economic loss for which monetary damages and medical monitoring are justified as remedies.

116.   Medical monitoring is justified as a remedy for nuisance in this case because: (a) Plaintiffs and Class Members have been significantly exposed to proven hazardous substances through the negligent actions of Defendants; (b) As a proximate result of exposure, Plaintiffs and Class Members suffer a significantly increased risk of contracting a serious latent disease such as

various forms of cancer; (c) This increased risk makes periodic diagnostic medical examinations reasonably necessary; and (d) Monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial.

117.  Defendants are jointly and severally liable to Plaintiffs and the members of the Classes for their acts and/or omissions.

118.  The nuisance that Defendants created is a continuing nuisance in that it has continued and remains unabated.

119.  Separate and apart from acting negligently, at all relevant times the Defendants caused injury and damages to the Plaintiffs, the Classes and/or their property through acts and omissions actuated by actual malice and/or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by such acts or omissions.

120.  Defendants, despite their knowledge of the serious health and environmental effects associated with exposure to the Site Contaminants, individually and together, released, discharged, stored, handled, processed, disposed, emitted and failed to properly investigate and remediate said contaminants from the surrounding environment, while failing to warn residents of the dangers of such contaminants.

121.  Defendants, despite their knowledge of the serious health and environmental effects associated with exposure to such contaminants, and despite orders from health and environmental regulators, masked the true extent of contamination, thereby enabling the Defendants to avoid taking all appropriate steps to properly remediate the Site Contaminants, or to mitigate dangers created by their release, emissions and discharge, in the Class Areas.

122.  Defendants, despite their knowledge of the serious health and environmental effects associated with exposure to the Site Contaminants, and despite orders and warnings from health and environmental regulators, failed to properly remediate such contamination in Franklin.

**WHEREFORE**, Plaintiffs demand judgment against Defendants individually, jointly, and severally, for compensatory damages, the implementation of a medical testing and monitoring program for those exposed to toxic and/or hazardous substances, the implementation of a property inspection and remediation program, punitive damages, interest, costs of suit as provided for by law, and such other relief as the Court may deem just and proper.

## COUNT 2: Strict Liability

123.  Defendants, by generating, discharging, releasing, emitting and dispersing Site Contaminants into the Class Areas and by failing to properly remediate and allowing those contaminants and pollutants to remain in the environment, and/or concealing knowledge of same, have engaged in abnormally dangerous, ultrahazardous, and inherently or intrinsically dangerous activities for which they are strictly liable to the Plaintiffs and the Class Members.

124.  Defendants' activities pose a high degree of risk of harm to Plaintiffs and the Class Members. The likelihood that the harm that results from the Defendants' activities will be great is based on the fact that the contaminants released into the Class Area from Defendants' Site contain highly toxic and carcinogenic Site Contaminants; that these contaminants present serious health risks; and that Defendants' acts and omissions continue to cause contamination in the groundwater, soil, and air at levels higher than acceptable limits.

125.  The risks posed by Defendants' release and failure to properly investigate, delineate and remediate Site Contaminants in a residential area could not be eliminated by the exercise of reasonable care and no safe way exists to dispose of toxic waste by simply dumping it into the

ground, water, and city wastewater sewers of a residential area. The serious health and environmental risks posed by the Site Contaminants that Defendants disposed of in residential area clearly could not have been eliminated by the exercise of reasonable care on the part of Defendants.

126. Defendants' release, and failure to properly investigate, delineate, remediate and warn Plaintiffs and the Class Members about the Site Contaminants in the Class Areas was neither a matter of common usage nor appropriate to the place where it was carried out.  Defendants knowingly hid the ultrahazardous conditions caused by the Site Contaminants that are harmful to Plaintiffs and the Class Members.

127. The discharge of dangerous toxic waste into the environment is a critical societal problem in Indiana, and thus, the value of Defendants' activities, if any, is substantially outweighed by the serious health and environmental problems caused by them.

128. As a direct and proximate result of Defendants' misconduct as set forth herein, Plaintiffs and the Class Members have suffered and continue to suffer enhanced risk of future personal injury; economic losses, such as costs of medical monitoring; the loss of value to their property; and other damages as set forth herein.

