**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| FRANCES DENNEY on behalf of themselves and all others similarly situated, ARTHUR TERHUNE on behalf of themselves and all others similarly situated, MCKENZIE NEWBY on behalf of themselves and all others similarly situated,[1] <br><br> Plaintiffs, <br><br> v. <br><br> AMPHENOL CORP., BORGWARNER, INC., BORGWARNER PDS (PERU), INC. f/k/a FRANKLIN POWER PRODUCTS, INC., HONEYWELL INTERNATIONAL, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| BORGWARNER PDS (PERU), INC., <br><br> Cross Claimant, <br><br> v. <br><br> AMPHENOL CORP., <br><br> Cross Defendant. | ) ) ) ) ) ) ) ) ) ) |

Case No. 1:19-cv-04757-TWP-MKK

<u>**ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**</u>

 This matter is before the Court on Plaintiffs Frances Denney's and Arthur Terhune's (collectively, "Plaintiffs") Motion for Class Certification filed pursuant to Federal Rule of Civil Procedure ("Rule") 23(b)(2) and 23(b)(3) (Filing No. 268). Plaintiffs initiated this environmental

---

[1] Although Plaintiff McKenzie Newby appears in the caption of this case, Plaintiffs' Motion for Class Certification and briefing never mentions McKenzie Newby and, as such, the Court assumes Plaintiffs no longer intend for McKenzie Newby to serve as a class representative in this proposed class action (Filing No. 268; Filing No. 320; Filing No. 321). This finding is immaterial to the Court's ultimate determination.

class action suit against Defendants Amphenol Corporation ("Amphenol"); BorgWarner, Inc. ("BorgWarner"); BorgWarner PDS (PERU), Inc. f/k/a Franklin Power Products, Inc. ("Franklin Power"); and Honeywell International, Inc., ("Honeywell") (collectively, "Defendants") ([Filing No. 143](#)). Plaintiffs allege their properties have been exposed to toxic and hazardous substances released because of Defendants' conduct associated with their ownership and operations of a manufacturing facility located in Franklin, Indiana. *Id.* Defendants contend Plaintiffs cannot satisfy the prerequisite requirements of Rule 23(a) and, even if they could, Plaintiffs cannot satisfy the predominance or superiority requirements of Rule 23(b)(3), nor are they entitled to injunctive relief pursuant to Rule 23(b)(2) ([Filing No. 296](#); [Filing No. 298](#)).  For the reasons explained below, Plaintiffs' Motion for Class Certification is **denied**.

## I.      FACTUAL BACKGROUND

From 1963 to present, the various Defendants owned the manufacturing facility at 980 Hurricane Road ("the Former Amphenol Site") and at 400 North Forsythe Street, ("the Former Franklin Power Products Site") (collectively "the Sites"), in the town of Franklin, Johnson County, Indiana. This class action is one of three lawsuits[2] filed by Plaintiffs' lawyers against the Defendants alleging similar harms caused by Defendants' processing, releasing, and failing to adequately investigate and remediate the Sites' alleged hazardous and toxic chemical emissions. The Court takes judicial notice of the other litigations.

---

[2] One of the state court actions was filed on the same day this case was initiated. The Plaintiffs alleged similar claims, with the addition of a wrongful death claim, against the Defendants. *See* Cause No. 49D02-1912-CT-050268, styled *Bromley, et al. v. Amphenol Corp., et al.* Soon after, another state court action with the same claims was filed against the Defendants. *See* Cause No. 49D06-2010-CT-037131, styled *Shank, et al. v. Amphenol Corp., et al*. As explained in *Opoka v. Immigration and Naturalization Service*, a court may generally take judicial notice of another court or agency's decision or of a document filed in another matter only for the limited purpose of recognizing the fact of such litigation or judicial act, not for the truth of the matters asserted in the other litigation. 94 F.3d 392, 395 (7th Cir. 1996).

A.      **The Sites' Ownership History**

From 1963 to 1983, the Bendix Corporation ("Bendix") owned the land and manufactured various electrical, automotive, and aviation components on the Former Amphenol Site (Filing No 143 at ¶¶ 55, 58). In 1983, Bendix ceased operation at the Former Amphenol Site and later merged with Allied Corporation ("Allied") ([Filing No. 241 at 3](#)). Allied "assumed all of the liabilities and obligations of Bendix." *Id*. (citing [Filing No. 166 at 2](#)). Allied then entered a "Subscription Agreement with Amphenol …, a subsidiary of Allied, whereby Amphenol assumed all liabilities and obligations of Bendix." *Id*.  In June 1987, Allied sold Amphenol to LPL Investment Group and, as a part of the transaction, Allied agreed to indemnify Amphenol for pre-existing environmental liabilities, including those related to the Former Amphenol Site. *Id*.  Allied would later merge into Allied-Signal, Inc. whereby Allied-Signal expressly "assume[d] all the liabilities and obligations of . . . Allied." *Id*. (citing [Filing No. 166 at 3](#).)  "Amphenol later sold the Former [Amphenol] Site to Franklin Power Products on June 15, 1989." *Id*. (citing [Filing No. 143 at 19](#).) BorgWarner is the parent corporation of Franklin Power ([Filing No. 29](#)).  In 1999, Allied-Signal, Inc. was acquired by Honeywell ([Filing No. 241 at 3](#)) (citing [Filing No. 160 at 7](#)).

B.      **The Contaminants**

From 1961 to 1983, during Bendix's ownership, significant hazardous volatile organic compound ("VOC") was "discharged into the soil, air, sewer system, and groundwater in and around the Former Amphenol Site and flowed through the environment such that Plaintiffs, Class Members, and their properties in Franklin were, and continue to be, exposed to toxic and hazardous materials from Defendants' Sites." ([Filing No. 143 at ¶ 4](#).)[3]  Defendants' conduct, "created numerous pathways for the Site Contaminants to enter Plaintiffs' and the Class Members'

---

[3] "Groundwater is not used for drinking water purposes in this area of Franklin." ([Filing No. 298-1 at 11](#).)

properties, including through the groundwater, soil, outdoor air, indoor air, soil gas, sewer pipes, sewer bedding gas, and sewer VOC gas." *Id.* The wastewater discharge from the Sites consisted of both tetrachloroethylene ("PCE") and trichloroethylene ("TCE"). *Id.* at ¶¶ 3, 71. As PCE degrades and loses one chlorine molecule, it becomes TCE. As TCE loses chlorine molecules, it becomes cis-1,2 dichloroethene ("DCE") (two chlorines).[4] These contaminants "include multiple substances that are known carcinogens." (Filing No. 143 at ¶ 3.)

The wastewater flowed within the sanitary sewer line through the residential area and leaked from "cracks in that system and reaching homes far from the site by utilizing this direct path to thousands of homes in Franklin as well as the indirect pathway through cracks in the system that have created remote sources for soil and water contamination as well as vapor intrusion into homes." *Id.* at ¶ 11. This condition was "amplified by numerous rain events including record flooding that occurred, including, but not limited to, that which occurred in 2005 and 2008, which served to redistribute pockets of contamination both up and downstream within the system." *Id.* at ¶ 14.