129. Defendants are jointly and severally liable to Plaintiffs and the Class Members for their acts and/or omissions.

130. Separate and apart from acting negligently, at all relevant times the Defendants caused injury and damages to the Plaintiffs and/or their property through acts and omissions actuated by actual malice and/or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by such acts or omissions.

131. Defendants, despite their knowledge of the serious health and environmental effects associated with exposure to the Site Contaminants, individually and together, released, discharged,

stored, handled, processed, disposed, emitted and failed to properly investigate and remediate said contaminants from the surrounding environment, while failing to warn residents of the dangers of such contaminants.

132.  Defendants, despite their knowledge of the serious health and environmental effects associated with exposure to the Site Contaminants, and despite orders from health and environmental regulators, masked the true extent of contamination, thereby enabling the Defendants to avoid taking all appropriate steps to properly remediate the Site Contaminants, or to mitigate dangers created by their release, emissions and discharge, in the Class Areas.

133.  Defendants, despite their knowledge of the serious health and environmental effects associated with exposure to the Site Contaminants, and despite orders and warnings from health and environmental regulators, failed to properly remediate such contamination in Franklin.

**WHEREFORE**, Plaintiffs demand judgment against Defendants individually, jointly, and severally, for compensatory damages, the implementation of a medical testing and monitoring program for those exposed to toxic and/or hazardous substances, the implementation of a property inspection and remediation program, punitive damages, interest, costs of suit as provided for by law, and such other relief as the Court may deem just and proper.

## COUNT 3: Battery

134.  Defendants, by intentionally generating, discharging, releasing, transporting, disposing, emitting, failing to properly remediate and allowing the discharge of hazardous and toxic substances, and/or concealing knowledge of same, intentionally and willfully caused a direct, harmful and/or offensive contact with Plaintiffs and the Class Members and thereby committed battery upon the Plaintiffs and the Class Members.

135. A. s a direct and proximate result of Defendants' misconduct as set forth herein, Plaintiffs and the Class Members have suffered and continue to suffer enhanced risk of future personal injury and serious latent disease; economic losses, such as costs of medical monitoring and the loss of value to their property and other damages.

136. Defendants are jointly and severally liable to Plaintiffs and the Class Members for their acts and/or omissions.

137. Separate and apart from acting negligently, at all relevant times the Defendants caused injury and damages to the Plaintiffs and/or their property through acts and omissions actuated by actual malice and/or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by such acts or omissions.

138. Defendants, despite their knowledge of the serious health and environmental effects associated with exposure to the Site Contaminants, individually and together, released, discharged, stored, handled, processed, disposed, emitted and failed to properly investigate and remediate said contaminants from the surrounding environment, while failing to warn residents of the dangers of such contaminants.

139. Defendants, despite their knowledge of the serious health and environmental effects associated with exposure to the Site Contaminants, and despite orders from health and environmental regulators, masked the true extent of contamination, thereby enabling the Defendants to avoid taking all appropriate steps to properly remediate the Site Contaminants, or to mitigate dangers created by their release, emissions and discharge, in the Class Areas.

140. Defendants, despite their knowledge of the serious health and environmental effects associated with exposure to the Site Contaminants, and despite orders and warnings from health and environmental regulators, failed to properly remediate such contamination in Franklin.

**WHEREFORE**, Plaintiffs demand judgment against Defendants individually, jointly, and severally, for compensatory damages, the implementation of a medical testing and monitoring program for those exposed to toxic and/or hazardous substances, the implementation of a property inspection and remediation program, punitive damages, interest, costs of suit as provided for by law, and such other relief as the Court may deem just and proper.

### COUNT 4: Negligence and Gross Negligence

141. Defendants, at all times material hereto, acted through their respective officers, employees, and agents, who in turn acted in the scope of their authority and employment in furtherance of the business of Defendants.

142. Defendants owed a duty to use reasonable and ordinary care in: (a) conducting their operations in a proper and safe manner, (b) disposing of their toxic waste, including the Site Contaminants, resulting from their operations in a proper and safe manner, (c) training and supervising their employees regarding the proper disposal of toxic waste, including the Site Contaminants, (d) warning those living in the Class Area of any discharges of toxic waste, including the Site Contaminants, that could migrate off site and impact the Class Area, and (e) properly remediating and cleaning up any and all material discharges of toxic waste, including the Site Contaminants, in a timely and adequate manner.