## C.    Initial Remediation Efforts

The Sites and the nearby residential community are the subject of two U.S. Environmental Protection Agency ("EPA") consent orders concerning Defendants' alleged contamination and the related cleanup. (Filing No. 298-1).[5] On November 27, 1990, Amphenol and Franklin Power

---

[4] For purposes of the Motion for Class Certification, Plaintiffs identified the following chemicals: PCE, TCE, and 1,2-dichloroethane ("DCA") (Filing No. 268 at 10). Defendants claim that DCA is not a breakdown product of PCE or TCE, rather the correct breakdown product is "1,2-dichloroethylene ("DCE") (Filing No. 298 at 16, fn. 2). Although Plaintiffs have not responded to this contention, the Court agrees with Defendants. *See Schmucker v. Johnson Controls, Inc.*, 447 F.Supp.3d 791, 796 (N.D. Ind. 2020) (noting that "[a]s TCE loses chlorine molecules, it becomes cis-1,2 dichloroethene (DCE) (two chlorines)".

[5] *See* Filing No. 268 at 10 (citing Franklin Power Prods., Inc., IND 044 587 848 E.P.A. (1990); Franklin Power Prods. Inc., R8H-5-99-002 EPA (1998)).

voluntarily entered a consent order with the EPA that was later amended in 1998 ("Consent Orders") (Filing No. 143 at ¶¶ 26, 70).  Under the EPA's Consent Orders, Amphenol, along with Franklin Power, was required to submit a remedial investigation and plan for corrective measures. *Id*. at ¶ 70. In the interim, Amphenol and Franklin Power were required to install "an on-Site groundwater recovery system, commonly referred to as a pump and treat system…." (Filing No. 298-1 at 9.) "The system maintains an inward groundwater gradient to keep the contaminated plume within the Site boundaries and treats the captured contaminated groundwater." *Id*. at 8.

As a final remedy and, as part of the of the 1998 amendment, the EPA Administrator signed an Interim Final Remedy for the Facility which prescribed corrective measures including,

- Continued operation and upgrading of on-site groundwater recovery system[;]
- Implementation of an air sparge/soil vapor extraction system[;]
- A monitoring system to evaluate the results of the corrective measures[; and]
- Investigation of possible contaminant migration from the Facility to a public water supply well field, and appropriate corrective action if such contaminant migration is confirmed[.]

(Filing No. 143 at ¶ 74).

> Although an air sparging and groundwater treatment system was installed at the Former Amphenol [Site]…the system unfortunately did not initially include treatment of the air used to strip hazardous VOCs from the water, and thus those VOCs were simply emitted into the atmosphere providing another pathway by which to assault the local community.

(Filing No. 143 at ¶ 75.)

## D.   **Recent Remediation Efforts**

Some years later, in 2018, after community members renewed concerns, the EPA "evaluate[d] whether the previously selected remedy was protective of human health and the environment based on updated vapor intrusion guidance and changes in volatile chemicals toxicity." (Filing No. 298-1 at 8.) The EPA determined "that residual contamination along the sanitary sewer lines and in groundwater could pose a vapor intrusion risk to the adjacent residential

community." *Id*. at 10. As a result, the "EPA required that Amphenol perform several investigations to evaluate current conditions, including indoor air evaluation of homes, and to address human health risks and conduct interim cleanup measures, as needed to protect human health." *Id*. Between September 2018 and August 2020,

> Amphenol performed indoor air testing in homes and in the on-Site building as well as testing residential plumbing systems for integrity. Amphenol performed intervention or mitigation measures where data indicated vapor entry or when the building structure presented a potential for vapor entry. Concurrently, Amphenol investigated groundwater, soil, soil vapor and sewer vapor conditions.

([Filing No. 298-1 at 11](.).)

In 2019, "Amphenol dug out the old sanitary sewer line and surrounding 341 tons of contaminated soils for off-site disposal (while mobilized for the off-Site Sewer and Soil Interim Measure)." ([Filing No. 298-1 at 25](.).)  Amphenol installed vapor remediation systems in homes and replaced portions of the sanitary sewer line.  ([Filing No. 298-1 at 18](.).)  The EPA identified forty-two (42) homes for indoor air testing.  *Id*.  Amphenol performed indoor air testing at thirty-seven (37) homes and were not granted access to the other five (5) homes ([Filing No. 298 at 17](); [Filing No. 298-1 at 18-19]()).  Amphenol repaired the "plumbing systems in nine homes," and installed sub-slab depressurization systems "[i]n seven homes where soil gas and or indoor air exceeded screening levels…." ([Filing No. 298-1 at 19](); [Filing No. 298-1 at 25]()).   The sub-slab depressurization systems "captured and vented vapors trapped beneath the slab to assure the vapors did not enter the home." ([Filing No. 298-1 at 19](.).)

By 2020, "all potential soil vapor exposure pathways have been mitigated to prevent exposure to VOCs into residential structures above the [Indiana Department of Environmental Management ("IDEM")] Residential Indoor Air Screening Levels."  ([Filing No. 298-1 at 11](.).)  As a result, the EPA concluded the,

Site['s] conditions do not pose a human health risk for residents within the Study Area that provided EPA access for indoor air sampling. Additionally, the sanitary sewer system has been replaced or lined on portions of Hamilton Avenue, Forsythe Street, Ross Court, and Glendale Drive to reduce the potential for vapor intrusion into the sanitary sewer system (which could result in potential exposure to VOCs through leaky residential plumbing systems). All tested residential plumbing systems which exhibited vapor leaks were repaired during residential vapor intrusion investigation activities.

(Filing No. 298-1 at 11.)

E.   **This Class Action**

On December 3, 2019, Plaintiffs initiated this proposed class action against Defendants BorgWarner, Franklin Power, Amphenol, and 400 Forsythe, LLC (Filing No. 1). They alleged that toxic and hazardous waste from the Sites migrated into their groundwater, the sewer lines, and nearby residential neighborhoods. *Id*. This condition has interfered with the use and enjoyment of their properties and diminished their properties' values. *Id*. Thus, Plaintiffs brought the following claims against the Defendants: private nuisance (Count I); strict liability (Count II); battery (Count III);[6] and negligence or gross negligence (Count IV). *Id*. at ¶¶ 106-151. In July 2021, Plaintiffs amended their complaint by adding Honeywell as a defendant. (Filing No. 143.) In the Amended Complaint, Plaintiffs allege that Honeywell, like the other named Defendants, created a private nuisance, is strictly liable for exposing potential class members to hazardous materials, committed battery, and was negligent or grossly negligent in its handling of the wastewater (Filing No. 143). *Id*. On December 12, 2022, Plaintiffs moved for certification of its class, the Defendants filed their respective responses, and Plaintiffs filed their respective replies (Filing No. 268; Filing No. 296; Filing No. 298; Filing No. 320; Filing No. 321).

---

[6] The Court notes that while Plaintiffs initially pled a claim for battery and purported to allege facts to support a medical monitoring claim, they are not moving to certify those claims (Filing No. 268 at fn. 1).