143. Defendants failed to exercise their duty of care by: (a) failing to conduct their operations in a proper and safe manner, (b) failing to dispose of their toxic waste, including the Site Contaminants, resulting from their operations in a proper and safe manner, (c) failing to adequately train and supervise their employees regarding the proper disposal of toxic waste, including the Site Contaminants, (d) failing to warn those living in the Class Area of any discharges of toxic waste, including the Site Contaminants, that could migrate off site and impact the Class

Area, and (e) failing to properly remediate and clean up any and all material discharges of toxic waste, including the Site Contaminants, in a timely and adequate manner.

144.   Defendants' acts and omissions, as set forth herein, directly and proximately caused Plaintiffs and the Class Members significant and continuing injuries and damages, including suffering enhanced risk of future personal injury and serious latent illness; economic losses, such as costs of medical monitoring, loss of use and enjoyment of their property; annoyance, anxiety, discomfort and inconvenience; and the loss of value to their property and other monetary damages.

145.   At all relevant times, Defendants failed to safely sample for, identify and properly remove and dispose the Site Contaminants, and failed to advise or warn Plaintiffs and the Class Members of the dangers emanating from the discharge of hazardous and toxic substances into the soil, air, dust and surrounding environment.

146.   Defendants failed to use reasonable care to safeguard those residing in the Class Areas from injury or property damage. In addition, Defendants knowingly hid the ultrahazardous conditions caused by the Site Contaminants that are harmful to Plaintiffs and the Class Members.

147.   Defendants are jointly and severally liable to Plaintiffs and the Class members for their acts and/or omissions.

148.   Alternatively, separate and apart from acting negligently by merely failing to exercise their duty of ordinary care, Defendants are also liable for gross negligence because they breached their duty of care by engaging in conscious, voluntary acts or omissions in reckless disregard of the consequences to the Plaintiffs and Class Members.

149.   Defendants, despite their knowledge of the serious health and environmental effects associated with exposure to the Site Contaminants, individually and together, released, discharged, stored, handled, processed, disposed, emitted and failed to properly investigate and remediate said

35

contaminants from the surrounding environment, while failing to warn residents of the dangers of such contaminants.

150.  Defendants, despite their knowledge of the serious health and environmental effects associated with exposure to the Site Contaminants, and despite orders from health and environmental regulators, masked the true extent of contamination, thereby enabling the Defendants to avoid taking all appropriate steps to properly remediate the Site Contaminants, or to mitigate dangers created by their release, emissions and discharge, in the Class Areas.

151.  Defendants, despite their knowledge of the serious health and environmental effects associated with exposure to the Site Contaminants, and despite orders and warnings from health and environmental regulators, failed to properly remediate such contamination in Franklin.

**WHEREFORE**, Plaintiffs demand judgment against Defendants individually, jointly, and severally, for compensatory damages, the implementation of a medical testing and monitoring program for those exposed to toxic and/or hazardous substances, the implementation of a property inspection and remediation program, punitive damages, interest, costs of suit as provided for by law, and such other relief as the Court may deem just and proper.

### LIMITATIONS DOES NOT BAR ANY OF THE CLASS MEMBERS' CLAIMS:
### Discovery Rule, Common Law Fraudulent Concealment, Statutory Fraudulent Concealment, and Equitable Estoppel

152.  As a result of the acts and omissions of Defendants and various public officials and health and environmental regulators, under Indiana's discovery rule, Plaintiffs and Class Members could not have reasonably known or have learned through the exercise of reasonable diligence that Plaintiffs' and the Class Member's properties were contaminated with the Site Contaminants, thereby causing injury to their persons and property. Thus, the applicable limitations periods did not begin to accrue until Plaintiffs and Class Members actually discovered, or through the exercise

36

of reasonable diligence should have discovered, Defendants' tortious acts and omissions.