On March 3, 2023, the Plaintiffs and defendant 400 Forsythe, LLC filed a Joint Motion for Dismissal with Prejudice (Filing No. 309), which the Court granted on March 6, 2023 (Filing No. 310 at 2) (concluding that "Plaintiffs' claims against Defendant 400 Forsythe, LLC are hereby dismissed with prejudice and each party shall bear its own costs.").

F.   <u>**Pending Motions**</u>

Also before the Court are Defendants' Motions to Strike[7] and Exclude Dr. W. Richard Laton's ("Dr. Laton") expert opinions (Filing No. 297; Filing No. 299; Filing No. 333); Plaintiffs' Motion to Strike Defendants Amphenol's and Honeywell's Joint Notice of New Additional Evidence (Filing No. 354); Plaintiffs' Motion for Leave to Supplement its Motion for Class Certification based on the same new evidence (Filing No. 359); Defendants BorgWarner's and Franklin Power's Motion for Leave to Supplement its Response to Plaintiffs' Motion for Class Certification based on the same new evidence (Filing No. 366); and Defendants Amphenol's and Honeywell's Motion for Leave to Supplement based on the same new evidence (Filing No. 368). For the reasons stated below, the Court **denies** Defendants' Motions to Strike and Motion to Exclude **as moot**; **denies** Plaintiffs' Motion to Strike Amphenol's and Honeywell's Joint Notice of New Additional Evidence; **grants** Plaintiffs' Motion for Leave to Supplement; **grants** Defendants BorgWarner's and Franklin Power's Motion for Leave to Supplement; and **grants** Defendants Amphenol's and Honeywell's Motion for Leave to Supplement.

## II.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 23 governs class action lawsuits.  To certify a class, plaintiffs must first satisfy the four prerequisite requirements of Rule 23(a): numerosity,

---

[7] Although BorgWarner styles both of its Motions (Filing No. 299; Filing No. 333) as "Motions to Strike," they all seek to exclude Dr. Laton's expert opinions pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

commonality, typicality, and adequacy. Fed. R. Civ. P. 24(a)(1)-(4).  Before evaluating the Rule 23 requirements, the court must first determine whether the class is identifiable. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006).  A class is identifiable if class membership can be readily determined by reference to objective criteria. *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 496 (7th Cir. 2012).  If successful in that regard, plaintiffs must overcome the final hurdle by showing that the circumstances of their case fit one of the three "types" of class actions which Rule 23(b) defines.  Here, Plaintiffs are moving pursuant to Rule 23(b)(2) and 23(b)(3).

A Rule 23(b)(2) class action does not require giving class members notice of the suit and a chance to opt out of it and bring their own, individual suits; a Rule 23(b)(3) class action does. The thinking behind this distinction is that declaratory or injunctive relief will usually have the same effect on all the members of the class as individual suits would.  *Lemon v. International Union of Operating Engineers, Local No. 139*, 216 F.3d 577, 580 (7th Cir. 2000).  Rule 23(b)(2) permits the court to certify a case for class-action treatment if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

Where certification is sought under Rule 23(b)(3), the plaintiffs must show that questions of law or fact common to the members of the proposed class predominate over any questions affecting only individual class members and that a class action is the superior method of resolving the controversy.  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). A party seeking class certification bears the burden of demonstrating that certification is

appropriate by a preponderance of the evidence. *Id*. The determination of whether to certify a proposed class is within the broad discretion of the district court. *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 596 (7th Cir. 1993). While consideration of class certification is not "a dress rehearsal for trial on the merits," the court "must receive evidence and resolve the disputes before deciding whether to certify the class." *Messner*, 669 F.3d at 811 (quoting *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)).

### III.   DISCUSSION

Plaintiffs allege the Defendants' failure to properly control and remediate contaminants at its Sites caused financial, health, and community damages. They move to certify an injunctive relief class pursuant to Rule 23(b)(2) and a damages class under Rule 23(b)(3). Defendants generally deny these allegations and argue that Plaintiffs cannot satisfy Rule 23(a), nor either Rule 23(b)(2) or 23(b)(3). The parties' arguments are addressed below.

### A.   Class Definitions

Plaintiffs seek to certify two geographical classes situated in two separate areas of Franklin. (1) the Glendale Class Area consisting of 69 residences ("Glendale Class" or "GCA") define the defined as: Current residents of Indiana who, on or after the date of the filing of this Complaint, own or owned any real property identified as residential property located within the following area (outlined in red):



(Filing No. 268 at 15-16); and (2) Plaintiffs define the Sewer Class Area ("Sewer Class" or "SCA")

consisting of 794 residences defined as: Current residents of Indiana who, on or after the date of

the filing of this Complaint, own or owned any real property identified as residential property

located within the following area (794 residences shaded in red):



(Filing No. 268 at 16).

A plaintiff must show by a preponderance of the evidence that the proposed class is

"currently and readily ascertainable based on objective criteria." *Bridgeview Health Care Ctr. Ltd*

*v. Clark*, 2011 WL 4628744, at *2 (N.D. Ill. Sept. 30, 2011) ("To be ascertainable, a class must be

identifiable as a class and membership within it must be determined by application of precise,

objective criteria.").  Here, the Court believes that the potential class members of the proposed

classes could be ascertained.  These potential class members are easily identifiable by public

property records or tax records.  As such, the Court is satisfied that the Plaintiffs have objectively defined the two proposed classes.

**B.**     **The Parties' Pending Motions**

As noted earlier, the parties filed several motions ancillary to Plaintiffs' Motion for Class Certification (Filing No. 297; Filing No. 299; Filing No. 333; Filing No. 354; Filing No. 359; Filing No. 366; Filing No. 368).

First, in support of its Motion for Class Certification, Plaintiffs rely on Dr. Laton's Expert Report, Exhibit 11, and Rebuttal Expert Report, Exhibit 12 (collectively, the "Reports") to serve as the basis for certification of the Sewer Class (Filing No. 268 at 12-13; Filing No. 268-11; Filing No. 268-12).  Defendants have moved to exclude the Reports (Filing No. 297; Filing No. 299) and Dr. Laton's Declaration, which is attached as Exhibit 2 to Plaintiffs' Response to BorgWarner's 'Motion to Strike' (collectively, "Laton Reports") (Filing No. 333). The Court declines to resolve these motions on their substance.  As explained in detail below in discussing Plaintiffs' request for injunctive relief, the Court does not place weight on the challenged testimony even assuming it is admissible.  Because the Court does not credit the testimony (or has decided that it does not affect the outcome), the Court need not determine whether the testimony falls short of Rule 702.  Even if the Court were to find that the Laton Reports were admissible, the Court is convinced that Plaintiffs' Sewer Class cannot be certified pursuant to Rule 23(b)(2).  Thus, Defendants' Motions to Exclude and Strike (Filing No. 297; Filing No. 299; Filing No. 333) are **denied as moot**.

Second, on June 7, 2023, after the Motion for Class Certification was fully briefed, the Agency for Toxic Substances and Disease Registry ("ATSDR")[8] conducted a Public Health

---

[8] The ATSDR is a federal public health agency of the U.S. Department of Health and Human Services. *See* www.atsdr.cdc.gov (last visited September 14, 2023).