153.  In addition, Defendants are estopped from asserting the statute of limitations as a defense under the equitable doctrine of fraudulent concealment. Under Indiana law, the doctrine of fraudulent concealment is available to plaintiffs to estop a defendant from asserting the statute of limitations when the defendant has, either by deception or by a violation of duty, concealed material facts thereby preventing the plaintiffs from discovering a potential cause of action. When this occurs, equity will toll the statute of limitations until the equitable grounds cease to operate as a reason for delay. Here, at various times, each respective Defendant either engaged in unlawful discharges of the Site Contaminants and/or learned of the hazardous conditions posed by the Site Contaminants in and around the Class Area, yet at no time did any of the Defendants warn or otherwise provide notice to the Class Members. Regarding the Former Amphenol Site, Amphenol (through its predecessor Bendix Corp.) directly engaged in unlawful discharges of Site Contaminants from 1963 to 1983. By the time that Franklin Power Products purchased the Former Amphenol Site in 1989, it, as well as various federal, state, and local government agencies, knew full well of the unlawful discharges of Site Contaminants into the environment and that the groundwater in and around the Class Area had been contaminated. Similarly, regarding the Former Franklin Power Products Site, from 1985 to 2006, Franklin Power Products employees directly engaged in unlawful discharges of Site Contaminants.  By the time that 400 Forsythe purchased the Former Franklin Power Products Site in 2006, it knew full well, through various Environmental Site Assessments, of the unlawful discharges of Site Contaminants into the environment and that the groundwater in and around the Class Area had been contaminated. Yet, with respect to both sites, no one alerted the public or the Class Members. By every reasonable measure, Defendants, all sophisticated parties with high paid environmental consultants, had much superior knowledge

regarding the contamination in and around the Class Area than the public or Class Members. Defendants' acts and omissions have prevented the Plaintiffs and Class Members from obtaining the knowledge necessary to pursue their claims.

154. Similarly, the Indiana Fraudulent Concealment Act provides: "If a person liable to an action conceals the fact from the knowledge of the person entitled to bring the action, the action may be brought at any time within the period of limitation after the discovery of the cause of action." Ind. Code § 34–11–5–1. Thus, when a plaintiff establishes the applicability of this provision, it effectively moves the date on which the statute of limitation begins to run forward from the date of the alleged tort to the discovery date. Here, at various times, each respective Defendant either engaged in unlawful discharges of the Site Contaminants and/or learned of the hazardous conditions posed by the Site Contaminants in and around the Class Area, yet at no time did any of the Defendants warn or otherwise provide notice to the Class Members. Regarding the Former Amphenol Site, Amphenol (through its predecessor Bendix Corp.) directly engaged in unlawful discharges of Site Contaminants from 1963 to 1983. By the time that Franklin Power Products purchased the Former Amphenol Site in 1989, it, as well as various federal, state, and local government agencies, knew full well of the unlawful discharges of Site Contaminants into the environment and that the groundwater in and around the Class Area had been contaminated. Similarly, regarding the Former Franklin Power Products Site, from 1985 to 2006, Franklin Power Products employees directly engaged in unlawful discharges of Site Contaminants. By the time that 400 Forsythe purchased the Former Franklin Power Products Site in 2006, it knew full well, through various Environmental Site Assessments, of the unlawful discharges of Site Contaminants into the environment and that the groundwater in and around the Class Area had been contaminated. Yet, with respect to both sites, no one alerted the public or the Class Members. By

every reasonable measure, Defendants, all sophisticated parties with high paid environmental consultants, had much superior knowledge regarding the contamination in and around the Class Area than the public or Class Members. Defendants' acts and omissions have prevented the Plaintiffs and Class Members from obtaining the knowledge necessary to pursue their claims.

155.   Further, Indiana law also allows for tolling a period of limitations under the doctrine of equitable estoppel, which can apply to conduct apart from a defendant's fraudulent concealment that lulls a plaintiff into inaction, such that it prevents inquiry, eludes investigation, or misleads and hinders.  Under the facts and circumstances of this case, the limitations period should be tolled under the equitable estoppel doctrine because the acts and omissions of Defendants and various public officials and health and environmental regulators lulled Plaintiffs and Class Members into action, prevented and hindered them from conducting an inquiry, and otherwise mislead them regarding the facts of this case. Indeed, it was not until an alarming and tragic pattern of at least 58 cases childhood in and around Franklin led to the creation of the If It Was Your Child Group, who pressured the EPA into investigating the causes of these cancers. In response, the EPA ordered that Amphenol conduct new testing to determine the current extent of the contamination. It was only after the EPA revealed the results of this new testing to Plaintiffs and Class Members that they first learned of the extensive contamination in and around the Class Area, including through the groundwater, soil, outdoor air, indoor air, soil gas, sewer bedding gas, and sewer VOC gas. But even as the EPA finally revealed, after decades of silence and inaction, the existence of the contamination to Plaintiffs and Class Members, it proceeded to mislead Plaintiffs, Class Members, and the public by, among other things, falsely representing that the plume containing the Site Contaminants was "under control" when, in fact, the agency was still testing to determine the extent of the toxins and how they should be fixed. That the EPA has repeatedly downplayed the