Consultation[9] and released a report ("ATSDR Report") related to the environmental contamination in the Sewer Class areas (Filing No. 353-1). Subsequently, Defendants Amphenol and Honeywell filed a Joint Notice of New Additional Evidence (Filing No. 353). The new evidence was the ATSDR Report. *Id*. Plaintiffs then filed a Motion to Strike Defendants Amphenol's and Honeywell's Joint Notice of New Additional Evidence (Filing No. 354). Plaintiffs also filed a Motion for Leave to Supplement its Motion for Class Certification based on the same new evidence (Filing No. 359). Defendants BorgWarner and Franklin Power soon after filed a Motion for Leave to Supplement its Response to Plaintiffs' Motion for Class Certification Based on the same New Evidence (Filing No. 366); and Defendants Amphenol and Honeywell filed a Motion for Leave to Supplement based on the same new evidence (Filing No. 368).

Plaintiffs contend that "[t]he ATSDR Report provides further confirmation that there is a current complete pathway of exposure that impacts the health of the proposed class members." (Filing No. 359-1 at 1.) However, and as explained in more detail below, this fact is immaterial to whether the Sewer Class should be certified pursuant to Rule 23(b)(2). Considering that Plaintiffs object to the very ATSDR Report they seek to rely on in their supplemental briefing, and that Defendants do not object to any of the parties filing supplemental briefing addressing the ATSDR Report (Filing No. 364; Filing No. 367 at 2), the Court **denies** Plaintiffs' Motion to Strike Amphenol's and Honeywell's Joint Notice of New Additional Evidence; **grants** Plaintiffs' Motion for Leave to Supplement; **grants** Defendants BorgWarner's and Franklin Power's Motion for

---

[9] "If a specific health question or issue arises about a potential environmental hazard, ATSDR conducts a public health consultation. A consultation differs from a public health assessment in that the consultation focuses on a specific question and provides a more rapid response. A consultation can address public health issues such as a chemical or radiological contamination, epidemiology, or provide technical advice on sampling and remediation plans. Public health consultations are not medical examinations, community health studies, or public health assessments." *See* https://www.atsdr.cdc.gov/hac/products/consultation.html (last visited September 14, 2023).

Leave to Supplement; and **grants** Defendants Amphenol's and Honeywell's Motion for Leave to Supplement.  Accordingly, the Court has considered the supplements in making this ruling.

## C.   The Rule 23(a) Requirements

Pursuant to Rule 23, the named parties of a class of plaintiffs may sue on behalf of all the members of a class if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Although the Plaintiffs ultimately bears the burden of showing that the Rule 23 requirements are met, this Court must engage in its own "rigorous analysis" to ensure that certification is appropriate. *See Santiago v. City of Chicago*, 19 F.4th 1010, 1016 (7th Cir. 2021).

### 1.   Numerosity

"Mere allegations that a class action would make litigation easier for a plaintiff are not enough to satisfy Rule 23(a)(1)."  *Anderson v. Weinert Enters., Inc*., 986 F.3d 773, 777 (7th Cir. 2021).  The rule requires "the class must be so numerous that joinder of all class members is impracticable." *Jones v. Blinziner*, 536 F. Supp. 1181, 1189 (N.D. Ind. 1982). "While 'impracticable' does not mean 'impossible,' a class representative must show that it is extremely difficult or inconvenient to join all the members of the class." *Anderson at 777.*

Public property records and publicly available geographical databases demonstrate that there are 69 properties in the GCA (which reasonably can be estimated to include well over 100 individual claimants) and 794 properties within the SCA.  (Filing No. 268 at 17-18; Filing No. 268-8; Filing No. 268-12).  Defendant Amphenol contends that Plaintiffs made "no effort to show that it would be impractical to join the claims of the putative class members" and, as such, cannot satisfy the numerosity requirement (Filing No. 298 at 15, 54-55).  The Court agrees.

14

In the Seventh Circuit, "a forty-member class is often regarded as sufficient to meet the numerosity requirement," though the proper focus should be the "practicability of joinder" rather than the number of putative class members. *Anderson v. Weinert Enterprises, Inc.*, 986 F.3d 773, 777 (7th Cir. 2021). However, this determination requires evaluation of "the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute." *Id.* (quoting 7A C. Wright & A. Miller, *Federal Practice & Procedure* § 1762 (3d ed.). Plaintiffs make no such evaluation. Instead, they merely rely on the fact that a 40-member class is often regarded as sufficient to meet the numerosity requirement.

Amphenol argues "[t]he alleged damages are substantial enough to warrant the filing of individual cases, particularly if they can be joined for discovery and other pretrial purposes, which they could be. *See, e.g., Briggs v. Freeport-McMoran Copper & Gold, Inc*., No. CIV-13-1157-M, 2017 WL 1162208, at *3 (W.D. Okla. Mar. 28, 2017) (finding that joinder was not impractical in a case involving 479 parcels)." (Filing No. 298 at 55). Defendants' reliance on *Briggs* is not necessarily persuasive, because *Briggs* is not binding on this Court. And in any event, *Briggs* is readily distinguishable from this case because "almost thirty percent of the landowners [had] already … joined" the action. *Id.*

*Anderson* is also distinguishable. In *Anderson*, the Seventh Circuit found that geographic dispersion cut against certification where "[a]ll but two of the [37] class members lived within a 50-mile radius of the courthouse." *Anderson*, 986 F.3d at 777. The plaintiffs in *Anderson* had not alleged that the proposed class size was over the Seventh Circuit 40-member benchmark. *Id.*; *see also O'Brien v. Encotech Const. Services, Inc.*, 203 F.R.D. 346, 350 (N.D. Ill. 2001), *on reconsideration*, 183 F.Supp. 2d 1047 (N.D. Ill. 2002) (noting that the class contains approximately thirty people and stating that "[w]here the class size is relatively small, as it is in

this case, courts consider a number of factors in addition to class size in order to determine whether the numerosity requirement is met.").

Ultimately, the Court disagrees with Plaintiffs' conclusion that they have established impracticability of joinder.  Regardless of how many individuals are in the proposed classes, all the above factors weigh against a finding of impracticability of joinder in this case.  Again, Plaintiffs assert that there are 69 properties in the GCA and 794 properties within the SCA." (Filing No. 268 at 17-18; Filing No. 268-8; Filing No. 268-12). Unlike some proposed classes that are spread throughout a city, state, or even the entire country, all purported class members presumably live or at least own a possessory interest in real property within two miles of the Sites, and the Sites are located only twenty-five miles from the courthouse.  Thus, the class members are in close geographic proximity both to each other, and to the courthouse.  Considering this close geographic proximity, service on potential plaintiffs joined in this litigation would also be straightforward.  As such, identifying and contacting potential plaintiffs would not be exceedingly difficult.