risks of the Site Contaminants to the public is not merely an allegation made by Plaintiffs – it is the conclusion of the EPA's Office of the Inspector General, which issued an urgent letter to the EPA criticizing the agency that "EPA's communication of inaccurate and outdated human health exposure and groundwater migration information for the Amphenol site may impact human health" and that the "OIG is issuing this report because the EPA should convey the most accurate, reliable and up-to-date information on matters related to public health."

156.   Nevertheless, and even after the OIG's conclusions that it was misleading the public, the EPA has continued to downplay the extent and risk of the contamination and the efficacy of Amphenol's remediation efforts. For example, while the EPA repeatedly extolls the virtues of the pump and treat system and the millions and millions of gallons of water that have been processed, the actual facts indicate that the pump and treat system is antiquated technology that has wholly failed to remediate the TCE and PCE groundwater plume despite operating for decades. Yet EPA informed the public that its intent is to continue to operate the completely ineffective pump and treat system for "decades to come."

157. In addition to the Defendants and EPA failing to warn and actively concealing the extent and dangers of the contamination made the basis of this lawsuit, the Johnson County Health Department, the Indiana American Water Corporation, and Indiana Department of Natural Resources also knew of the groundwater contamination in and around the Class Area and wholly failed to warn the public.

## JURY TRIAL DEMAND AND PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and the members of the Classes hereby demand a trial by jury and request that the Court enter an order or judgment against Defendant as follows:

A. Enter an Order pursuant to Federal Rule of Civil Procedure 23 permitting this action to be maintained as a class action, appointing Plaintiffs as the representatives of the Classes and Plaintiffs' counsel as counsel for the Classes;

B. Enter an Order requiring the Defendants to bear the costs of medical monitoring, including, but not limited to, testing, examination, preventative and diagnostic screening for conditions that can result from, or potentially result from, exposure to lead, arsenic and other Site Contaminants;

C. Enter an Order requiring the Defendants to bear the costs of a property inspection and remediation program, including, but not limited to, testing, examination, and remediation of the Site Contaminants;

D. Enter an Order requiring the Defendants to bear the cost of publication to Plaintiffs and Class Members of approved guidelines and procedures for medical screening and monitoring of Plaintiffs and Class Members, the content, form and manner of such publication to be approved by the Court;

E. Enter judgment in favor of Plaintiffs and Class Members against Defendants for costs incurred in medical monitoring, loss of property value and for all other relief, in an amount to be proven at trial, as to which they may be entitled, including interest, expert fees and costs of this suit;

F. Award prejudgment and post-judgment interest as provided by law;

G. Award punitive damages; and

H. Such other relief as this Court deems necessary, just and proper.

Dated: <u>December 3, 2019</u>            Respectfully Submitted:

HOVDE DASSOW & DEETS, LLC

By:   <u>*s/Robert T. Dassow*</u>
Robert T. Dassow, #15145-64
10201 N. Illinois Street, Suite 500
Indianapolis, IN 46290
Telephone: (317) 818-3100
Facsimile: (317) 818-3111


*OF COUNSEL:*

Chris Gadoury
The Lanier Law Firm
10940 W. Sam Houston Pkwy N.
Houston, TX 77064
(Tel) 713.659.5200
(Fax) 713.659.2204
*(pro hac vice to be filed)*


Chris Nidel
Nidel & Nace, PLLC
2201 Wisconsin Ave., NW
Suite 200
Washington, DC 20007
(Tel):  (202)780-5153
*(pro hac vice to be filed)*