Although a prospective class member's financial ability or motivation to prosecute individual suits could weigh in favor of a finding of impracticability of joinder, Plaintiffs have offered no evidence to indicate that potential plaintiffs do not have the financial means or lack financial motivation to prosecute suits.  Indeed, Plaintiffs' arguments regarding the lack of financial means and motivation to bring suit is undermined by the fact that Plaintiffs' attorneys filed two separate state court actions on behalf of different plaintiffs alleging similar claims against the Defendants.  The Court is acquainted with the facts of this litigation and has extensive experience overseeing complex litigations involving many parties.

While the Court is mindful of concerns regarding judicial economy, this concern does not outweigh the other considerations discussed above.  Inefficiency can be largely avoided by joinder

and intervention as all the proposed class members may not even seek to join the suit. Considering the close geographical proximity of all potential plaintiffs to each other, the Court, and the Sites, the ease of identifying and serving all potential plaintiffs, the high profile and discrete nature of the harm in this case, and the Court's familiarity with the facts underlying this litigation. Plaintiffs have not demonstrated impracticability of joinder. Accordingly, Plaintiffs have **failed to meet the numerosity prerequisite** for class certification.  *See* Fed. R. Civ. P. 23(a)(1).

### 2.   Commonality and Typicality

Defendants contend that Plaintiffs have not satisfied the commonality and typicality requirements because, among other things, the proposed questions incorrectly imply common conduct by the Defendants, and there are complex questions that will require individualized scrutiny.  (Filing No. 296 at 6; Filing No. 298 at 13-14.)  The Court disagrees.

To satisfy the commonality requirement, the claims of the proposed class members "must depend upon a common contention that is capable of class-wide resolution."  *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 434 (7th Cir. 2015).  A "common nucleus of operative fact" generally fulfills this requirement.  *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).  This common nucleus is typically found "where the defendant has engaged in some standardized conduct toward the proposed class members."  *Mejdreck v. Lockformer Co.*, No. 01 C 6107, 2002 WL 1838141, at *3 (N.D. Ill. Aug. 12, 2002), *aff'd sub nom. Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910 (7th Cir. 2003).

Typicality is satisfied if the named representative's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and ... [the] claims are based on the same legal theory."  *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).  "[T]here must be enough congruence between the named representative's claim and that of the

unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011).

### i.   **Commonality**

Plaintiffs propose two primary questions: "(1) whether Defendants improperly discharged contaminants; and (2) whether those contaminants have impacted the class members' properties." (Filing No. 268 at 19.)  They also listed additional questions that they claim are common to one or both classes.

> (1) Whether Honeywell is a successor to Bendix Corporation; (2) Whether Defendants improperly discharged contaminants at the Amphenol Site; (3) Whether contaminants released by Defendants contaminated (the GCA) or threaten to contaminate (the SCA) class members' properties; (4) Whether Defendants' failure to identify, remove or properly remediate contaminants caused injury to the class members; (5) Whether and when Defendants became aware of the threat of contaminants off-site, including in the class areas; (6) Whether and when Defendants took steps to notify the public, including the class members, about the threat of contaminants off site; (7) Whether Defendants' failure to notify the public caused injury to the class members; (8)Whether the detected contaminants pose a health risk to the class members; (9) Whether the detected contaminants require remediation and cleanup; (10) Whether the sanitary sewer system provides a conduit for Defendants' contaminants to reach homes in the SCA.

(Filing No. 268 at 19-20).

Defendants argue that Plaintiffs' first proposed question, "whether Defendants improperly discharged contaminants," incorrectly implies common conduct on the part of all Defendants, (Filing No. 296 at 6), and Plaintiffs' second question, "whether those contaminants have impacted the class members' properties," is not common across the Glendale Class. *Id*.

At this stage, the Plaintiffs need not prove the truth of their allegation that all the Defendants, including BorgWarner, discharged contaminants onto their properties or that said contaminants somehow impacted their properties. *See Messner*, 669 F.3d at 818 (noting that "case law is clear that such proof is not required, only that it "is capable of proof at trial through evidence

that is common to the class rather than individual to its members."). The Plaintiffs, however, must put forth evidence, which they have, that the answer to these questions will be resolved "in one stroke." Plaintiffs made clear that the use of the word "Defendants" in the Amended Complaint includes all the named defendants, as well as their "affiliates, predecessors, and agents." (Filing No. 143.)

Which successor is responsible for what harm, if any, or in what proportion will be decided by the finder of fact. Therefore, whether BorgWarner, or any of the other Defendants, discharged contaminants or failed to act must be proven at trial. Likewise, the impact or level of those contaminants on the proposed class members' properties must be proven at trial. The complexity of proof is a problem Plaintiffs will have to address in presenting their case on the merits, but it does not negate commonality. The common nucleus of operative facts all points to contaminants being discharged from the Sites and then migrating to the nearby residential communities. Having found at least one common question, the Court need not address the other proposed questions.[10]

Defendants next contend that the "presence of contamination on some properties but not others implies that some property owners may have suffered an injury, and some have not." (Filing No. 298 at 28.) A class will often include persons who have not been injured by a defendant's conduct, but this possibility or, indeed inevitability, does not preclude class certification. *Kohen v. Pacific Invest. Mtg. Co., LLC*, 571 F.3d 672, 677 (7th Cir. 2009). "If very few members of the class were harmed, that is an argument not for refusing to certify the class but for certifying it and then entering a judgment that would largely exonerate" the defendant. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757–58 (7th Cir. 2014). "If, however, a class is defined so broadly as to include

---

[10] A single common question is sufficient to satisfy the Rule 23(a)(2) commonality requirement. *See Wal-Mart Stores*, 564 U.S. at 359.

a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification." *Messner*, 669 F.3d at 824.  The important distinction then is "between class members who were not harmed and those who could not have been harmed." *Id*. at 825.  For example, in this case, the proposed class members' properties could have been harmed by the contaminants from the Sites.  Those properties that could have been harmed by the contaminants, but were, in fact, not harmed, can be excluded during a later determination on the merits.

The fact that the Plaintiffs might require individualized relief or not share all questions in common does not preclude certification of a class.  *Chicago Teachers Union No. 1 v. Board. Of Edu. Of City of Chicago*, 797 F.3d at 441–42 (7th Cir. 2015); *In re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014) (commonality of damages is not required in class action suit); *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) (the need for individual proof alone does not necessarily preclude class certification).  "Neither Rule 23 nor any gloss that decided cases have added to it requires that every question be common.  It is routine in class actions to have a final phase in which individualized proof must be submitted." *Suchanek*, 764 F.3d at 756.  *See also Johnson v. Meriter Health Servs. Employee Ret. Plan*, 702 F.3d 364, 369 (7th Cir. 2012).  Therefore, the Court is satisfied that **the commonality element is met**.

### ii.    Typicality

A claim is typical if it 'arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . [plaintiff's] claims are based on the same legal theory.'" *Oshana v. Coca-Cola*, 472 F.3d 506, 514 (7th Cir. 2006). "The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d

225, 232 (7th Cir. 1983). "Typical does not mean identical, and the typicality requirement is liberally construed." *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996). Factual inconsistencies between the class are not enough to defeat typicality. *see also Schleicher v. Wendt*, 618 F.3d 679, 686 (7th Cir. 2010) ("Rule 23 allows certification of classes that are fated to lose as well as classes that are sure to win.").

Plaintiffs advance identical legal theory to the putative class. Namely, all the claims arise from a singular event: contaminants migrating from the Site into the class areas and Defendants' failure to adequately remediate the condition. According to Plaintiffs, a common course of wrongful conduct produced a common class-wide injury, *i.e.*, contamination of the groundwater and the vaper zone, leading to vapor intrusion, or the risk thereof, in all properties within the geographical areas, which resulted in the diminution of property values. Like the putative class members, the named Plaintiffs have allegedly suffered a loss of property value, and lost use and enjoyment of their properties, and seek to be compensated for those injuries. In other words, Plaintiffs assert the same legal theories, and they are based on the same conduct as the claims of the class. Therefore, **the typicality prerequisite is met.**

### 3.   <u>Adequacy</u>

As for adequacy, a representative party must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[A]dequacy of representation is composed of two parts: the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the class members." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993) (quotation omitted).

The Court has no reason to question the competence of Plaintiffs' lawyers.  Plaintiffs' counsels have vigorously prosecuted this action and are well-versed in environmental class actions.

The Court has no reason to believe they are unqualified or that they will not fairly and adequately represent the interests of either class.  But adequacy of representation implicates more than that.  Indeed, there is a constitutional dimension to this part of the inquiry; absentee members of a class will not be bound by the final result if they were represented by someone who had a conflict of interest with them or who was otherwise inadequate.  *See Richards v. Jefferson County, Ala.*, 517 U.S. 793 (1996).  Here, Plaintiffs assert,

> The fact that Dana Shank filed a claim for her daughter's illness and death has zero relevance to questions regarding the economics of property damage claims that Defendants repeatedly contend are worthless. King is also a cancer claim (not a property damage claim) [] but is represented by only one of the three firms litigating this case. Neither are relevant here.

([Filing No. 320 at 29](#)).

However, in addition to their other claims, Plaintiffs' Amended Complaint alleges they were at "an increased risk of serious future illness necessitating medical monitoring."  ([Filing No. 143 at ¶¶ 21-23](#).)  Here, Plaintiffs have not sought to certify a medical monitoring class and have decided to forgo its previously alleged battery claim ([Filing No. 268 at fn. 1](#)).  It is significant that Plaintiffs' counsels filed two separate personal injury cases in state court.  In making these decisions, Plaintiffs are imposing upon the entire proposed class their decision to give up any medical monitoring, emotional distress, and other personal injury claims that could be asserted against Defendants.  Plaintiffs are correct that those state court lawsuits do not seek to recover for property damage ([Filing No. 320 at 29](#)).  Plaintiffs fail to recognize that regardless of the type of suit or type of recovery, what is relevant is the existence of those lawsuits.  The mere fact that they exist, evidences a conflict between Plaintiffs and the putative class members who may be entitled to recover for personal injury.  Plaintiffs have made no effort to otherwise rebut this argument.

The Court can only conclude that the conflict-of-interest renders Plaintiffs as inadequate representatives. *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."). Therefore, Plaintiffs have **failed to meet the adequacy prerequisite.**

### D.    Plaintiffs Cannot Satisfy Rule 23(b)(3)

Even if Plaintiffs had satisfied Rule 23(a) prerequisites, they would still need to show that the circumstances of their case are such that one of the three available options for class certification under subsection (b) of the rule applies. Plaintiffs have asked the Court to certify the Glendale Class pursuant to Rule 23(b)(3). Under Rule 23(b)(3), Plaintiffs must show questions of law or fact common to the class members predominate over any questions affecting individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). The burden is on the Plaintiffs to demonstrate, by a preponderance of the evidence, that they have met each requirement of Rule 23. *Messner*, 669 F.3d at 811.

#### 1.   Predominance

Although the common issues are numerous, certain causation and damages issues remain that would have to be decided on an individual basis were the Plaintiffs able to satisfy the other requirements for class certification. These limited individualized issues do not defeat predominance considering the core common issues that are appropriate for class wide treatment.

The predominance requirement is related to commonality—in that common questions must exist class wide—but "the predominance criterion is far more demanding." *Amchem*, 521 U.S. at 623–24. To meet this requirement, the plaintiff must show "common questions represent a

significant aspect of [a] case and ... can be resolved for all members of [a] class in a single adjudication." *Messner*, 669 F.3d at 815 (quoting 7AA Wright & Miller, *Federal Practice & Procedure* § 1778 (3d ed. 2011)). Predominance is "a qualitative rather than a quantitative concept. It is not determined by simply counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). Predominance measures whether the litigation will be overly burdened by resolution of individual questions, which will substantially inhibit the quest for answers to common questions—the foundational pursuit of class action litigation.

In *Mejdrech v. Met–Coil Sys. Corp.*, a class of residences located within a one-mile radius of a factory alleged contaminants from defendant's factory leaked into the soil and groundwater, which then migrated to the nearby residential area. 319 F.3d 910 (7th Cir. 2003). There, the defendant argued that various causation issues, like the varying degree of contaminations on each property, precluded class certification. *Id*. at 911. The Seventh Circuit affirmed the district court in finding that common issues predominated because "[t]he questions whether Met–Coil leaked TCE in violation of law and whether the TCE reached the soil and groundwater beneath the homes of the class members are common to all the class members." *Id*.; *see also Pella Corp. v. Saltzman*, 606 F.3d 391, 394–95 (7th Cir. 2010) (noting that even though class members still must prove individual issues of causation and damages, this does not prevent class certification).

Here, Plaintiffs ask the Court to certify the Glendale Class as a damages class for properties affected by contaminants that migrated from the Site (Filing No. 268). According to Plaintiffs, a common course of wrongful conduct produced a common class-wide injury. In contrast, Defendants contend that individual issues will predominate because "[e]valuating any damages to residences in the Glendale Class will require household specific analysis to ascertain both the

24

presence and extent of any contamination as well as household specific analysis of the pre-impact value of each home." (Filing No. 296 at 18.) Like the putative class members, the named Plaintiffs have allegedly suffered a loss of property value, and the loss of the use and enjoyment of their properties and seek to be compensated for those injuries.

Defendants' potential liability for the contaminants that migrated from the Site is a common question that can be decided for all proposed class members, even if the extent of damages among them varies. The operative facts regarding liability are common to all individuals who own property in the Glendale Class area. In other words, for preponderance purposes, it makes no difference that contaminant levels may vary from property to property within the class area or that the class members' potential damages may also vary. Like *Mejdrech*, individual hearings can follow on the issues of whether a particular class member suffered a harm and the amount of injury. While honing its arguments against Plaintiffs' experts and focusing on proving that individualized damages would predominate, Defendants have lost sight of the class wide commonalities and unique circumstances present in this litigation that allow Plaintiffs to demonstrate compliance with Rule 23(b)(3)'s predominance requirement. The Court concludes that **Plaintiffs have met the predominance requirement.**

### 2. **Superiority**

In addition to establishing that common issues predominate over individual ones, Plaintiffs seeking class certification under Rule 23(b)(3) must show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Rule 23(b)(3) requires a showing that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "This requirement is satisfied if 'a class action would achieve economies of time, effort, and

expense and promote ... uniformity of decisions as to persons similarly situated, without sacrificing fairness or bring about other undesirable results.'" *Bruzek v. Husky Oil Operations Ltd.*, 520 F. Supp. 3d 1079, 1099 (W.D. Wis. Feb. 19, 2021); *see also Mitchell v. LVNV Funding, LLC*, No., 2015 WL 7016343, at *8 (N.D. Ind. Nov. 10, 2015). To determine superiority, the Court considers:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Here, the above factors weigh against superiority. The Court is aware of two pending state court actions brought by Plaintiffs' attorneys against the Defendants. Both actions suggest that potential class members may have additional claims, primarily medical monitoring, and wrongful death claims, such that they would have an interest in individually controlling their own separate action. *See Ladegaard v. Hard Rock Concrete Cutters, Inc.*, 2000 WL 1774091, at *7 (N.D. Ill. Dec. 1, 2000) (noting that the court "has not been informed by either party of any pending suits brought by individual class members, other than the [named] plaintiff[s]'," and thus, "there does not appear to be an interest of individual members in controlling the prosecution of the state claims.")).

Where there is the potential for actions involving claims for personal injury and death, the Court is persuaded that individual plaintiffs have a significant interest in individually controlling the prosecution of their cases and have a substantial stake in making individual decisions. To be sure, the fact that many potential victims have not sued may indicate they are unaware of the

26

opportunity to seek damages. But given that other suits have been brought, the availability of enterprising counsel seeking to bring them, and the emotionally charged stakes involved, the Court is not prepared to infer reasons potential claimants have not come forward.

Plaintiffs are seeking to recover diminution in property value, punitive damages, expert fees, and other costs (Filing No. 143; Filing No. 268). Unlike the plaintiffs in *Parko*, where the potential recovery to each class member would have been a *de minimis* amount, *e.g.*, $5.50, individual Plaintiffs' potential recovery would be in the thousands if not hundreds of thousands. It remains the case that the relatively large damages at stake and the existence of other cases evidencing potential class members' strong motivation to file their own actions weigh heavily against class certification here. Even if the damages award may not be huge, the Court is satisfied that it may be sizable enough for individuals (or joined) suits to be a feasible alternative to a class action.

The Court is convinced that potential claims would be "significant as to make pursuit of individual claims likely." *Mitchell*, 2015 WL 7016343, at *10. The Court gives little weight to the desirability and manageability factors. As previously discussed, any potential inefficiency can be largely avoided by joinder and intervention. Considering the close geographical proximity of all potential plaintiffs to each other, the Court, and the Sites, Plaintiffs will likely not have problems contacting the potential members. After considering all the above factors, the Court accords greater weight to the first two considerations in making a finding against superiority and, as such, class certification pursuant to Rule 23(b)(3) must be **denied**.

## E.   <u>The Sewer Class—Injunctive Relief Pursuant to Rule 23(b)(2)</u>

Even if the Court did find that the Sewer Class could satisfy the Rule 23(a) prerequisite requirements, which it doubts, class certification pursuant to Rule 23(b)(2) would be inappropriate

because the Sewer Class lacks cohesion, and the requested injunctive relief would not be final (Filing No. 268 at 29).

By its terms, there are two separate elements to certification under Rule 23(b)(2): first, the Defendants' action must be "generally applicable" to the class as a whole; and second, the Plaintiffs must seek final injunctive or declaratory relief on behalf of the class. *Hostetler v. Johnson Controls, Inc.*, 2018 WL 3868848, at * 10 (N.D. Ind. Aug. 15, 2018). "By virtue of its requirement that the plaintiffs seek to redress a common injury ... Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive." *Lemon,* 216 F.3d at 580. Accordingly, to maintain certification pursuant to Rule 23(b)(2), the proponent of certification must establish that the putative class is sufficiently cohesive to warrant class treatment. *Id.*

As the Seventh Circuit has emphasized, "[t]he final clause is important: [t]he injunctive or declaratory relief sought must be 'final' to 'the class as a whole.'" *Hostetler*, 2018 WL 3868848 at * 10 (quoting *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 498–99 (7th Cir. 2012)). The key to the "(b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Wal–Mart Stores,* 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L.Rev. 97, 132 (2009)).

In *Ebert v. General Mills, Inc.*, residential property owners sought an injunction against General Mills for remediation after they allegedly exposed neighboring residential properties to toxic vapors. 823 F.3d 472, 474 (8th Cir. 2016). The Eighth Circuit held that the class of property owners was not cohesive because the remediation sought was "not even universal" and remediation, if awarded, would have been "unique" to "each of the affected properties." *Id*. at 480-81. Indeed, some of the class members had already received vapor migration systems customized

28

to their properties and some had not; some members' properties had been tested and no vapors were detectible; and of those homes affected by the vapors, their test results showed "widely varying levels." *Id*. at 481.

Two years later, *Hostetler* was decided by then Chief Judge Jon E. Deguilio of the U.S. District Court for Northern District of Indiana. *See Hostetler*, 2018 WL 3868848 at *10. In *Hostetler,* the proposed class was comprised of prior residents of a neighborhood that sought an injunction to require the defendant to remediate contamination in that neighborhood. *Id*. at *2. In addressing whether the class was cohesive for injunctive relief purposes, the court explained,

> Even aside from the substantial overbreadth of the class definition relative to this issue, the Plaintiffs have made little effort to establish that injunctive relief can be resolved on a class-wide basis. In fact, all the Plaintiffs' expert identifies in her affidavit are the areas that should be remediated. She opined that those areas include the soils, the shallow groundwater, deep groundwater, and utility lines. That fails to establish, though, that the remediation would need to be imposed through a single, indivisible class-wide injunction. As Johnson Controls argues, even class members with current ties to the neighborhood might have differing interests in the types or extent of injunctive relief, based on their location relative to groundwater contamination or if they are at risk only through utility lines, or whether they have experienced indoor vapor intrusion or have had a mitigation system installed, among other possible factors.

*Hostetler*, 2018 WL 3868848 at *11.

Plaintiffs contend that "[d]ue to the threat of chemical contamination and the intrusion of vapors into homes in the Sewer Class Area, investigation involving sampling and mitigation is required across the class." (Filing No. 268 at 29; Filing No. 320 at 34-36) They argue that "[b]ecause every homeowner in the SCA needs testing not only on their own property but throughout the SCA, their claims are cohesive under Rule 23(b)(2)." (Filing no. 320 at 36.) All told, approximately 800 properties are in the affected area (Filing No. 268 at 17-18; Filing No. 268-8; Filing No. 268-12). Nevertheless, Plaintiffs maintain that all the properties are at risk for

vapor intrusion, a risk that will continue to exist until the groundwater has been remediated and, as such, the Court should certify the Sewer Class.

The Court respectfully disagrees. Plaintiffs have superficially structured their case around a claim for class-wide injunctive relief. Although the circumstances that led to Defendants' alleged conduct may be common to all the members of the putative class, and the resulting injury the same, this does not hold true for the relief that might apply. Plaintiffs' testing and remediation request would be unique to each class member and, thus, would not be cohesive for purposes for Rule 23(b)(2). Like *Ebert*, some of the Sewer Class members, including a class representative have received vapor migration systems customized to their properties; some class members, including a class representative had their plumbing repaired; some class members' properties were tested and little to no vapors were detected, and of those homes affected by the vapors, their test results, in Dr. Laton's opinion, varied (Filing No. 296-2 at 33; Filing No. 296-2 at 18-19; Filing No. 298 at 13).

Like *Holester*, the other class members might have differing interests in the types or extent of testing and remediation efforts, as some homeowners denied Defendants access to their properties to conduct testing and remediation efforts. As Dr. Laton noted, the mitigation approach may differ since potential exposure pathways included varied sources: sewer gas, groundwater, surface water, and gases outside sewer lines, storm drains, and utilities (Filing No. 296-6 at 17). In response to Defendants' Motion to Strike Dr. Laton's Expert Report, Plaintiffs argued that "Dr. Laton did explain how non-detects of indoor air in the [Sewer Class] did not indicate a lack of contamination throughout." (Filing No. 319 at 9).

> **Q**: So you don't find it at all unusual that you may have a very low detection on
> one side of the street and then a high detection on the other side of the street that
> may be caused by vapor intrusion?

**A. It's quite common to see variability in indoor air as well as soil gas and concentrations.**

**\*\*\***

**A. What I'm saying is the high variability of indoor air versus vapor intrusion versus soil gas versus the groundwater is such that you would expect to see some non-detects next to some concentrations. And that'll change over time. It'll change daily, weekly. That's the reason why you have to put in monitoring points to sample repeatedly over and over again to see if you can catch this variability.**

*Id.* ) (emphasis in original) (citing Ex. 4. 123:25-124:5; 127:9-18.)

Plaintiffs' requested relief would be class-wide in name only and, as such, injunctive relief is not appropriate. Significant individual aspects of the relief, varying with each homeowner, would remain to be worked out before any remedial action could be started, much less, completed. Considering "the potential differences just discussed, the Plaintiffs have not shown that certification on that basis is appropriate here, where injunctive relief could include a range of activities over a large area to address different potential sources of vapor intrusion that affect different properties to different extents." *Hostetler*, 2018 WL 3868848 at *11. Dr. Laton provided no opinion regarding what mitigation efforts would be required to adequately correct the condition in the Sewer Class nor have Plaintiffs put forth a specific remediation plan beyond generally requesting investigation and remediation (Filing No. 296-6 at 23-24). As Dr. Laton notes, you would have to "put in monitoring points to sample repeatedly over and over again to see if you can catch this variability." (Filing No. 319 at 9) (citing Ex. 4. 123:25-124:5; 127:9-18.) The Court fails to see how any testing or mediation relief would be final. A judicial declaration in this situation would be essentially advisory and, thus, not final.

Furthermore, while it may very well be true that "the investigation of chemical contamination of homes is inadequate and that homes within the [Sewer Class] lie on contaminated

sewer lines which require further investigation including sampling, plumbing repairs and mitigation on their properties," the Court is cognizant that the requested relief may intrude upon the EPA's authority. The EPA has not opined that remediation of the Sewer Class area is warranted. The EPA is better positioned to determine what remediation efforts, if any, are necessary to address potentially dangerous environmental conditions.

Plaintiffs have **failed to meet their burden** to certify the Sewer Class pursuant to 23(b)(2).

## IV.    <u>CONCLUSION</u>

The Seventh Circuit has directed district courts to exercise "caution in class certification generally." *Thorogood v. Sears, Roebuck & Co*., 547 F.3d 742, 746 (7th Cir. 2008). This is especially so in cases where plaintiffs seek damages resulting from alleged environmental contamination, where individualized inquiries frequently abound. *See, e.g., Parko*, 739 F.3d at 1086–87. For the reasons described above, Plaintiffs' Motion for Class Certification pursuant to Rule 23(b)(2) and 23(b)(3) (Filing No. 268) is **DENIED**. The Court also **DENIES** Defendants' Motions to Strike and Motion to Exclude **as moot** (Filing No. 297; Filing No. 299; Filing No. 333); **DENIES** Plaintiffs' Motion to Strike Amphenol's and Honeywell's Joint Notice of New Additional Evidence (Filing No. 354); **GRANTS** Plaintiffs' Motion for Leave to Supplement Motion for Class Certification Based Upon New Evidence (Filing No. 359); **GRANTS** Defendants BorgWarner's and Franklin Power's Motion for Leave to Supplement Response to Motion for Class Certification (Filing No. 366); and **GRANTS** Defendants Amphenol's and Honeywell's Joinder in Motion for Leave to Supplement (Filing No. 368).

    **SO ORDERED.**

Date:   9/26/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Tabitha Lucas Balzer
LEWIS & KAPPES PC
tbalzer@lewis-kappes.com

Jacob R. Cox
COX LAW OFFICE
JCOX@COXLAW.COM

Robert Thomas Dassow
HOVDE DASSOW & DEETS LLC
rdassow@hovdelaw.com

Delmar R. Ehrich
FEAGRE DRINKER BIDDLE & REATH LLP
delmar.ehrich@faegredrinker.com

Matthew Richard Elliott
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
matthew.elliott@faegredrinker.com

Ryan D. Ellis
THE LANIER LAW FIRM PC
ryan.ellis@lanierlawfirm.com

Christopher L. Gadoury
THE LANIER LAW FIRM PC
chris.gadoury@lanierlawfirm.com

Thomas R Jones
LEWIS & KAPPES
tjones@lewis-kappes.com

H. Max Kelln
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
h.max.kelln@faegrebd.com

Donald J. Kelly
WYATT TARRANT & COMBS
dkelly@wyattfirm.com

Kip S.M. McDonald
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
Kip.McDonald@Faegredrinker.com

Emanuel McMiller
FAEGRE DRINKER BIDDLE & REATH LLP
manny.mcmiller@faegredrinker.com

Jonathan Barry Nace
NIDEL & NACE PLLC
jon@nidellaw.com

Christopher T. Nidel
NIDEL & NACE PLLC
chris@nidellaw.com

Lisa K. Rushton
WOMBLE BOND DICKINSON (US) LLP
lisa.rushton@wbd-us.com

Matthew F. Tilley
WOMBLE BOND DICKINSON (US) LLP
matthew.tilley@wbd-us.com

Allison Lauren Upchurch
LEWIS & KAPPES PC
aupchurch@lewis-kappes.com

Richard S. VanRheenen
LEWIS & KAPPES PC
rvanrheenen@lewis-kappes.com

Jordan M. White
WYATT TARRANT & COMBS, LLP (Louisville)
jwhite@wyattfirm.com

Paul A. Wolfla
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
paul.wolfla@faegredrinker.com

James E. Zoccola
LEWIS & KAPPES PC
jzoccola@lewis-kappes.com