# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| FRANCES DENNEY on behalf of themselves and all others similarly situated, ARTHUR TERHUNE on behalf of themselves and all others similarly situated, MCKENZIE NEWBY on behalf of themselves and all others similarly situated,[1] ) ) ) ) ) ) ) ) | |

FRANCES DENNEY on behalf of themselves and
all others similarly situated,        )
ARTHUR TERHUNE on behalf of themselves and
all others similarly situated,        )
MCKENZIE NEWBY on behalf of themselves and
all others similarly situated,[1]     )
             )
        Plaintiffs,     )
             )
       v.        )   Case No. 1:19-cv-04757-TWP-MKK
             )
AMPHENOL CORP.,        )
BORGWARNER, INC.,      )
BORGWARNER PDS (PERU), INC.  )
   f/k/a FRANKLIN POWER PRODUCTS, INC.,  )
HONEYWELL INTERNATIONAL, INC.,  )
             )
        Defendants.   )
             )
BORGWARNER PDS (PERU), INC.,  )
             )
        Cross Claimant,  )
             )
       v.        )
             )
AMPHENOL CORP.,        )
             )
        Cross Defendant.  )

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION AND MOTION TO STRIKE

This matter is before the Court on several pending motions. Defendants BorgWarner, Inc.

("BorgWarner"), BorgWarner PDS (PERU), Inc. f/k/a Franklin Power Products, Inc.

("BorgWarner Peru") (Filing No. 382), Amphenol Corporation ("Amphenol") (Filing No. 385), and

---

[1] Although Plaintiff McKenzie Newby appears in the caption of this case, Plaintiffs' counsel represented that they would file a voluntary dismissal of McKenzie Newby's claim (*see* Filing No. 386 at 18 n.7; *see also* Filing No. 383 at 2 n.1). Plaintiffs' Responses to the various Motions for Summary Judgment do not otherwise mention Plaintiff McKenzie Newby and, as such, the Court will assume that Plaintiffs still intend to file a voluntary dismissal of McKenzie Newby but just have not done so yet. This finding is immaterial to the Court's ultimate determinations.

Honeywell International, Inc., ("Honeywell") (collectively, "Defendants") ([Filing No. 387](#)), have all filed  Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure Rule 56. Plaintiffs Frances Denney and Arthur Terhune (collectively, "Plaintiffs") have filed a Motion for Leave to Renew Plaintiffs' Motion for Class Certification and to Reconsider the Court's Order Denying Class Certification ([Filing No. 428](#)) and a Motion to Strike Notice ([Filing No. 438](#)).

Plaintiffs initiated this environmental suit alleging Defendants failed to properly control and remediate contaminants released at 980 Hurricane Road (the "Site") and at 400 North Forsythe Street ("400 N. Forsythe") in the town of Franklin, Johnson County, Indiana.  For the reasons explained below, the Court **grants in part and denies in part** Defendants' motions for summary judgment, **denies** Plaintiffs' renewed motion for class certification, and **denies** Plaintiffs' motion to strike.

## I. <u>BACKGROUND</u>

### A. <u>Statutory Scheme</u>

The environmental statute at issue is the Resource Conservation and Recovery Act (the "RCRA"), 42 U.S.C. §§ 6901–6992k.  The RCRA is regulatory in nature, operating through a permit system.  Persons or entities who are generators of hazardous waste, and those who engage in the treatment, storage, and disposal of such waste, must obtain a permit or satisfy interim status requirements.  *See United States v. Bethlehem Steel Corp.*, 38 F.3d 862, 864 (7th Cir. 1994); 42 U.S.C. § 6925(a).

While chief responsibility for the RCRA's implementation and enforcement rests with the Administrator of the Environmental Protection Agency ("EPA"), *see* §§ 6928, 6973, the RCRA contains a citizen suit provision, § 6972, which permits private citizens to enforce its provisions in some circumstances.  *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996).  Important to the lawsuit

here, § 6972(f) contains a savings clause allowing individuals to seek enforcement under common law of standards or requirements relating to the management of solid waste or hazardous waste.

## B.    **Factual Background**

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, they are presented in the light most favorable to Plaintiffs as the non-moving parties. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).

Plaintiffs allege harms caused by Defendants' processing, releasing, and failing to adequately investigate and remediate alleged hazardous and toxic chemical emissions at the Site,[2] which various Defendants owned from 1963 to present.  The chronology and specifics of Site ownership, as well as the various agreements between the multiple, successive entities, are summarized in relevant part below, after which the Site's contaminants and remediation efforts are described, as well as the case's procedural history.

### 1.    **Ownership History of the Site and the Agreements Therein**

#### a.    **Bendix and the April 1985 Merger into Allied**

Starting in 1963, when it acquired a manufacturing facility on Route 12 in Franklin, Indiana, from Dage Electric, Inc., the Bendix Corporation ("Bendix") generated hazardous waste and engaged it in storage at the facility (*see* Filing No. 388-2 at 6, art. I, and 6, art. V ¶ 3).  The parties do not dispute that the Site includes this facility, formerly known as the Bendix Connector

---

[2] As is later discussed in this Order, the record demonstrates that the Site is the "single, proven source of [contaminants of concern] found in the study area and particularly in the Glendale Class Area" (Filing No. 384-3 at 4), which comprises Plaintiffs' properties. *Compare id.* at 5, *with* Filing No. 420-14 at 4 (Denney address), Filing No. 420-16 at 4 (Terhune address).  The Court grants summary judgment in Defendants' favor as it relates to Plaintiffs' claims concerning 400 N. Forsythe, *see infra*, and, accordingly, it need not be discussed here.

Operations facility.  Operations at the Site ceased in 1984 (*see* Filing No. 420-2 at 6; *but see* Filing No. 388-2 at 7, art. V ¶ 7 ("Operations at this . . . Facility . . . ceased in 1983.")).

On April 1, 1985, the Allied Corporation ("Allied") acquired Bendix (*see* Filing No. 389-2 (certification that Allied's board of directors had determined to merge Bendix into Allied); *see also* Filing No. 388-2 at 8, art. V ¶ 13).

###### b.    Allied and the February 1987 Subscription Agreement with subsidiary Amphenol Corporation

On December 19, 1986, Allied "transferred ownership [of the Site]" to Amphenol Corporation (Filing No. 388-2 at 8, art. V ¶ 13).  By a subscription agreement executed on February 20, 1987 (the "Subscription Agreement"),[3] Allied transferred to Amphenol Corporation the "entire [Amphenol Products Division] including the assets and liabilities associated therewith" (Filing No. 415-24 at 2; *see id.* at 3-4, art. 1).  In consideration for the assigned assets, Amphenol Corporation issued Allied all of its capital stock (*see id.* at 5, art. 2 ¶ A).  Amphenol Corporation also

> [a]ssume[d] and agree[d] to perform, pay and discharge the liabilities and obligations of Allied . . . , whenever arising, . . . arising out of or in any manner related to the operations or former operations of the [Amphenol Products] Division business or to the Assets, . . . , including but not limited to . . . all liabilities (including environmental liabilities) arising out of or related in any manner to the operation or use or former operation or use of all manufacturing and other facilities operated or used or formerly operated or used, in whole or in part, in connection with the Division business, as conducted or formerly conducted by Subsidiary [Amphenol Corporation], Allied, any of their respective affiliates or any predecessor companies . . . .

*See id.*, art. 2 ¶ B.

---

[3] Although the recital states the agreement was "made as of the 19th Day of December, 1986" (Filing No. 415-24 at 2), the signature page indicates the parties caused the document to be executed on February 20, 1987.  *See id.* at 10. While this Court has previously referred to these agreements separately, *e.g.*, *Denney v. Amphenol Corp.*, 2022 WL 2357300, at *6 (S.D. Ind. June 30, 2022), it no longer distinguishes between them to the extent it is unnecessary.

####     c.     Amphenol Corporation's Sale to LPL and the April 1987 Agreement and Merger

By June 1987, Allied sold Amphenol Corporation, including the Site, to LPL Investment Group, Inc. ("LPL") (*see* Filing No. 388-2 at 8, art. V ¶ 13).  This transaction was made partly pursuant to an "Agreement and Plan of Merger", which is dated April 1, 1987, and purported to be between Allied, Amphenol Acquisition Corporation[4] ("Amphenol Acquisition"), and Amphenol Corporation.[5]  While Honeywell contends that LPL merged Amphenol Corporation into Amphenol Acquisition (*see* Filing No. 389 at 4–5), the parties to the agreement inversely indicate in its text a contemplated merger of Amphenol Acquisition into Amphenol Corporation (*see* Filing No. 415-4 at 3, art. 1 ¶ 1.1).  Regardless, no party disputes that the emergent "New Amphenol Group" is today's Defendant Amphenol.

In Section 8.1.2 of the April 1987 merger agreement, Allied agreed to indemnify, defend, and hold harmless the New Amphenol Group or any member thereof from and against any and all loss, liability, damage, cost or deficiency that:

> the New Amphenol Group or any member thereof may suffer, sustain, incur or become subject to arising out of or due to any actual or alleged pollution or threat to the environment that is related in any way to events, conditions or circumstances that occurred or existed . . . on or before the Closing Date . . ."

*Id.* at 4, ¶ 8.1.2.  Section 8.1.2 specified that Allied would "also have the right during normal business hours, and at its expense, to inspect any of the Company's [(Amphenol Corporation's)] facilities to verify the appropriateness of any specific liability, cost or expense included on such schedule."  *Id.* at 6, ¶ 8.1.2.  The parties clarified in the final sentence of Section 8.1.2, however,

---

[4] Plaintiffs do not dispute the indication by Honeywell that Amphenol Acquisition Corporation was a pre-existing subsidiary of LPL (*see* Filing No. 389 at 4).

[5] The excerpts of the agreement submitted by Plaintiffs and Honeywell lack the signatory page (*see* Filing No. 389-4; Filing No. 415-4).

that "normal routine operating, maintenance and equipment replacement costs incurred by New Amphenol [were] not subject to the indemnification provisions" mentioned previously.  *Id.*

  **d.**  <u>Allied's Merger with Allied-Signal, Inc., and the November 1988 Settlement Agreement with LPL</u>

  On September 30, 1987, Allied merged into Allied-Signal, Inc. ("Allied-Signal"), with Allied-Signal assuming all of its liabilities and obligations (Filing No. 415-7).  Per Honeywell, Allied-Signal is its corporate predecessor (*see, e.g.*, Filing No. 389 at 5).

  In contemplation of various disputes, Allied-Signal, Amphenol, and LPL entered into a Settlement Agreement on November 28, 1988, modifying the April 1, 1987 Agreement and Plan of Merger, "as amended by the Amendment dated as of May 15, 1987"[6] (Filing No. 415-5).  The parties agreed that Section 8.1.2 (as amended)

> shall apply to all environmental liabilities relating to the period prior to the Closing … without recourse to any prior or extant agreements, commitments or understandings with respect thereto by or among Amphenol or its predecessor companies and Allied-Signal or its present or former subsidiaries or predecessor companies.

*Id.* at 4, ¶ 3.

  The parties confirmed that Amphenol's "out-of-pocket environmental costs and expenses" would be the only costs and expenses subject to the indemnification provisions of Section 8.1.2, but would not include certain types of expenses, such as wages and benefits for Amphenol or LPL employees or "any of the costs and expenses described in the final sentence of Section 8.1.2 of the Merger Agreement."  *Id.*  They also agreed to participate in reviewing "any substantial matter of which it is advised by one of the other parties," arising out of any pollution or threat to the environment related in any way to events, conditions, or circumstances that occurred or existed on or before June 2, 1987.  *Id.*

---

[6] The Court cannot locate within the record any evidence memorializing the May 15, 1987 Amendment.

e.     **Sale to Franklin Power Products and the Parties' Current Arrangements**

On June 15, 1989, LPL sold the Site to Franklin Power Products, Inc. ("FPP") (*see* Filing No. 388-2 at 8, art. V ¶ 13), which at some point was acquired as a subsidiary by Remy International, Inc. ("Remy") (*see* Filing No. 149 at 14, Answer to ¶ 27).  In 2015, BorgWarner acquired Remy and changed the subsidiary name to BorgWarner Peru.  *Id.*  At the time of its answer to the operative complaint, BorgWarner contended that BorgWarner Peru was not an active company.  *Id.*

Meanwhile, back in 1999, AlliedSignal, Inc.,[7] merged with, and changed its name to, Honeywell International Inc. (*see* Filing No. 108).  As previously mentioned, it is undisputed that Allied-Signal is Honeywell's predecessor.

2.     **The Contaminants**

Contaminants were released at the Site as a result of Bendix's manufacturing operations, as well as during subsequent remediation efforts.  Operations at the Site began in 1961 and continued until 1984, when the presence of on-site soil and ground water contamination by the primary contaminants of concern ("COCs"), or the volatile organic compounds of tetrachloroethylene ("PCE"), trichloroethylene ("TCE"),[8] and trichloroethane ("TCA"), was first reported (Filing No. 420-2 at 6).  The facility dumped degreasing solvents and plating and degreasing wastes into a clay-pipe drain line Bendix had constructed to route to the local sanitary sewer system.  Since the on-site sanitary sewer line had "major breaks," significant quantities of

---

[7] The Certificate of Ownership and Merger lacks the hyphen found in "Allied-Signal, Inc" (*see* Filing No. 108 at 2).  The parties raise no issue with the differences in the names and use the hyphenated version.  So shall the Court.

[8] Plaintiffs' expert, Susan Griffin, indicates that the EPA considers both PCE and TCE to be carcinogenic to humans by all routes of exposure (*see* Filing No. 420-9 at 3 (citing UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, INTEGRATED RISK INFORMATION SYSTEM, https://www.epa.gov/iris (last visited Mar. 2024))).

these hazardous substances leaked into the subsurface soil and ground water. *Id.* Other spills/leaks likely occurred from tanks and storage areas including discharges from the plating room area, as well as identified discharges to surface soils southwest of the concrete pad behind the western wall of the building. *Id.*; *see also* Filing No. 388-2 at 7–8, art. V ¶¶ 7–8.

The affected residences in the area south and west of the facility, were in an area previously known in this litigation as the Glendale Class Area ("Glendale Area") (*see, e.g.*, Filing No. 380 at 10). "Residents were exposed to the hazardous substances through outdoor air, ground water, surface water, soil vapor, sewer vapor, and indoor air within residences where they lived." (Filing No. 420-2 at 6.) Contamination migrated beyond the former facility boundaries, into the residential area south of the facility and into Hurricane Creek which runs through the area. *Id.* Specifically, flow through the drain line and sewer system caused on-site subsurface contamination, especially along a twenty-foot-long section of severely damaged pipe, as well as leakages off-site through cracks, off-set pipe joints, and poor connections along the sewer lines beneath residences. *Id.* Contaminated ground water infiltrated the storm sewer (Filing No. 420-2 at 6), and people living in the Glendale Area were exposed to toxic chemicals when their homes flooded[9] (*see* Filing No. 420-1 at 36).

Contaminated ground water also migrated to off-site locations, contributed to the widespread contamination of soil, and served as a source of off-site contaminated vapors (*see* Filing No. 420-2 at 6; Filing No. 384-7 at 11). Contamination of indoor air by the intrusion of

---

[9] Per Dr. Kram: "While limited information is currently known about potential toxic exposures prior to the Defendants' initiating characterization efforts in 2018, episodic flooding in the Franklin neighborhood is well documented and multiple flooding events occurred between the time the Defendants knew of their toxic releases to the shared sewer system . . . and their 2018 initiation of environmental assessment efforts in the neighborhood. For instance, in early June of 2008 and in July of 2017, storms resulted in widespread flooding in Franklin." (Filing No. 420-1 at 39.)

vapors through one or more pathways has been documented in multiple residential homes,[10] and people living in the Glendale Area were exposed to toxic chemicals (*see* Filing No. 420-1 at 8, 36).

Additionally, after remediation efforts began, contaminants removed by a ground water recovery system that began operating in February 1995 were discharged directly into the outdoor air at various times prior to the installation of a carbon filter in August 2018 (*see* Filing No. 420-2 at 14, 57). System failures of the same ground water pump and treat system (*see* Filing No. 384-7 at 16), resulted in the discharge of untreated water into the sanitary sewer systems. *See id.* at 24.

### 3.    Remediation Efforts

The Site and the nearby Franklin residential community are the subject of three EPA administrative orders on consent concerning the alleged contamination and related cleanup. On November 27, 1990, the EPA issued a consent order to Amphenol and FPP (the "1990 Consent Order"), superseded it with a second consent order in 1998 (the "1998 Consent Order"), and recently superseded the second consent order with a third in early 2024 (the "2024 Consent Order") (collectively, the "Consent Orders").[11]

The Consent Orders mandated certain clean-up actions or remedies, which the EPA divides into "Interim Measures" and a "Final Remedy". *See* AMPHENOL/FRANKLIN POWER PRODUCTS IN FRANKLIN, IND., https://www.epa.gov/in/amphenolfranklin-power-products-franklin-ind (last visited Apr. 15, 2024). The Court will first discuss the two basic periods of interim remediation, 1995–1997 and 2018–2020, before turning to the final remedy first proposed in the EPA's 2022 Statement of Basis.

---

[10] When vapors enter buildings from contaminated sources beneath buildings or through conduits like sewer lines, an occurrence called "vapor intrusion" occurs (Filing No. 388-8 at 8).

[11] Since the parties finished briefing the present set of summary judgment motions, the EPA and certain parties have signed a new consent order, the 2024 Consent Order, which "supplants the 1998 [Consent Order] . . . ." AMPHENOL/FRANKLIN POWER PRODUCTS IN FRANKLIN, IND., https://www.epa.gov/in/amphenolfranklin-power-products-franklin-ind (last visited Apr. 15, 2024).

### a.   <u>Initial Interim Measures</u>

The 1990 Consent Order required a facility investigation, including soil sampling, ground water well drilling, sampling and analysis, and contaminant plume description; as well as a corrective measures study and workplan that would develop and evaluate corrective measure alternatives and recommend final corrective measure(s) for the facility (*see* Filing No. 388-2 at 9–15, art. VII).  FPP and Amphenol were both to consult with the EPA while planning for and prior to field sampling and laboratory analysis and to make available the results of the generated data. *Id.* at 15–16, art. VIII ¶ 1; *see id.* at 18, art. XIII ¶ 1.

The 1990 Consent Order resulted in Amphenol's installation in February 1995 of "an on-Site groundwater recovery system, commonly referred to as a pump and treat system, as an Interim Measure."  (Filing No. 388-8 at 9, 27.)  The system "maintain[ed] an inward groundwater gradient to keep the contaminated plume within the Site boundaries and treat[ed] the captured contaminated groundwater."  *Id.* at 8.

On August 19, 1997, an RCRA Interim Final Decision for the Facility prescribed the following corrective measures, which became part of the 1998 Consent Order:

> operation of an existing on-site groundwater recovery system that is to be upgraded; [] implementation of an air sparge/soil vapor extraction system; [] a monitoring system to evaluate the results of the corrective measures; and [] investigation of possible contaminant migration from the Facility to a public water supply well field, and appropriate corrective action if such contaminant migration is confirmed.

(Filing No. 388-3 at 15–16, art. V ¶ I; *see id.* at 19, art. VIII.)  "The 1990s remedial work to control and remediate contaminated groundwater was considered to be *interim* due to the way the 1998 [Consent Order] was written."  (Filing No. 388-8 at 29.)

b.      **Recent Interim Measures**

Years later, in 2018, community members renewed concerns that the Site had not been properly evaluated[12] and remediated and that residual contamination was the potential cause of incidences of pediatric cancer in Johnson County. *Id.* at 10. In response, the EPA "evaluate[d] whether the previously selected remedy was protective of human health and the environment based on updated vapor intrusion guidance and changes in volatile chemicals toxicity." *Id.* at 8.

The EPA required Amphenol to test the indoor air of homes in the Study Area[13] for vapor intrusion and to perform any mitigation measures needed to eliminate exposures, and the indoor air vapor intrusion investigations followed an approved EPA work plan. *Id.* at 31.

"[U]sing current (updated) vapor intrusion methodology and toxicity science," the EPA found a potential exposure risk from vapor intrusion into homes and commercial buildings and determined "that residual contamination along the sanitary sewer lines and in groundwater could pose a vapor intrusion risk to the adjacent residential community." (Filing No. 388-8 at 10.) As a result, the EPA "required that Amphenol perform several investigations to evaluate current conditions, including indoor air evaluation of homes, and to address human health risks and conduct interim cleanup measures, as needed to protect human health." *Id.*

From 2018 to 2022, Amphenol completed several Interim Measures to address on and off-site contamination from the Site (*see generally* Filing No. 433-1 at 10–11). For example, between September 2018 and August 2020, Amphenol performed indoor air testing in homes and the on-Site building as well as tested residential plumbing systems for integrity (Filing No. 388-8 at 11).

---

[12] The EPA's previous 1997 Interim Final Decision had been based in part on a vapor intrusion risk evaluation from the previous year that concluded soil and groundwater contamination in the residential area did not pose a threat to people (*see* Filing No. 388-8 at 10).

[13] The Glendale Area makes up the overwhelming majority of the Study Area, which also includes some commercial and non-residential additions (*compare* Filing No. 380 at 10, Filing No. 268 at 15–16 (Glendale Area), *with* Filing No. 388-8 at 65).

Amphenol performed intervention or mitigation measures where data indicated vapor entry or when the building structure presented a potential for vapor entry, and it concurrently investigated groundwater, soil, soil vapor and sewer vapor conditions. *Id.*

The EPA identified forty-two (42) homes for indoor air testing. *Id.* at 18. Amphenol performed indoor air testing at thirty-seven (37) homes as they were not granted access to the other five (5) homes. *Id.* at 18-19. Amphenol repaired the "plumbing systems in nine homes," and installed sub-slab depressurization systems "[i]n seven homes where soil gas and or indoor air exceeded screening levels . . . ." *Id.* at 19. The sub-slab depressurization systems "captured and vented vapors trapped beneath the slab to assure the vapors did not enter the home." *Id.*

In 2019, Amphenol replaced portions of the sanitary sewer line as a sewer and soil interim measure (*see* Filing No. 388-8 at 18, 31–32). While it mobilized for the off-Site interim measures, Amphenol dug out from the source area the old sanitary sewer line and surrounding 341 tons of contaminated soils for off-site disposal. *Id.* at 25.

By 2020, "all potential soil vapor exposure pathways ha[d] been mitigated to prevent exposure to [Volatile Organic Compounds ("VOCs")] into residential structures above the [Indiana Department of Environmental Management ("IDEM")] Residential Indoor Air Screening Levels." (Filing No. 388-8 at 11.) At the time, the EPA determined

> the . . . Site['s] conditions did not pose a human health risk for residents within the Study Area that provided EPA access for indoor air sampling. Additionally, the sanitary sewer system has been replaced or lined on portions of Hamilton Avenue, Forsythe Street, Ross Court, and Glendale Drive to reduce the potential for vapor intrusion into the sanitary sewer system (which could result in potential exposure to VOCs through leaky residential plumbing systems). All tested residential plumbing systems which exhibited vapor leaks were repaired during residential vapor intrusion investigation activities.

*Id.*

### c.    The Final Remedy and the 2024 Consent Order

On March 22, 2022, Amphenol proposed final corrective measures to the EPA necessary to protect human health and the environment from all current and future unacceptable risks (*see* Filing No. 433-1 at 12, art. V ¶ 30).  On May 18, 2022, the EPA issued its Statement of Basis, which contained proposed final corrective measures, including a detailed description and justification for the proposals (Filing No. 388-8).  Following a public comment period, EPA selected the final corrective measures and issued its decision and rationale in a March 13, 2023 Final Decision and Response to Comments ("FDRTC") (Filing No. 388-10).

Per the FDRTC, the EPA's selected final remedy for the Site consists of the following components:

> On-Site Selected Remedies:
> - Installing a permeable reactive groundwater treatment barrier ("groundwater treatment remedy" or "PRB");
> - Shutting off the groundwater pump-and-treat system permanently if [corrective action objections] are reached; and
> - Injecting treatment materials into soil to breakdown VOCs ("soil source treatment remedy").
>
> Off-Site Selected Remedies:
> - Installing PRBs;
> - Monitoring Natural Attenuation, or MNA; and
> - Continuing operation and monitoring of off-Site engineering controls for vapor intrusion mitigation.

*Id.* at 17–18.

Following the parties' briefing in the present set of summary judgment motions, the EPA and Amphenol, along with several other owner respondents not named in this lawsuit, voluntarily entered into the 2024 Consent Order, agreeing to its mutual objectives of (1) implementing the corrective measures selected by the EPA as set forth in the FDRTC and associated work plans; (2) meeting and maintaining compliance with EPA-approved performance standards; and (3)

implementing any additional work required by the EPA. *See* Filing No. 433-1 at 4, art. I ¶ 1; *id.* at 8, art. IV ¶ 10.

## C.   <u>Procedural History</u>

On December 3, 2019, Plaintiffs initiated this lawsuit as a proposed class action against Defendants BorgWarner, BorgWarner Peru, Franklin Power, Amphenol, and 400 Forsythe, LLC, alleging that toxic and hazardous waste from the Site and 400 N. Forsythe migrated into their groundwater, the sewer lines, and nearby residential neighborhoods (Filing No. 1).  Maintaining that this condition interfered with the use and enjoyment of their properties and diminished their properties' values, Plaintiffs brought claims for private nuisance (Count I); strict liability (Count II); battery (Count III); and negligence and gross negligence (Count IV).  *Id.*, ¶¶ 106–151.

In July 2021, Plaintiffs amended their complaint and added Honeywell as a defendant (Filing No. 143).  In the Amended Complaint, Plaintiffs alleged Honeywell, like the other named Defendants, created a private nuisance, was strictly liable for exposing potential class members to hazardous materials, committed battery, and was negligent or grossly negligent in its handling of the wastewater.  *See generally id.*

On December 12, 2022, Plaintiffs moved for class certification (Filing No. 268), which the Court ultimately denied on September 26, 2023 (Filing No. 380).  In its Order, the Court denied class certification since Plaintiffs met neither the numerosity and adequacy Rule 23(a) prerequisites nor the superiority Rule 23(b)(3) prerequisite.  *See id.* at 17, 23, 27.  Plaintiffs subsequently petitioned the Seventh Circuit for leave to appeal the denial (Filing No. 392-1), but their petition was denied (*see* Filing No. 397).

In March 2023, Plaintiffs and defendant 400 Forsythe, LLC filed a Joint Motion for Dismissal with Prejudice (Filing No. 309), which the Court granted, dismissing 400 Forsythe, LLC (Filing No. 310).

On October 6, 2023, Defendants filed the motions for summary judgment presently before the Court (Filing No. 382; Filing No. 385; Filing No. 387).  Following a short stay to allow for the resolution of the petition for leave to appeal (*see* Filing No. 393), Plaintiffs responded (Filing No. 413; Filing No. 416; Filing No. 419), and Defendants replied (Filing No. 425; Filing No. 426; Filing No. 427).

Plaintiffs moved for leave to renew their motion for class certification and urged the Court to reconsider its denial for class certification (Filing No. 428), to which Defendants responded (Filing No. 430; Filing No. 431), and Plaintiffs replied (Filing No. 432).

As such, all motions are ripe and ready for ruling.

## II. <u>LEGAL STANDARDS</u>

### A. <u>Rule 56 Summary Judgment Standard</u>

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007).  That is, summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant.  *See Celotex Corp.*, 477 U.S. 317, 322 (1986); *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor."  *Zerante*, 555 F.3d at 584 (citation omitted).

**B.**     **Rule 54(b) Reconsideration and Rule 23(c)(1) Renewal Standards**

Motions to reconsider filed pursuant to Federal Rule of Civil Procedure 54(b) are for the purpose of correcting manifest errors of law or fact or to present newly discovered evidence not available at the time of briefing.  *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 954 (7th Cir. 2013).  A motion to reconsider under Rule 54(b) also may be appropriate where there has been "a controlling or significant change in the law or facts since the submission of the issue to the Court." *Id.* (citation omitted).

A manifest error "is not demonstrated by the disappointment of the losing party.  It is the wholesale disregard, misapplication, or failure to recognize controlling precedent."  *Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (citation and quotation marks omitted).  Additionally, "[r]econsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion."  *Ahmed v. Ashcroft*, 388 F.3d 247, 249 (7th Cir. 2004) (citation and quotation marks omitted).

Because this is a putative class action, the Court balances the above standard with Federal Rule of Civil Procedure 23(c)(1)(C), which provides that orders determining whether to certify an action as a class action "may be altered or amended before final judgment."

"[A] district court has broad discretion to determine whether certification of a class is appropriate."  *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 596 (7th Cir. 1993).  Under Rule 23(c)(1)(C), the Court retains authority to modify or vacate a class certification at any time prior to final judgment.  "[T]he district court has the power at any time before final judgment to revoke or alter class certification if it appears that the suit cannot proceed consistent with Rule 23's requirements."  *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977).  "Even

16

after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

On the other hand, courts are generally reluctant to reconsider and modify previous orders, even in the class certification context, in part because of the law-of-the-case doctrine and to avoid costly delays to the proceedings. *Outzen v. Kapsch Trafficcom USA, Inc.*, 1:20-cv-1286, 2022 WL 4259675, at *2 (S.D. Ind. Sept. 15, 2022) (citing 3 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 7:35 (6th ed.)).   "Rule 23(c)(1) provides [p]laintiffs with a limited opportunity to adduce additional facts: It is not a Trojan Horse by which Plaintiffs may endlessly reargue the legal premises of their motion."  *Gardner v. First Am. Title Ins. Co.*, 218 F.R.D. 216, 218 (D. Minn. 2003); *see also Jaynes v. United States*, 69 Fed. Cl. 450, 453 (2006).

### III. DISCUSSION

Plaintiffs bring claims against Defendants for Count 1: Private Nuisance; Count 2: Strict Liability; Count 3: Battery; and Count 4: Negligence and Gross Negligence.  As an initial matter, the Court will address Plaintiff's Motion to Strike before reviewing the September 26, 2023 order denying class certification and then dedicates the remainder of this order to summary judgment.

### A. Plaintiff's Motion to Strike

Plaintiffs ask the Court to strike Amphenol's notice of "new additional evidence" arguing it serves as an "improper[] award[]" of an additional summary judgment brief without the Court's leave (Filing No. 438 at 2).  The 2024 Consent Order, issued three weeks after Defendants filed their summary judgment replies, is as relevant to Amphenol's preemption defense as the other properly designated consent orders.  The Court agrees with Plaintiffs' argument that rather than merely informing the Court of ongoing developments in EPA enforcement, the notice advocates for Amphenol's summary judgment position (*see, e.g.*, Filing No. 433 at 20 ("It is clear that the over-arching goal of the 2024 Consent Order is to implement all corrective measures selected by

17

US EPA and address any and all threats to human health and the environment in the vicinity of Plaintiffs' properties.")).  However, in its discretion, the Court will not strike the notice, but will consider only the supplemental evidence of the 2024 Consent Order itself without consideration of any additional or duplicative arguments appearing in Amphenol's notice.  As it relates to the preemption arguments, the Court will only take judicial notice of the indisputable fact that the consent order exists, it says what it says, and it has legal consequences.  *See Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 943 (7th Cir. 2012).  The Court does not rely on the 2024 Consent Order as proof of disputed facts in any other sense.  *See id.*  Thus, the Court **denies** Plaintiffs' Motion to Strike (Filing No. 438). In making this decision, the Court further notes that Amphenol did place Plaintiffs and the Court on notice that the EPA was "currently in the process of developing a third consent order that will further address and require the final remedial measures . . ." (Filing No. 388-7 at 5, ¶ 12).

B.  **Plaintiffs' Motion for Leave to Renew Class Certification and for Reconsideration**

Certification of a class under Federal Rule of Civil Procedure 23(a) occurs "only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."

In its September 26, 2023 decision, the Court found that the first and last of the Rule 23(a) requirements, "numerosity" and "adequacy", respectively, were lacking although Plaintiffs had established the other two elements (*see* Filing No. 380 at 14–23).  These two requirements, therefore, are the only Rule 23(a) prerequisites at issue in the motion under consideration.

The Court found that Plaintiffs did not independently satisfy their Rule 23(b) requirements; although Plaintiffs had established that common questions of law or fact predominated over individual questions, they had not demonstrated that a class action was superior to other methods of adjudication.[14]  *See id.* at 23–27.

Before re-evaluating Plaintiffs' Rule 23 demonstration, the Court first addresses Plaintiffs' alternative request for leave to amend its complaint.

### 1.   <u>Good Cause Does Not Exist to Amend Plaintiffs' Complaint At This Stage of the Litigation</u>

Plaintiffs move for leave to file a Second Amended Class Action Complaint that does not seek or mention personal injury damages (Filing No. 432 at 7; *see* Filing No. 428-2).  "[A]s a general rule, a court 'should freely give leave [to amend] when justice so requires.'"  *Gonzalez-Koeneke v. West*, 791 F.3d 801, 807 (7th Cir. 2015) (quoting FED. R. CIV. P. 15(a)(2)).  "But when a party moves to amend the pleading after the deadline to amend is set by the Court, the Court applies the 'heightened good-cause standard of Rule 16(b)(4) before considering whether the requirements of Rule 15(a)(2) were satisfied.'"  *Stone v. Couch*, 2020 WL 4339439, at *1 (S.D. Ind. July 27, 2020) (quoting *Alioto v. Town of Lisbon*, 651 F.3d 715, 719 (7th Cir. 2011)).  The diligence required to amend a pleading pursuant to Rule 16(b) "is not established if delay is shown and the movant provides no reason, or no good reason, for the delay."  *E.F. Transit Inc. v. Ind. Alcohol and Tobacco Comm'n*, No. 1:13-cv-01927, 2015 WL 3631742, at *2 (S.D. Ind. June 10, 2015) (citing *Alioto*, 651 F.3d at 719).  "Ultimately, 'the decision to grant or deny a motion to file an amended pleading is a matter purely within the sound discretion of the district court.'"  *E.F.*

---

[14] While the Court also found class certification inappropriate as to the putative Sewer Class under Rule 23(b)(2) (*see* Filing No. 280 at 27–32), Plaintiffs do not seek reconsideration of that portion of the decision (*see generally* Filing No. 428).

*Transit*, 2015 WL 3631742 at *2 (quoting *Brunt v. Serv. Employees Int'l Union*, 284 F.3d 715, 720 (7th Cir. 2002)).

Plaintiffs offer no explanation for their lack of diligence, which is the primary consideration for district courts in making a Rule 16(b) good-cause determination. *See Alioto*, 651 F.3d at 720. Instead, they argue chiefly that "amending the class definition to exclude those with potential personal injuries related to TCE is a recognized way to remove concerns about claim-splitting and the adequacy of class representative." (Filing No. 428 at 12.)

While the voluntary elimination of claims is always welcome, Plaintiffs' choice to do so does not impact the evaluation of diligence in seeking the amendments. At this late stage in the litigation, the reasoning offered by Plaintiffs does not constitute good cause, especially given the exorbitant delay in bringing this case to the current moment.

The original complaint, filed nearly four and one-half years ago (December 3, 2019), included a claim for personal injury (Filing No. 1, ¶¶ 134–140); allegations of a direct, harmful and/or offensive contact, risks to human health, and emotional distress (*see, e.g.*, *id.*, ¶¶ 15, 19, 37, 98 (Medical Monitoring Class), 144); and a demand for compensatory and punitive damages and the implementation of medical testing and monitoring (*see id.*, ¶¶ 50, 140). The Court afforded Plaintiffs until March 30, 2021, over fifteen months after their initial filing, to amend the pleadings (*see* Filing No. 92). Plaintiffs waited until the last day to file a motion for leave to file an amended complaint that again included the personal injury claim, allegations, and demand (*see* Filing No. 98; *see, e.g.*, Filing No. 143, ¶¶ 17, 21, 41, 54, 110, 146–152).

Upon moving for class certification on December 12, 2022, over twenty-two months later, Plaintiffs decided against seeking certification on its previously alleged battery claim, providing no explanation, only a footnote (*see* Filing No. 268 at fn. 1).

20

Now, nearly a year later — when subtracting the monthslong stay in late 2023 for review of the Court's denial of class certification — Plaintiff finally argues, in the context of seeking review of the Rule 23(a)(4) adequacy requirement, that "**[n]o one** has come forward with a claim for medical monitoring, emotional distress or other personal injury" (Filing No. 428 at 6) (emphasis in original).  In support, a declaration by Plaintiffs' counsel avers the same and that counsel is "unaware of any potential personal injury claims from Plaintiffs or the proposed intervenors" and has for years made attempts to join absent class members in this matter for individual claims. (Filing No. 428-1, ¶ 6.)  The Court is unconvinced that such a realization took four years to manifest and reminds counsel that factual contentions require evidentiary support *prior to filing*.  *See* Fed. R. Civ. P. 11(b)(3).

In any event, the Court is largely concerned about the delay in progress that would be brought by the proposed second amended complaint, which seeks to again certify a class action (*see* Filing No. 428-2).  The parties have already extensively briefed the issue of certification to a class very similar to, and encompassing, the sole class that remains in the second amended complaint, both before this Court and in an unsuccessful request for interlocutory appeal to the Seventh Circuit (*see* Filing No. 392-1 (Plaintiffs' Petition for Leave to Appeal); Resp. of Defs.' Amphenol and Honeywell, *Denney v. Amphenol Corp.*, No. 23-8022 (7th Cir. Oct. 30, 2023); Resp. of Defs.' BorgWarner and BorgWarner Peru, *Denney v. Amphenol Corp.*, No. 23-8022 (7th Cir. Oct. 30, 2023)).  They also have teed up summary judgment, which the Court rules on below. An amended complaint would hit reset on these adjudications, and the Court does not wish to expend precious judicial resources on the "Groundhog Day" scenario that would likely result.

More importantly, the case is presently scheduled for a weeklong trial to begin on August 19, 2024 (*see* Filing No. 398).  Due to the Court's burgeoning caseload, a newly amended class

action complaint would almost inevitably continue this trial date yet again, likely stretching resolution several more years from initial filing.

In summary, this case has already consumed unjustified amounts of time in bringing it to the point of trial readiness, with a similarly protracted and contentious class certification process. Under these circumstances, the Court finds that Plaintiffs lack "good cause" for amending their complaint.

### 2.   Plaintiffs Have Not Established that the Proposed Class Is So Numerous that Joinder of All Members Is Impracticable under Rule 23(a)(1)

As mentioned previously, Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable" in order for the court to permit a class action. To be impracticable, joinder need not be impossible . . . ." *Copeland v. Wabash Cnty., Ind.*, 338 F.R.D. 595, 601 (N.D. Ind. 2021) (citing in part *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993)). "The representatives only need to show that it is extremely difficult or inconvenient to join all the members of the class." *Jaynes*, 69 Fed. Cl. at 454 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1762 (3d ed. 2005)). Number alone is not dispositive; "[r]ather, the impracticability inquiry depends on the *particular facts of each case* and no arbitrary rules regarding the size of classes have been established by the courts." *Id.* (internal quotation and citation omitted) (emphasis added).

As the Court highlighted in its previous decision, the potential class members all live in close geographic proximity to each other and to the courthouse; *i.e.*, "all purported class members presumably live or at least own a possessory interest in real property within two miles of the Sites, and the Sites are located only twenty-five miles from the courthouse." (Filing No. 380 at 16.) In this vein, "identifying and contacting potential plaintiffs would not be exceedingly difficult." *Id.* To be sure, these factors weigh against a finding of impracticability of joinder.

In their brief, Plaintiffs do not direct the Court to additional evidence to sway these factors in their favor or suggest why joinder is impracticable on its face. Instead, they attempt to demonstrate impossibility by observing that Defendants "seemingly correctly assert that this Court lacks subject matter jurisdiction over class members' attempts at joinder because the parties are not completely diverse."[15] (Filing No. 428 at 5.)

Plaintiffs cannot meet their burden, however, merely because the federal subject matter jurisdiction necessary for the Court to hear intervenors' claims is lacking. Such an interpretation of "impracticable" imports jurisdictional concerns not properly encompassed by class certification. Stated differently, the inability to actually join in this action is insufficient for Rule 23 purposes, for such a "difficulty does not constitute the kind of 'impracticability' that justifies a finding of numerosity." *Hum v. Dericks*, 162 F.R.D. 628, 634 (D. Haw. 1995). If "impracticable" meant simply 'unrealizable' or 'impossible,' a diverse plaintiff could satisfy numerosity by seeking to certify a class of one named diverse plaintiff and one non-diverse class member.[16] *See id.* Considerations typical of a numerosity evaluation — for example, the number of class members, their geographic proximity, and the amount of damages at stake — would be eviscerated.

---

[15] Indeed, Plaintiffs' observation foretold what ended up happening. After the instant motion for reconsideration became ripe, the Court denied a Rule 24 motion to intervene, both as of right and by permission, filed in January 2024, by Plaintiffs and sixteen individual property owners (Filing No. 437; *see also* Filing No. 410). In denying permissive intervention, the Plaintiffs' noted that the "proposed intervenors appear[ed] to admit that intervention is 'impossible'" and "doubled down on the impossibility of intervention in their reply in support of their motion" (Filing No. 437 at 8 (citing Filing No. 432 at 4) ("There is no matter where joinder and intervention of all individuals with common claims can bring their claims in one forum. Therefore, joinder and intervention [are] impracticable . . . .")). Ultimately, the proposed intervenors failed to prove independent jurisdiction and the motion to intervene was denied.

[16] This conclusion is supported by Federal Rule of Civil Procedure 82's firm mandate that the Federal Rules of Civil Procedure "do not extend or limit the jurisdiction of the district courts or the venue of actions in those courts." "In light of Rule 82, Rule 23 clearly cannot be construed to extend the subject-matter jurisdiction of the court, which means that the effect of joining a nondiverse party on jurisdiction is not a relevant factor in determining impracticability under subdivision (a)(1)." Wright, Miller & Kane, Federal Practice and Procedure § 1762 (4th ed. Apr. 2023).

The Court is aware of the practical difficulty facing non-diverse members at this juncture. Nevertheless, there is no side door to the Rule 23(a)(1) requirement.  In the absence of class certification, this merely leaves Plaintiffs to proceed individually in federal court or together with the proposed non-diverse class members in state court.  *See id.*

In conclusion, Plaintiffs have failed to meet their Rule 23(a)(1) burden.  The numerosity issue is dispositive of the motion since Plaintiffs cannot satisfy all of Rule 23(a)'s requirements as they must.  *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). The Court therefore need not reconsider its findings as to the remaining Rule 23 factors and **denies** Plaintiffs' Motion for Leave to Renew Class Certification and for Reconsideration.  The Court now turns to the arguments on summary judgment.

## C. <u>400 N. Forsythe</u>

Defendants BorgWarner and BorgWarner Peru argue, and Plaintiffs do not dispute, that no evidence supports that FPP released hazardous substance from 400 N. Forsythe (*see* <u>Filing No. 383 at 13</u>).  The opinion of Plaintiffs' expert, Mr. Frank Anastasi, P.G., although offered in an unsworn expert report, clearly indicates that the former Bendix site is the only location from which contaminants were released:

> Based on the available information that I have reviewed, including results of numerous environmental studies performed at the former Bendix facility and in the adjacent residential study area, the former Bendix facility is the single, proven source of the COCs found in the study area and particularly in the Glendale Class Area.

(<u>Filing No. 384-3 at 56</u>; *accord id.* at 14.)  After summarizing key specific examples of supporting evidence, he further indicated that "[t]he theory that some of the VOC contamination . . . originated from sources other than the former Bendix facility . . . is not credible and is lacking in scientific basis."  *Id.* at 58.

24

Anastasi's opinion coincides with BorgWarner's expert, Dr. Stanley Feenstra, who found no documentation that PCE, TCE, or TCA were used in any of the industrial operations conducted at 400 N. Forsythe ([Filing No. 384-2 at 7]).  Likewise, an FPP employee declared that FPP or Remy never used any chlorinated solvents at 400 N. Forsythe from 1983 until 2007 ([Filing No. 384-5 at 2], ¶ 8; *see also* [Filing No. 384-4 at 2], ¶ 8 (FPP founder declaring same from 1983 to 1999)).  Per Dr. Feenstra, the low concentrations of TCE that had been detected in soil and groundwater beneath the 400 N. Forsythe site "were probably derived from the migration of TCE-contaminated groundwater that is evident from other sources located north and northeast of the site." ([Filing No. 384-2 at 7].)  Dr. Feenstra further found there to be no contribution from 400 N. Forsythe to vapor intrusion in the Glendale Area.  *Id.* at 9.

The Court finds no dispute as to whether hazardous substances were released from 400 N. Forsythe; on this record, there was no such release.  Accordingly, the Court **grants partial summary judgment** in favor of Defendants on Plaintiffs' claims relating to 400 N. Forsythe. Going forward, the surviving claims are limited to the Site, and the analysis of the claims which follows only relates to it, not to 400 N. Forsythe.

### D.  Issues of Liability Specific to Honeywell

#### 1.  Successor Liability

Honeywell argues that it is not liable for the Site as its current successor, taking the position that all environmental liabilities related to the former Bendix site were transferred to Amphenol — and thus did not remain with Honeywell — "as an asset sale in 1986" that then "stayed with [] Amphenol" when that company was later sold to LPL ([Filing No. 389 at 3, 7]).  By its interpretation, the 1986 Subscription Agreement transferred all of Allied's assets and liabilities, and, in exchange, it received all of the stock in what it calls "Original Amphenol" (or Amphenol prior to the April 1987 sale to LPL), as well as "Original Amphenol's *express assumption* of all environmental

liabilities" related to the former Amphenol Division, "which included those related [to the] Bendix electrical connector business unit and the Former Bendix Site." *Id.* at 8 (emphasis in original), 4.

Honeywell turns to language in the Subscription Agreement indicating that Amphenol "assumed and agreed to perform, pay and discharge" Allied's liabilities, including "all liabilities (including environmental liabilities) arising out of or related in any manner to the operation or use or former operation or use of all manufacturing and other facilities operated or used or formerly operated or used, in whole or in part, in connection with the Division business …. *Id.* at 8–9 (quoting Filing No. 415-24 at 5, art. 2 ¶ B).

Plaintiffs view the situation vastly differently. It traces the corporate transactions and series of mergers connecting Bendix's liabilities from Bendix to Allied in 1985, then Allied to Allied-Signal in 1987, and lastly Allied-Signal to Honeywell in 1999 (*see* Filing No. 414 at 16–17). Plaintiffs would have the liabilities pass through uninterruptedly to Honeywell; "[g]iven these corporate transactions, Honeywell, among others, is liable for the environmental pollution and subsequent injuries by virtue of assuming the liabilities of Bendix following the mergers …." *Id.* at 17. The Subscription Agreement between Allied and its then-owned subsidiary does not alter the conclusion. According to Plaintiffs, the agreement did not clearly transfer all liabilities from Allied to Amphenol; instead, it transferred assets in exchange for "stock, a limited contractual assignment of certain liabilities, and an indemnification." *Id.*

In support, Plaintiffs point to the November 28, 1988 Settlement Agreement between Allied-Signal, Amphenol, and LPL modifying the April 1, 1987 merger agreement that formed Amphenol. The Settlement Agreement specified that provisions of Section 8.1.2 of the previous merger agreement shall apply to all environmental liabilities relating to the period prior to closing, but clarified that it was "without recourse to any prior or extant agreements, commitments or understandings with respect thereto" by or among Amphenol or its predecessor companies and

Allied-Signal or its present or former subsidiaries or predecessor companies. (Filing No. 415-5 at 4, ¶ 3.) Plaintiffs assert the Subscription Agreement (on which Honeywell relies) is encompassed by the "prior or extant agreements" language. Plaintiffs reason that Allied "legally held" the liabilities in question after the Subscription Agreement and would be liable as Bendix's successor if sued for prior acts or omissions — but "Allied could seek indemnification from Amphenol" because of the Subscription Agreement (Filing No. 414 at 17).

Honeywell rebuffs this in its reply brief, again emphasizing that the aforementioned agreements leave no question as a matter of law that the liabilities in question "did not remain with Allied" (Filing No. 426 at 5), and accordingly could not have been transferred as a matter of corporate successor liability after the Subscription Agreement. *See id.* "Original Amphenol expressly assumed Bendix's liabilities (along with the other liabilities associated with the Amphenol Products Division) pursuant to the 1986 Subscription Agreement. It is that simple." (Filing No. 389 at 9.)

Where a corporation's stock is sold, all liabilities of that corporation remain with that corporation. *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1233 (Ind. 1994). By contrast, where one corporation purchases the assets of another, the buyer does not assume the debts and liabilities of the seller. *Id.*

> Generally recognized exceptions to this rule include (1) an implied or express agreement to assume the obligation; (2) a fraudulent sale of assets done for the purpose of escaping liability; (3) a purchase that is a de facto consolidation or merger; or (4) instances where the purchase is a mere continuation of the seller.

*Sorenson v. Allied Products Corp.*, 706 N.E.2d 1097, 1099 (Ind. Ct. App. 1999) (citing *Winkler*, 638 N.E.2d at 1233). These exceptions to the general rule of successor non-liability are set forth in the disjunctive; fulfillment of any one of the four exceptions is adequate to classify the purchasing corporation as a successor corporation.

27

Honeywell's position — that Original Amphenol assumed all tort liabilities arising out of Bendix's manufacturing activities, regardless of when the injury occurred — is strongly supported by the purpose of the transaction detailed in the Subscription Agreement, as described in the agreement itself: Original Amphenol was organized for the purpose of "holding the [Amphenol Products Division] business and the assets *and liabilities* associated therewith", and Allied desired to "transfer the entire Division including the assets *and liabilities* associated therewith to [Original Amphenol]" in exchange for the initial issuance of all of Original Amphenol's capital stock (Filing No. 415-24 at 2 (emphases added)).  Nothing in the nature of the transaction suggests that the parties intended Original Amphenol, which received all the assets of the Amphenol Products Division, to escape any of the related liabilities.

The agreement shows that Original Amphenol simply took over all of Allied's Division business, with nothing therein suggesting an intention to leave any obligations related to that business behind.  The Court finds that the language of the parties' agreement, read in context, shows that the buyer expressly assumed those liabilities.

Put plainly, Paragraph B of Article 2 of the Subscription Agreement is an express agreement by Original Amphenol to assume in late 1986 the liabilities of Allied relating to the Site, or "all liabilities (including environmental liabilities)" related in any manner to former operation of Bendix's manufacturing and other facilities "in connection with [Amphenol Products Division] business." (Filing No. 415-24 at 5, art. 2 ¶ B).  Today, those liabilities have not transferred in corporate succession to Honeywell.

Previous declarations of the Court on which Plaintiffs now rely do not change this conclusion.  Neither does the litany of cases Plaintiffs cite regarding Honeywell's corporate successorship as a successor-in-interest to Bendix's *asbestos* liability.  Honeywell was certainly Bendix's successor when Allied and Bendix merged, as this Court previously observed.  Deciding

Bendix's corporate successorship at present is academic for the purposes presently before the Court, since the Subscription Agreement's language clearly evidences an intent to excise the Amphenol Products Division environmental liabilities (the liabilities in Plaintiffs' claims), and for a separate entity to then assume this environmental subset.

The Court recognizes that, as part of the April 1987 merger, Allied agreed to indemnify the New Amphenol Group from any loss or liability that it "may suffer, sustain, incur or become subject to" due to any actual or alleged pollution (Filing No. 415-4 at 4, ¶ 8.1.2).  This arrangement was later amended by the November 1988 Settlement Agreement.  Though incidental to the liabilities in question, these indemnification agreements remain separate from, and do not impact, the issue of which entity had *assumed* the liabilities and when such assumptions transpired.  As contractual provisions, they assign risks and decide who among the parties will ultimately bear the costs associated with those risks.  *See, e.g.*, *Travelers Cas. & Sur. Co. v. United States Filter Corp.*, 895 N.E.2d 1172, 1181 (Ind. 2008) (explaining in practice how indemnification insures against losses).  For this reason, Plaintiffs' attempts to excavate Original Amphenol's assumption *viz-a-viz* the Settlement Agreement's indemnification provisions and associated clarifying language ("… without recourse to any prior or extant agreements …") are inapposite.

**2.      Non-Successor Liability for Negligence**

Honeywell first argues that Allied's agreement to indemnify Amphenol as part of the April 1987 merger agreement does not give Plaintiffs, strangers to the agreement, an independent right to sue Honeywell.

As correct as Honeywell is on its point, a duty of care may arise nevertheless where a party gratuitously or voluntarily assumes such a duty.  *Reece v. Tyson Fresh Meats, Inc.*, 153 N.E.3d 1193, 1203 (Ind. Ct. App. 2020) (citing *Plan-Tec, Inc. v. Wiggins*, 443 N.E.2d 1212, 1219 (Ind. Ct. App. 1983)), *opinion aff'd in relevant part*, *vacated in part*, 173 N.E.3d 1031 (Ind. 2021).  "The

assumption of such a duty creates a special relationship between the parties and a corresponding duty to act in the manner of a reasonably prudent person." *Id.*  Finding such a duty to exist requires affirmative and deliberate conduct such that it is "apparent that the actor . . . specifically [undertook] to perform the task that he is charged with having performed negligently." *Id.* (quoting *Yost v. Wabash College*, 3 N.E.3d 509, 517 (Ind. 2014)).  "Thus, to impose liability resulting from breach of assumed duty, it is essential to identify and focus on the specific services undertaken. Liability attaches only for the failure to exercise reasonable care in conducting the 'undertaking.'" *Yost*, 3 N.E.3d at 517 (quoting Restatement (Third) of Torts: Physical and Emotional Harm § 42 (2012)).

Plaintiffs argue that the Settlement Agreement and an April 1996 Letter of Understanding between Honeywell and Amphenol demonstrate Honeywell "controlled the cost and payment for expenses that Amphenol incurred" (Filing No. 414 at 24).  To the extent that these and other agreements themselves do not create third-party beneficiaries, though, the contractual obligations for Allied (Honeywell) to indemnify — reimburse in this case — Amphenol's remediation expenses cannot serve as the sole basis for Honeywell's liability.  An agreement governing the relationship between two contracting parties does not automatically create third party beneficiaries.  *See Girard v. Allis Chalmers Corp., Inc.*, 787 F.Supp. 482, 489 (W.D. Pa. 1992) ("Holding that an agreement which obligated [Defendant 1] to indemnify [Defendant 2] actually operated in the same manner as a direct action statute would unduly strain the language of a contract which was drafted to govern intercorporate relationships, not to create third party beneficiaries").  Plaintiffs do not point to the contractual creation of third-party beneficiaries and, as such, they remain third parties not in privity to, and lack standing to enforce, the agreements by their own terms.

The various actions taken by Allied and Honeywell pursuant and in addition to its contractual obligations suggest that they assumed duties beyond a typical indemnitor, however. Plaintiffs designated sufficient evidence to raise the question of whether Allied or Honeywell intended to voluntarily assume various duties integral to remediation and its oversight.

Since 2019, Honeywell directly contracted and paid the engineering firm, Wood P.L.C., for the time of the Site's Project Manager, Joseph Bianchi (Filing No. 415-22 at 6, 16), a role that "manage[s] the site work that is being done to make sure it is in compliance with the order and the requirements of the agency."  *Id.* at 26.  Honeywell requested that Cox-Colvin & Associates "become involved on the site as a third-party vapor intrusion expert," and Bianchi reached out in August 2018 accordingly (Filing No. 415-25 at 2).  Honeywell requested that AMEC Environment & Infrastructure conduct a Strategic Technical Review "to validate the current project strategy or suggest alternatives" (Filing No. 415-20 at 2), which it did (*see id.* at 11 ("The strategic technical shift that is recommended . . . .")).  Though these concrete instances of direct control may be the strongest evidence of voluntary assumption, they are not all.

Honeywell provided recommendations for communications with the public and suggested changes: reviewing "a lot of documents", they suggested "different language at different times" if they "saw something they thought could be improved or was confusing" (Filing No. 415-22 at 10, 11).  For a letter to homeowners, Honeywell, through Mark Schweitzer, provided Bianchi with suggested edits. *Id.* at 17.  Responding to the "draft letter", Sweitzer shared with Bianchi an intent to "tone down the presentation", explained that matters in the draft letter were "outside the scope of this general information letter", and advised that he "[does] not like to ever use the word 'contaminants.'"  (Filing No. 415-27 at 2).

Furthermore, Allied/Honeywell "would concur" with the "approach" Amphenol "[was] taking on a project," and "[s]ometimes . . . had other suggestions," which were sometimes followed

(Filing No. 415-23 at 18).  By way of example, at one point, with regards to "preemptively complet[ing] soil vapor intrusion testing," Schweitzer "comment[ed] on what he felt might be proper or . . . next steps" (Filing No. 415-22 at 30).

When differences of opinion between Amphenol and Allied arose, they "would discuss [them] and reach a mutual agreement."  (Filing No. 415-23 at 18.)  Samuel Waldo, Amphenol's first director of environmental affairs and corporate oversight person for various remediation activities at the Site, *id.* at 5–6, agreed that Allied/Honeywell employees had "[o]versight in a very broad sense of the word, yes."[17]  *Id.*  As it concerned an updated 2018-2019 summary report with a "$600,000 change order for Franklin removed", Bianchi emailed Amphenol that he had contacted Rich Galloway from Honeywell "as he has to review and approve the transfer."  (Filing No. 415-18 at 2; *see also* Filing No. 415-19 at 2 (from Bianchi, "Honeywell agreed to extending the existing Franklin PO by another $600 k to cover all costs up to the actual remedial action in August").)

In sum, the Court finds that the above conduct, in light of the specific duties spelled out in the Settlement Agreement and Letter of Understanding, amounts to an affirmative and deliberate undertaking of integral aspects of remediating the Sites that were designed, if executed properly, to safeguard nearby residents from injury or property damage.  Were a trier of fact to find Honeywell to have failed to exercise reasonable care in these voluntarily-assumed duties, liability would attach.

The trier of fact can sift through and decide which testimony, emails, and documents to credit and how much credence to afford each.  Having reviewed the portions of statements of Bianchi and Waldo to which Honeywell now points, the Court finds that a reasonable jury could

---

[17] Plaintiffs point to Amphenol's May 15, 2002 Form 10-Q Quarterly Report filed with the Securities and Exchange Commission to corroborate such testimony (*see* Filing No 414 at 24 (citing Filing No. 415-21)), which states, without specific reference to the Site, that Honeywell representatives "work closely" with Amphenol "in addressing the most significant environmental liabilities."  (Filing No. 415-21 at 11.)

find them contradicted by the emails and documents discussed above showing that Honeywell planned certain hires and utilizations, monitored the  "tone" or word usage in letters, enacted "[o]versight", and influenced approaches through necessary approval and concurrence.  The line is indeed blurred between merely indemnifying material expenditures (verifying the appropriateness of costs) and generally overseeing remediation project management.

Having found that the liabilities in question did not transfer in corporate succession to Honeywell, but that Honeywell's actions demonstrate a voluntary assumption of a duty of care, such that a trier of fact could find it independently liable, the Court concludes that summary judgment is inappropriate as to Honeywell on these grounds and, accordingly, **denies in part** its motion.  The Court turns now to discuss Defendants' preemption and property damages arguments and, finally, to address arguments specific to Plaintiffs' claims.

**E.**   **Preemption of Plaintiffs' Claims**

Defendants argue the federal RCRA preempts Plaintiffs' claims even if they were to survive summary judgment.  Amphenol and Honeywell maintain that preemption applies to each of the common law and statutory claims (*see* Filing No. 386 at 10–11),[18] while BorgWarner argues that it only applies to Plaintiffs' negligence claim (*see* Filing No. 383 at 19).  Due to the overlap, the Court will address the parties' preemption arguments together and will not separate or distinguish the negligence cause of action from the others.[19]

Where, as here, the federal statute or regulation contains no explicit preemption clause, "[t]he purpose of Congress is the ultimate touchstone."  *Nat'l Solid Wastes Mgmt. Ass'n v. Killian*,

---

[18] Honeywell joins in Amphenol's motion for summary judgment, submitting it is entitled to judgment on the same grounds as Amphenol (*see* Filing No. 389 at 7).

[19] Defendants' preemption arguments do not prejudice Plaintiffs at this stage since Amphenol raised preemption as an affirmative defense in its August 13, 2021 Answer to the First Amended Complaint (*see* Filing No. 151 at 66).

918 F.2d 671, 676–77 (7th Cir. 1990) (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978)), *aff'd sub nom. Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992).  Courts do not lightly attribute to Congress or to a federal agency the intent to preempt state or local laws.  *Id.* at 676.  Indeed, courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the *clear and manifest* purpose of Congress."  *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)) (emphasis in original); *see also Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting *Rice*, 331 U.S. at 230).  Environmental regulation has long been recognized as a "historic police power[ ] of the States."  *Id.* (citing *Huron Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960)).

"Preemption  can take on three different forms: express preemption, field preemption, and conflict preemption."  *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 652 (7th Cir. 2015) (quoting *Aux Sable Liquid Products v. Murphy*, 526 F.3d 1028, 1033 (7th Cir. 2008)).  In asserting that field preemption and conflict preemption apply, Defendants argue Plaintiffs' claims are preempted due to Congress's expressed intent to fully occupy the field of RCRA private enforcement, or preempted at least to the extent that the requested relief conflicts with the RCRA statutory scheme (*see* Filing No. 383 at 20; Filing No. 386 at 21–27; *see also* Filing No. 389 at 7 (joining in Amphenol's motion)).

### 1.   Field Preemption

Field preemption "confers exclusive federal jurisdiction in certain instances where Congress intended the scope of a federal law to be so broad as to entirely replace any state-law claim."  *In re Repository Techs., Inc.*, 601 F.3d 710, 722 (7th Cir. 2010) (citing *Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Trust Fund*, 538 F.3d 594, 596 (7th Cir. 2008)).

34

Although the EPA has the primary responsibility for enforcement, the RCRA, "like other environmental laws, . . . contains a citizen suit provision, 42 U.S.C. § 6972, which permits private citizens to enforce its provisions in some circumstances." *Liebhart v. SPX Corp.*, 917 F.3d 952, 958 (7th Cir. 2019) (quoting *Meghrig*, 516 U.S. at 484).  Here, Plaintiffs allege actions that conceivably might amount to § 6972(a)(1)(A) violations[20] of both the 1990 Consent Order and the subsequent 1998 Consent Order.  According to Plaintiffs, despite being parties to both consent orders, Amphenol "wholly failed to remediate the Site Contaminants" and Amphenol and FPP "failed to contain and/or adequately treat the presence of hazardous chemicals at the property", causing the damage alleged in the Amended Complaint (Filing No. 143, ¶¶ 26, 76).

At the same time, Plaintiffs' causes of action lack express invocations of RCRA authority and are framed exclusively in terms of state statutory and common law claims, *see id.* ¶¶ 117–69, and thus are properly deemed as such.  BorgWarner argues in this vein that Plaintiffs "attempt to occupy th[e] same space" as the consent orders, "without complying with RCRA citizen suit mandates," and should not be allowed to adjudicate the orders' mandates by utilizing common law claims (Filing No. 383 at 22).

The RCRA's private enforcement (citizen suit) mechanism under § 6972 contains a savings clause that clarifies:

> [n]othing in this section shall restrict *any right* which any person (or class of persons) may have *under any statute or common law to seek enforcement of any standard or requirement* relating to the management of solid waste or hazardous waste, or *to seek any other relief* (including relief against the Administrator or a State agency).

---

[20] § 6972(a)(1)(A) permits citizens to commence civil actions against any person "who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter," given the citizen observes certain prohibitions and follows certain procedures not taken or at issue here. *See Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 486–87 (7th Cir. 2011) (discussing in part 42 U.S.C. § 6972(b)).

§ 6972(f) (emphases added).  Though the language used by Congress is clear, BorgWarner nevertheless maintains that interpreting the savings clause to allow enforcement of RCRA cause of actions via common law claims would "circumvent[] compliance with the prerequisites of a RCRA citizen suit" and "be 'absolutely inconsistent' with the citizen suit statute." (Filing No. 383 at 22 (quoting *Atlantic Richfield Co. v. Christian*, 140 S.Ct. 1335, 1355 (2020).)

After reviewing the RCRA, the Court disagrees and ultimately finds the regulatory framework does "not regulate so pervasively as to occupy the field completely." *Feikema v. Texaco, Inc.*, 16 F.3d 1408, 1413 (4th Cir. 1994).  Unlike the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601–9675, the RCRA "is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards." *LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 938 (7th Cir. 2019) (quoting *Meghrig*, 516 U.S. at 483).  Instead, its primary purpose, national in scope and universal in coverage, "is to reduce the generation of hazardous waste and to ensure the proper treatment . . . of that waste which is nonetheless generated," *id.* (quoting *Meghrig*, 516 U.S. at 483), so as "to minimize the present and future threat to human health and the environment." *Albany Bank & Tr. Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 972 (7th Cir. 2002) (quoting 42 U.S.C. § 6902(b)).

Observations made in *Feikema*, a case relied heavily upon by Defendants, further persuade the Court that the RCRA framework is not so comprehensive as to leave the field without any room.  In addressing as a matter of first impression the issue of "whether the [RCRA], or an administrative order entered pursuant to it, preempts state common law causes of action for nuisance and trespass," 16 F.3d at 1410, the Fourth Circuit Court of Appeals noted that explicit provisions in the statute revealed an intent contrary to field preemption.  Specifically, "a separate provision . . . states that it is the will of Congress that the RCRA guide 'a *cooperative effort* among

36

the Federal, State, and local governments and private enterprises,"[21] *id.* at 1413 (emphasis in original) (quoting 42 U.S.C. § 6902(a)(11)), while another "allow[s] states to run their own waste management programs, although the Act does require federal approval of such state plans." *Id.* (citing 42 U.S.C. § 6943). "Thus, the legislation seems to contemplate state law action, rather than preempt it in its entirety." *Id.* Like the *Feikema* court, the Court is "led to conclude that the RCRA does not preempt by implication the field staked out by the Act's regulation." *Id.* at 1414.

This conclusion parallels this Court's preemption ruling involving the RCRA in a previous case involving an EPA order issued pursuant to § 6928(h), akin to the consent orders here. In *Stoll v. Kraft Foods Glob., Inc.*, this Court noted the language in § 6972(f) and indicated that, "[q]uite clearly, Congress sought to preserve state common law actions under § 6972." 2010 WL 3702359, at *12 (S.D. Ind. Sept. 6, 2010). The Court finds today as it did then.

### 2.   Conflict Preemption

The Court turns from field preemption to determine whether Plaintiffs' state statutory and common law actions are preempted by an actual conflict with some provision of the RCRA, a line of argument Defendants expend much ink in making. Conflict preemption will be found where it would be impossible for a party to comply with both federal and state requirements "or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Hoagland v. Town of Clear Lake, Ind.*, 415 F.3d 693, 696 (7th Cir. 2005) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)); *see also Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984)).

The party advancing the conflict preemption claim bears the burden of establishing that a conflict exists. *See, e.g.*, *Hobart Corp. v. Gen. Elec. Co.*, 2007 WL 9814737, at *2 (N.D. Ill. Sept.

---

[21] A Seventh Circuit judge has indicated likewise *in dicta*, noting that the "stated objectives of RCRA reflect a vision of state-federal cooperation." *Adkins*, 644 F.3d at 510 n.2 (Ripple, J., dissenting in part) (citing 42 U.S.C. § 6902(a)).

25, 2007); *Ready Fixtures Co. v. Stevens Cabinets*, 488 F. Supp. 2d 787, 789 (W.D. Wis. 2007). Preemption doctrine should not be lightly applied, and the showing of conflict presented should be "strong enough to overcome the presumption that state and local regulations can coexist with federal regulation."[22] *Vanlaningham v. Campbell Soup Co.*, 492 F. Supp. 3d 803, 806 (S.D. Ill. 2020) (quoting *Patriotic Veterans, Inc. v. Ind.*, 736 F.3d 1041, 1049 (7th Cir. 2013)).

Amphenol contends that Plaintiffs' requests — for abatement of the nuisance caused by the contamination and "the prompt and thorough investigation, identification, excavation and removal of all Site Contaminants, from the properties of plaintiffs" (Filing No. 386 at 22 (quoting Filing No. 143, ¶ 108))[23] — conflict with the necessary measures the EPA has already established. Specifically, Amphenol quotes the Statement of Purpose in the 1998 Consent Order (*see* Filing 386 at 22–23 (quoting Filing No. 388-3 at 10)), and argues that the consent order

> sets the — federally mandated — framework for (1) implementation of measures to control, prevent, or mitigate the release or potential release of hazardous waste; (2) the applicable standards to which Amphenol [and other respondents] must adhere to; and (3) additional measures that may be necessary to address threats or potential threats to public health or the environment emanating from the designated area.

*Id.* at 23. "[A]ll remedial work to be performed at the Site must be approved by the [] EPA prior to its implementation." *Id.* at 24 (citing Filing No. 388-3 at 8, 18, 21–23).

Additionally, BorgWarner reasons it owes "no duty outside the scope of the EPA's RCRA-promulgated consent orders" given that it did not cause the contamination or threat of

---

[22] It is inapposite that the asserted conflict involves actions brought under state and local common law, and not pursuant to regulations, since the same federalism principles apply. Obstacle preemption applies not only to positive enactments of state law but also to state law tort claims and breach of contract actions. *See, e.g.*, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000) (holding that negligence action against manufacturer was preempted); *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 652–54 (7th Cir. 2015) (signifying that a court may not entertain a breach of contract action when the claim conflicts with federal law); *see also Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 522 (1992) (recognizing "the phrase 'state law' to include common law as well as statutes and regulations").

[23] Although Amphenol points to requests Plaintiffs made in favor of class certification, which the Court has since denied, these demands appear elsewhere in the cause of action.

contamination to Plaintiffs' properties (Filing No. 383 at 24; *see id.* at 25).  Since "no legal basis [exists] to impose an obligation . . . in excess of the requirements" already contained within the EPA consent orders, BorgWarner concludes Plaintiffs' claims for specific injunctive relief must fail.  *Id.* at 25.

Plaintiffs respond that the requested injunctive relief is not precluded by the agency's plan, nor does it "come close to even infringing on any aspect" of the plan (Filing No. 417 at 14).  They argue Amphenol "hastily misstates" the purpose of the EPA-"approval" language in the 1998 Consent Order and contends that it does not prevent parties other than the EPA from ordering additional work at the Site.  *Id.* at 15, 16.  Plaintiffs maintain Defendants fail their burden of "show[ing] how the requested injunctive relief would conflict with the EPA's consent order."  *Id.* at 15; *accord* Filing No. 419 at 28–29.

### a.   __Dual compliance is possible__

The Court starts again at the text of the RCRA, where Congress preserved the rights under common law to seek relief beyond that which was statutorily provided for in the private enforcement mechanism, *see* § 6972(f) — that is, the rights of individuals to seek and enforce *common law claims*.  Generally, state law tort claims like negligence fall squarely into this category.

BorgWarner portrays Plaintiffs' negligence claims as merely "[a]djudicating compliance with the EPA consent order . . . ."  (Filing No. 383 at 24.)  On balance, this characterization is incorrect and overly truncates the claims in the suit.  Indeed, Plaintiffs argue that Amphenol and FPP, as BorgWarner's legal predecessor, "resisted fully investigating off-site impacts in the area to the South of the Site where [] Plaintiffs live" and that Defendants, including BorgWarner, "have not complied with the 1990 Consent Order . . . ."  (Filing No. 419 at 10–11, ¶¶ 14, 15.)  At the same

time, however, Plaintiffs plead negligence extending well beyond compliance with the consent order, and the Court resists the simplified characterization.

Plaintiffs' claims for damages and injunctive relief are not "necessarily premised" on violations of federal law, dissimilar to the state-law fraud claims in *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Practices Litig.*, a case on which BorgWarner relies. 65 F.4th 851, 865 (6th Cir.), *cert. denied sub nom. Lloyd v. Ford Motor Co.*, 144 S. Ct. 332 (2023); *see* Filing No. 383 at 23–24. The *In re Ford* claims "could not exist apart from" federal law; that is, they "arose out of" testing procedures set by the EPA in the Energy Policy and Conservation Act. 65 F.4th at 865 (addressing 42 U.S.C. § 6201 *et seq.*).

To demonstrate negligence, Plaintiffs need not reference EPA consent orders to prove BorgWarner and other Defendants breached duties of care otherwise owed legally to them. For the purposes of this discussion of impossibility preemption, the Court finds the Plaintiffs' claims of negligence exist apart from any standards or requirements of federal law. *Cf. Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1206 (9th Cir. 2002) ("[T]he existence of the [Federal Insecticide, Fungicide, and Rodenticide Act] requirements are similarly a critical element of [plaintiff's] state-law case for intentional interference with prospective business advantage . . . ."). The same is true for each of Plaintiffs' other common law and statutory claims.

The Court concludes that Defendants overstate the potential conflict between the work of the injunctive remedy sought and work of the remedial action required. Plaintiffs request injunctive relief in the form of vapor mitigation, which would include "immediate removal and replacement of sewer laterals" and should include

> floor sealant, sub-slab depressurization, confirmation that system performance meets specific no-risk criteria, and system performance shall be periodically assessed and maintained at a pre-determined frequency and over a conservative duration that would extend until complete site remediation . . . . Performance monitoring should also include appropriate

chemical and physical measurement during anticipated worst-case conditions . . . to increase confidence that systems are properly designed, operating and maintained.

(Filing No. 420-1 at 34; *see* Filing No. 419 at 29 n.3; Filing No. 417 at 14).  Per their characterization, the proposed relief "serves to guard their own properties from the migration of . . . contaminants *into Plaintiffs' homes*, which will continue occurring until the TCE and [dense nonaqueous phase liquids] sources are eliminated."  (Filing No. 419 at 29 (emphasis added).)

The 2024 Consent Order implements certain corrective measures selected by the EPA and set forth in the FDRTC.  Filing No. 433-1 at 8, art. IV ¶ 10.  Since Plaintiffs' homes are undisputedly not located on-Site, the Court considers the FDRTC's off-Site remedies.  Off-Site, the measures include installing permeable reactive groundwater treatment barriers ("PRBs") with "in-situ chemical reduction" injections in the southern boundary "to prevent downgradient plume migration to the south of the source area treatment system" (Filing No. 388-10 at 18; *see id.* at 81). Following injection activities and creation of the barriers, monitored natural attenuation — or, monitoring of the "natural processes [that] decrease or attenuate concentrations of contaminants in soil and groundwater" — will verify that short-and long-term corrective action objectives are attained and maintained.  *Id.* at 19, 83.  And, continued operation and monitoring of off-Site engineering controls — using "construction or other physical means" like the commonly used sub-slab depressurization system — would mitigate vapor intrusion.  *Id.* at 18, 78.

In comparing these two sets of remedies, the Court finds that no evidence readily demonstrates that floor sealant or sub-slab depressurization is physically detrimental to, or otherwise incompatible with, the EPA's plan for off-Site PRBs.  In fact, pursuant to the 2022 Statement of Basis, Amphenol has already installed sub-slab depressurization systems in seven homes in the Study Area where soil gas and/or indoor air exceeded screening levels (*see* Filing No. 388-8 at 19).  Similarly, no evidence exists that either Plaintiffs' desired assessments or

41

performance monitoring would displace the EPA's monitoring efforts aimed at the natural attenuation of contamination.   Without any such indications, the Court cannot say that simultaneously complying with a court order for Plaintiffs' proposed relief (were one to issue) and the latest consent order would be a "physical impossibility" for purposes of conflict preemption. *McHenry Cnty. v. Kwame Raoul*, 44 F.4th 581, 591 (7th Cir. 2022) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)); *see Wyeth v. Levine*, 555 U.S. 555, 573 (2009) ("Impossibility pre-emption is a demanding defense.").   While the relief sought in this suit may be in addition to that required by the consent orders, no such future impossibility of dual compliance with both sets of relief is presented by this record.

> **b.**   **Achievement of the congressional objective is frustrated by injunctive relief prior to the fulfillment and termination of the EPA Consent Order**

At least with respect to injunctive relief, however, the Court is convinced that Indiana state law, under the circumstances of this particular case, "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *MITE Corp. v. Dixon*, 633 F.2d 486, 493 (7th Cir. 1980) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)), *aff'd sub nom. Edgar v. MITE Corp.*, 457 U.S. 624 (1982).

If two statutes are involved, the Court traditionally "consider[s] the relationship between state and federal laws as they are interpreted and applied, not merely as they are written."  *Aux Sable Liquid Prods. v. Murphy*, 526 F.3d 1028, 1034 (7th Cir. 2008) (quoting *Frank Bros. v. Wis. Dep't of Transp.*, 409 F.3d 880, 894 (7th Cir. 2005)).  However, even in cases involving common law claims, whether state law is "a sufficient obstacle" is a "matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000), with "the crucial inquiry" being "whether [state

law] differs from [federal law] in such a way that achievement of the congressional objective . . . is frustrated." *Murphy*, 526 F.3d at 1034 (quoting *Frank Bros.*, 409 F.3d at 8940).

Under this analytical framework, it is first necessary to establish the congressional objective for the RCRA and, if possible, for the **specific provision that facilitates consent orders under 42 U.S.C. § 6928(h) ("Interim status corrective action orders")**.

This is not a difficult task since Congress expressly outlined the statute's objectives. § 6902 explains that RCRA was meant to promote the protection of health and the environment and to conserve valuable material and energy resources by, in part, "requiring that hazardous waste be properly managed in the first instance thereby reducing the need for corrective action at a future date. . . ." § 6902(a)(5). Furthermore,

> [t]he Congress hereby declares it to be the national policy of the United States that, wherever feasible, the generation of hazardous waste is to be reduced or eliminated as expeditiously as possible. Waste that is nevertheless generated, like that here, should be treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment.

§ 6902(b). From this the Court finds — like was mentioned previously — that the RCRA "is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards," but rather to "reduce the generation of hazardous waste and to ensure the proper treatment . . . of that waste which is nonetheless generated . . . ." *LAJIM, LLC*, 917 F.3d at 938 (quoting *Meghrig*, 516 U.S. at 483).

The congressional intent most relevant to the determinations now before the Court is found not only in the requirement that generated waste receive "proper treatment", *id.*, but also in the objective that hazardous waste "be treated . . . so as to *minimize the present and future threat to human health and the environment*." § 6902(b) (emphasis added). Such statutory objective is mirrored in § 6928(h)(1), which permits the EPA to issue an order, like the various Consent Orders,

that requires corrective action or such other response measure as it "deems necessary to protect human health or the environment . . . ."

Next, to evaluate the relationship between state and federal laws as "interpreted and applied", *Aux Sable Liquid Prods.*, 526 F.3d at 1034, the Court identifies the federal law's "intended effects", *Crosby*, 530 U.S. at 373. In doing so, the Court carefully considers the consent orders themselves, as well as the remedial corrective work ordered therein "deem[ed] necessary" by the EPA.

The 1998 Consent Order required, and the 2024 Consent Order now requires, respondent parties to implement certain corrective measures (*see, e.g.*, Filing No. 388-3 at 18–26, art. VIII, and 60–63; Filing No. 433-1 at 14–16, art. VIII). Also under the authority granted in the 1998 Consent Order, the EPA ordered several Interim Measures from 2018 to 2022 (*see* Filing No. 388-3 at 23–24, art. VIII. ¶¶ M.1–M.3).

> In 2018, EPA began investigations and required Respondents to address the potential soil vapor exposure pathways within the Study Area. By 2020, all potential soil vapor exposure pathways have been mitigated to prevent exposure to VOCs into residential structures above IDEM Residential Indoor Air Screening Levels. Therefore, EPA has determined the current Site conditions do not pose a human health risk for residents within the Study Area that provided EPA access for indoor air sampling. Additionally, the sanitary sewer system has been replaced or lined on portions of Hamilton Avenue, Forsythe Street, Ross Court, and Glendale Drive to reduce the potential for vapor intrusion into the sanitary sewer system (which could result in potential exposure to VOCs through leaky residential plumbing systems). All tested residential plumbing systems which exhibited vapor leaks were repaired during residential vapor intrusion investigation activities.

Filing No. 388-8 at 11. Specifically, an interim measure was conducted from 2019 to 2020, wherein "several residential pipes that connect homes to the sewer main (laterals) were replaced or repaired. Some private sanitary sewer laterals were not replaced due to their configuration

within the homes (*i.e.*, pipe location beneath structures with a basement)." *Id.* at 32.  Following

the interim measure,

> Amphenol re-sampled the manholes along with the sewer laterals of several
> homes in April 2020.  The vapor levels were unexpectedly elevated in
> thirteen of the manholes.  Amphenol observed that the elevated vapor
> concentrations were a result of a malfunction of the on-Site groundwater
> recovery system based on sewer line samples upstream and downstream of
> the system and proposed a recovery system modification.  Following EPA's
> approval and the recovery system modification, Amphenol re-sampled the
> sewer lines and confirmed that the vapors had cleared ….  In addition,
> Amphenol re-sampled sewer manholes in February 2021 to confirm that the
> sewer vapor levels remained low.

*Id.* at 21.  Afterwards, the EPA proposed corrective measures (as well as detailed descriptions and

justifications for the choices), evaluated and selected final corrective measures, and integrated

them into the 2024 Consent Order for implementation.

This painstaking, iterative, and years-long process that produced the various interim and

final corrective measures the EPA required of respondents breathes life into the congressional

intent behind § 6928(h)(1)'s "deems necessary" language.  Interim status corrective action orders

are deliberate grants of authority for the agency: to avoid improper and likely "expensive, complex

and time consuming" corrective action down the road, 42 U.S.C. § 6901, the agency is to select

and supervise the corrective measures it considers appropriately ameliorative.

Here, somewhere hopefully towards the end of that long and winding road, the EPA chose

against the vapor mitigation measures proposed by Plaintiffs as final corrective measures.  While

these litigated-for measures were not formally considered as proposed corrective measures, the

record demonstrates that the EPA knew of and, at least in the case of sewer laterals and sub-slab

depressurization, selectively implemented some by the time it evaluated alternatives for the final

remedy.  The record also contains a plethora of information about the corrective measures it did

select, as well as identified alternatives that were developed, screened, and evaluated using general

criteria (effectiveness, implementability, and cost) (*see* Filing No. 388-8 at 42–43).  Importantly, as it relates to Plaintiffs' concerns, the off-Site corrective measure evaluation focused "on impacts within the nearby residential area where historical VOC releases to the sanitary sewer line contaminated soil and groundwater and created indoor air vapor intrusion risk."  *Id.* at 43.

In these circumstances, the injunctive relief requested by the homeowners from the court conflicts with the remedial measures selected and supervised by the EPA.  *See Feikema*, 16 F.3d at 1416.  At bottom, the Consent Orders address the same site and conditions covered by the homeowners' suit, and they provide the agency's measured response, as authorized by the RCRA.  Not only would the Court, if it granted injunctive relief, be substituting its judgment for the authorized judgment of the EPA, the Court also would be usurping the enforcement role given by statute to the EPA.  *See* 42 U.S.C. § 6928(h)(1), (h)(2).

This conclusion mirrors that of the *Feikema* court, which held that "when the EPA, acting within valid statutory authority of the RCRA and not arbitrarily, enters into a consent order, that order will also preempt conflicting state regulation, including a federal court order based on state common law."  16 F.3d at 1416.  Though it involved a consent order issued pursuant to 42 U.S.C. § 6973, and not § 6928, *Feikema* is otherwise sufficiently similar in all other respects to this case.  For the reasons explained above, the Court holds that the Consent Orders pre-empt Plaintiffs' state common law and statutory claims to the extent they seek injunctive relief before the Consent Orders are fulfilled and terminated by the EPA and **grants partial summary judgment** to Defendants as to all injunctive relief sought.

As it relates to damages, however, the Court finds that state law damages claims, such as Plaintiffs', are not necessarily pre-empted by federal statutes that regulate the same field, *see id.* at 1416–18 (discussing *Cipollone*, 505 U.S. 504, 519; *Silkwood*, 464 U.S. 238, 251), and does not agree with Defendants that Plaintiffs' damages claims would conflict with the Consent Orders,

46

which make no provision for the payment of damages to affected homeowners.  For these reasons, the Court finds preemption does not apply to the damages relief sought and **denies** Defendants' motion for summary judgment in this respect.

## F.   <u>Property Damages</u>

Defendants seek summary judgment on Plaintiffs' claims for property damages (*see, e.g.*, Filing No. 386 at 27–32).

As a threshold matter, Plaintiffs submitted an unsworn expert report by Mr. Anastasi (Filing No. 418-1), and a pair of unsworn appraisal reports by Zora L. Crabtree (Filing No. 418-11, Filing No. 418-12) in opposition to Defendants' motions for summary judgment regarding property damages.  Expert reports are merely discovery materials; therefore, unless the expert authenticates the report, it is inadmissible.  *In re Method of Processing Ethanol Byproducts & Related Subsystems ('858) Patent Litig.*, 303 F. Supp. 3d 791, 807, 2014 WL 12774227 (S.D. Ind. 2014) (citing *Blue Cross & Blue Shield United of Wis. v. Marshfield*, 152 F.3d 588, 595 (7th Cir. 1998); *Wittmer v. Peters*, 87 F.3d 916, 917 (7th Cir. 1996), *reh'g denied*, *cert. denied*).  Neither Anastasi's nor Crabtree's reports are stated under penalty of perjury, and authenticating affidavits of the experts are likewise absent.[24]  Unsworn and unauthenticated expert reports are inadmissible under Federal Rule of Civil Procedure 56.  *See Estate of Brown v. Thomas*, 771 F.3d 1001, 1005–06 (7th Cir. 2014) (citing Fed. R. Civ. P. 56(e)(3); Fed. R. Evid. 901(a); *Scott v. Edinburg*, 346 F.3d 752, 759–60 & n.7 (7th Cir. 2003)).  As such, reports like these are not Rule 56 evidence that may be relied upon to overcome a motion for summary judgment.  *Id.* at 1006; *see also* Local Rule 56-

---

[24] Though Crabtree's reports contain a signed but undated certification stating that "to the best of [her] knowledge and belief . . . the statements of fact contained in this report are true and correct" (Filing No. 418-11 at 5; *accord* Filing No. 418-12 at 5), this does not suffice.

1(f)(2) ("[F]acts that a non-movant asserts are true to the extent admissible evidence supports them.").

Although evidence "should not be excluded on summary judgment on hypertechnical grounds," *Fowle*, 868 F.2d at 67, strict adherence to the requirements of Rule 56(e) is particularly appropriate here.  The extent to which Defendants have or will be able to remediate the properties and minimize damages presents a factual question that the trier of fact cannot resolve without appropriate, admissible evidence addressing the costs of remediation and the ultimate reduction in the sought-after property value; otherwise any conclusions drawn would necessarily be based solely on speculation.

With this in mind, the Court turns to the parties' arguments.  "[T]he aim in awarding damages in Indiana is to fairly and adequately compensate an injured party for his loss."  *Terra-Products, Inc. v. Kraft Gen. Foods, Inc.*, 653 N.E.2d 89, 93 (Ind. Ct. App. 1995) (citing *Wiese–GMC, Inc. v. Wells*, 626 N.E.2d 595, 597 (Ind. Ct. App. 1993), *trans. denied*), *trans. denied*.

Plaintiffs maintain they do not seek stigma damages (Filing No. 417 at 19).  Instead, they seek "the cost of cleaning up the contamination, as limited by the value of their homes."  (Filing No. 417 at 18.)  They interpret the Indiana Court of Appeals' decision in *Terra-Products* to mean that the measure of damages under Indiana law in environmental property damage cases, "reduction in fair market value", may be established "by evidence of the cost of remediation and repair."  (Filing No. 417 at 18 (citing 653 N.E.2d at 93).)

In this vein, they posit damages "estimated by the cost of repair (remediation)" and rely exclusively on the estimate provided by Anastasi ($15 million), a figure that recognizes the fact that the individual properties "cannot be cleaned up individually" and that "instead, the plume must be remediated in toto, or else the individual properties remain contaminated."  (Filing No. 417 at 18; *see* Filing No. 418-1 at 66 (estimating the "cost to remediate the contamination to the maximum

48

extent practicable" to "exceed $15 million dollars" and stating opinion that the remedy for the legacy contamination then existing "is not a property-by-property process" but would require "remediating the contaminated media in the entire area").)

Plaintiffs contend that, in cases where the cost of remediation "*as a measure* of the damage to the[] properties" is disproportionate to the property value, such as this one, the damages are "limited to the value of the[] real properties," *id.* at 18 (emphasis in original), 19 (citing *Allgood v. Gen. Motors Corp.*, 2006 WL 2669337 (S.D. Ind. Sept. 18, 2006)).  By their reasoning, "Ms. Denney has provided evidence . . . that she has suffered damages in the amount of $370,000, and Mr. Terhune's evidence establishes damages of $200,000," *id.* at 19, amounts determined in Crabtree's appraisal reports (*see* Filing No. 418-11 at 4, Filing No. 418-12 at 4).

Plaintiffs' argument is rather straightforward: because they cannot recover the entire cost of remediation, they are entitled at least to the full value of their unremediated property.

However, Plaintiffs collapse important distinctions set out in the *Terra-Products* and *Allgood* cases to reach their desired recovery metric.  The Court considers a missed portion of the *Terra-Products* analysis that it finds to be essential: namely, that "a party should be entitled to recover as damages any proven reduction in the fair market value of real property *remaining after remediation, i.e., the remaining loss damages*."  653 N.E.2d at 93 (emphasis added).  The question before the *Terra-Products* court was "whether the plaintiff could recover additional damages, such as for a long-term reduction in value even after the remediation."  *Allgood*, 2006 WL 2669337, at *21.

It is key that the loss in that case centered on compensating plaintiffs for a remediation that "did 'not restore the value of [the site] to its prior level' or 'to its fair market value before the causative event.'"  *Terra-Products*, 653 N.E.2d at 94 (quoting *In re Paoli R.R. Yard Litigation*, 35

49

F.3d 717, 797 (3rd Cir. 1994), *reh'g denied*, *cert. denied*; *Wiese–GMC, Inc. v. Wells*, 626 N.E.2d 595, 597 (Ind. Ct. App. 1993), *reh'g denied*, *trans. denied*).  This nuance should not be lost.

In light of the fact that the remediation here is still ongoing (*see* Filing No. 388-7 at 4, ¶ 10), a fact that Plaintiffs implicitly rely on to lodge their nuisance arguments (*see* Filing No. 417 at 21 ("Even after the remediation is complete at the source . . .")), the Court recognizes that it remains fundamentally unclear what "remaining loss" Plaintiffs seek to establish.  If Plaintiffs were to contend the "value of [their property] after remediation was less than its value before discovery of [] contamination," then they would be entitled to the compensation for the loss remaining in the property's fair market value "in that, under such circumstances, remediation would be inadequate to compensate [] fully for [the] loss."  *Terra-Products*, 653 N.E.2d at 94.  Instead, Plaintiffs' incorrect substitution of "cost of repair/remediation" as an invariable proxy for "remaining loss" damages, muddies what they are entitled to: "*reduction* in the fair market value of [their property] caused by [Defendants]."  *Id.* (emphasis added).  Were the full cost of repair (deviated downward to account for disproportionality) to be awarded now, before the completion of remediation, the relief would stand in some senses as a preemptive double recovery, in that Plaintiffs would receive value that would presumably (re)accrue to their properties over the course of the remediation process.  This would be inconsistent with Indiana law's interest in preventing windfall damages. *See Allgood*, 2006 WL 2669337, at *24; *see also INS Investigations Bureau, Inc. v. Lee*, 784 N.E.2d 566, 577 (Ind. Ct. App. 2003) (citing *Curtis v. Clem*, 689 N.E.2d 1261, 1265 (Ind. Ct. App. 1997)), *trans. denied*.

Notwithstanding this theoretical dilemma, "circumstances where a reduction in the fair market value of real property after remediation of environmental contamination supports recovery of both temporary and permanent damages in order to compensate fully the plaintiff[s]" require evidence of both temporary injury, the cost of remediation, and permanent injury, the value of the

land before and after remediation. *Id.* at 95. To the extent that is what Plaintiffs really claim, they must produce evidence of both.

*Allgood* does not alter this requirement. Confronted with a cost to restore land to its original condition that was "grossly disproportionate" to the change in value, Judge David Hamilton turned to the measured guidance of the Restatement (Second) of Torts to decide damages. *Allgood*, 2006 WL 2669337, at *22. "[C]onsistent with Indiana law", Restatement § 929

> addresses the measure of damage for harm to land from past invasions, which can include pollution:
>
> (1) If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for
>
> > (a) the difference between the value of the land before the harm and the value after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred . . . .

*Id.* at *22 (quoting Restatement (Second) of Torts § 929). Section 929(1)(a), as Judge Hamilton noted, permits a plaintiff to elect to receive restoration costs "in an appropriate case," but comment (b) adds a relevant caution:

> If, however, the cost of replacing the land in its original condition is disproportionate to the diminution in the value of the land caused by the trespass, unless there is a reason personal to the owner for restoring the original condition, damages are measured *only by the difference between the value of the land before and after the harm*.

(Emphasis added.) Relying on *Terra-Products*, Section 929, and other cases outside of this Circuit, the *Allgood* Court found the defendant entitled to summary judgment on plaintiffs' claims "for the cost of restoring their property to the condition it was in prior to contamination, beyond the conditions to be achieved by the government-ordered clean-up that [defendant] has undertaken,

51

and in excess of the market value of the property in the absence of any contamination."  2006 WL 2669337, at *25.

Like their *Terra-Products* counterparts, Plaintiffs have failed to carry their burden on the "most critical element in the permanent damage equation: the amount, if any, of the 'remaining loss' or reduction in fair market value of [the Site] after remediation."  653 N.E.2d at 95.  Issues of inadmissibility aside, Crabtree's appraisal reports do not allege a reduction in the fair market value. Each expresses the opinion of the property's market value, or the "most probable price which a property should bring in a competitive and open market" (Filing No. 420-17 at 12; Filing No. 420-18 at 12), as of the date of inspection, February 2, 2024.  That opinion nets a single estimate (*see, e.g.*, Filing No. 420-17 at 4).  Alone, that single number cannot serve in isolation as evidence of a "reduction", which by its nature requires the benchmark of a second, pre-harm valuation.  These estimates of market value may not even prove to be reliable evidence of the present market value (let alone post-remediation), in that the appraiser makes the "extraordinary assumption that if any contamination from industrial plume was at the subject property, it has been remediated" (Filing No. 420-17 at 11; Filing No. 420-18 at 11).  And while, at least under Indiana law, a property owner is qualified to offer an opinion about the value of his or her own property and an expert opinion is not necessary, *Allgood v. Gen. Motors Corp.* (*Allgood II*), 2007 WL 647496, at *4 (S.D. Ind. Feb. 2, 2007) (citing *Allgood*, 2006 WL 2669337, at *36 n.14)), Plaintiffs do not produce, and the Court was unable to locate, reliable evidence of such.[25]

---

[25] The pair of expert reports (Filing No. 384-10, Filing No. 384-11) by Plaintiffs' "former expert" Jennifer Keefe (Filing No. 419 at 33) is likewise insufficient to fulfill Plaintiffs' burden.  The record indicates that Keefe was deposed, and in the course of such deposition, she reaffirmed opinions stated in the unsworn report and the parties had a full and fair opportunity to address the basis and admissibility of her opinions in the unsworn report (*see generally* Filing No. 384-12; Filing No. 388-26).  Thus, her reports, unlike Anastasi's or Crabtree's, are admissible.  *See Maytag Corp. v. Electrolux Home Prods., Inc.*, 448 F.Supp. 2d 1034, 1064–65 (N.D. Iowa 2006) ("[A]n unsworn expert report may be considered at summary judgment where the opinions therein are otherwise adopted or reaffirmed in an admissible affidavit or deposition testimony by the expert.").

Accordingly, since Plaintiffs have not designated evidence demonstrating a reduction in the fair market value of their real property, the Court **grants partial summary judgment** in Defendants' favor on the issue of property damages. The Court now turns to the remaining individual claims.

**G.**     **Battery Claims and the Request for Medical Monitoring Relief**

Regarding Plaintiffs' battery claims, Amphenol and Honeywell move for dismissal and maintain the "contact" alleged by Plaintiffs is that contact with, or exposure to, contaminants, primarily through vapor intrusion of their homes (Filing No. 386 at 32–33). They argue Plaintiffs lack evidence of a harmful bodily contact, as an essential element of a claim for battery. *Id.* at 33.

Plaintiffs do not oppose summary judgment on these grounds (*see* Filing No. 417 at 25). Indeed, Plaintiffs even seek leave to file an amended complaint "that makes claims only for property damage and does not [s]eek medical monitoring or personal injury damages of any kind for any plaintiff or proposed class member." (Filing No. 428 at 12–13.)

The Court agrees with the parties' request that the battery claims against Defendants be dismissed at this stage. Accordingly, the Court **grants partial summary judgment** in favor of Defendants on Plaintiffs' battery and medical monitoring claims.

**H.**     **Strict Liability Claims**

Indiana courts evaluate whether a particular *activity* is abnormally dangerous, *Ind. Harbor Belt R.R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1181 (7th Cir. 1990) ("[U]ltrahazardousness or abnormal dangerousness is, in the contemplation of the law at least, a property not of substances, but of activities . . . ."), and determine on a case-by-case basis whether the actions and particular

---

Nevertheless, Keefe's reports, like Crabtree's, only provide a single appraisal value for each property, as of August 18, 2022 (*see generally* Filing No. 384-10). Most importantly, "the impact of contamination on the value of the residences was outside the scope of the Appraiser's project" (Filing No. 384-11 at 12), and Crabtree admitted to having never conducted an appraisal measuring whether contamination impacted a residence's value (*see* Filing No. 388-26 at 5).

circumstances involved constitute as ultrahazardous.  *See Bridges v. Kentucky Stone Co.*, 425 N.E.2d 125, 126 (Ind. 1981).  In conducting that evaluation, the Supreme Court of Indiana treats as authoritative the provisions of the Restatement (Second) of Torts (1977).  *See id.* at 126.

One who carries on an ultrahazardous activity, also referred to as an "abnormally dangerous activity" in the Restatement, "is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm." Restatement (Second) of Torts § 519 (1977).  This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.  *Id.*  The Restatement instructs:

> In determining whether an activity is abnormally dangerous, the following factors are to be considered:
>
>> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
>> (b) likelihood that the harm that results from it will be great;
>> (c) inability to eliminate the risk by the exercise of reasonable care;
>> (d) extent to which the activity is not a matter of common usage;
>> (e) inappropriateness of the activity to the place where it is carried on; and
>> (f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 520.  "This analysis requires the full inability to eliminate the risk, not merely to significantly reduce it."  *PSI Energy, Inc. v. Roberts*, 829 N.E.2d 943, 966 (Ind.), *aff'd on reh'g*, 834 N.E.2d 665 (Ind. 2005) (Dickson, J., concurring in part), *abrogated on other grounds by Helms v. Carmel High Sch. Vocational Bldg. Trades Corp.*, 854 N.E.2d 345 (Ind. 2006).

First, Plaintiffs contend that BorgWarner's abnormally dangerous activity was its "conscious decision to permit contaminants to flow unabated from its property for years, discharging into the neighborhood sewer lines south of its Site and into Hurricane Creek," (Filing No. 419 at 20), whereas Amphenol's was the "disposal of the industrial chemicals into the residential area through necessarily dangerous pathways" (Filing No. 417 at 20).

54

A "decision to permit" contaminants to "flow" and reach beyond the Site is not a claim for strict liability under the conditions of this case. By their own representation of the theories they ascribe to assign strict liability to BorgWarner's actions, Plaintiffs do not contend, as they must, that the continued "flow" of contaminants could *not* have been avoided by the exercise of reasonable care, *see* Restatement (Second) of Torts § 520(c); instead, they reason in essence that a "flow" allegedly continued because *reasonable care was not exercised*. Plaintiffs allude to the reasonable care they assert BorgWarner should have taken in their argument:

> Rather than take steps to stop the flow of contaminants from its property, the evidence is that BorgWarner failed to take corrective action to prevent the contaminants from migrating to the residential area south of the Site and failed to take action to remediate the residential properties that have been impacted.

([Filing No. 419 at 18.](Filing No. 419 at 18))

Plaintiffs argue that BorgWarner did not conduct "activity" (for strict liability purposes or otherwise) until the 1989 sale of the Site to FPP, soon after which a consent order mandated BorgWarner to act to, in Plaintiffs' words, "remediate the [impacted] residential properties." *Id.* At any rate, Plaintiffs' assertions as to BorgWarner's involvement is fundamentally inconsistent with a theory of strict liability, which is based on the inability to eliminate risk, a factor "at the core of § 519 [strict] liability." *Fechtman v. U.S. Steel Corp.*, 994 N.E.2d 1243, 1248 (Ind. Ct. App. 2013) (quoting *Erbrich Prods. Co., Inc. v. Wills*, 509 N.E.2d 850, 857 n.3 (Ind. Ct. App. 1987)). Once subject to the Consent Orders, BorgWarner was not only in a position to eliminate risk, but required to do so. In seeking liability for those actions, Plaintiffs conflate the doctrines of strict liability and negligence and assert BorgWarner was *negligent* in eliminating that risk. Most, if not all, strict liability claims that allow for risk elimination are masquerading negligence theories; this one is.

Second, strict liability applies differently to Amphenol than it does BorgWarner, since Amphenol's "activities" at the Site extend backwards to Bendix's operations. As an initial matter,

the Court must determine what the relevant "activity" is in this instance.  Amphenol initially maintains that it is merely the industrial use of the chlorinated solvents (*see* Filing No. 386 at 26), but then appears, in light of Plaintiffs' response, to concede the "whole" of the activities included the "[u]se, [h]andling, [a]nd [d]isposal" alleged in the operative complaint; that is, the "wrongful emission, release, discharge, handling, storage, transportation, processing, [and] disposal [of] toxic and hazardous waste [specifically, TCE and PCE], which was generated as a by-product of Defendants' . . . processing, casting, production and recovery operations in Franklin, Indiana . . ." (Filing No. 425 at 20; *id.* at 21 (quoting Filing No. 143, ¶ 1)).

The relevant question is whether, under Indiana law, the use, handling, and disposal of TCE and PCE constitutes an abnormally dangerous activity such that Amphenol is subject to strict liability regardless of fault.

Plaintiffs argue that Amphenol discharged its manufacturing wastewater into a sewer manhole that then in turn discharged the wastes into the local sanitary sewer, which was directly connected to homes south of the Site (Filing No. 417 at 20).  They reason that, "[b]ecause there is no safe way toxic and carcinogenic substances can be disposed of into a leaking sewer system, this is an abnormally dangerous activity." *Id.*

However, the Seventh Circuit has noted that "Indiana courts have generally been reluctant to impose strict liability based on the abnormally dangerous activity doctrine." *Consol. Rail Corp. v. Allied Corp.*, 882 F.2d 254, 257 n.3 (7th Cir. 1989).  "In fact, it appears that strict liability for abnormally dangerous activities has been limited in Indiana to blasting and housing wild animals in a residential area." *Fechtman*, 994 N.E.2d at 1250.

Plaintiffs have offered no reason to believe the Indiana Supreme Court would expand the tort of strict liability to encompass the use, handling, and disposal of chlorinated solvents.  All cases interpreting Indiana law that this Court has been able to locate and that involve even remotely

similar activities — like the delivery (and habitual spilling) of TCE[26], the manufacture (and discharging into sewers) of polychlorinated biphenyls[27], and the manufacture of liquid bleach using chlorine gas[28] — have found against expansion of the doctrine.

As for the Restatement factors (about which the parties' arguments do not supply much guidance), the first and second factors here weigh in favor of finding that the use, handling, and disposal of TCE and PCE is abnormally dangerous. Both contaminants are carcinogenic to humans, and thus are understandably ultra-hazardous or abnormally dangerous materials. The Court recognizes that great harm might result from certain kinds of exposure resulting from the disposal of the chemicals into the residential area.

Nevertheless, strict liability attaches only to ultra-hazardous or abnormally dangerous *activities* and not to ultra-hazardous or abnormally dangerous materials. As stated in *Erbich*,

> we must not look at the abstract propensities or properties of the particular substance involved, but must analyze the defendant's activity as a whole . . . . If the rule were otherwise, virtually any commercial or industrial activity involving substances which are dangerous only in the abstract automatically would be deemed as abnormally dangerous. This result would be intolerable.

509 N.E.2d at 856. In this case, the use, handling, and disposal of these industrial solvents, when properly done, is not so intrinsically dangerous that absolute liability must attach. *See also In re Behr Dayton Thermal Prods. Litig.*, 2022 WL 3328407, at *10 (S.D. Ohio Aug. 11, 2022) ("[T]he high degree of risk associated with [TCE and PCE] can be largely eliminated with the exercise of reasonable care.").

---

[26] *Amcast Indus. Corp. v. Detrex Corp.*, 779 F. Supp. 1519, 1544 (N.D. Ind. 1991), aff'd in part, rev'd in part on other grounds, 2 F.3d 746 (7th Cir. 1993).

[27] *City of Bloomington, Ind. v. Westinghouse Elec. Corp.*, 891 F.2d 611, 616–17 (7th Cir. 1989).

[28] *Erbich Prods. Co.*, 509 N.E.2d at 856. Decisions of the Indiana Court of Appeals, like *Erbich*, provide a "strong indication of how [the Indiana] Supreme Court would decide a similar question, unless there is a persuasive reason to believe otherwise." *Adams v. Atl. Richfield Co.*, 2022 WL 4463345, at *2 (N.D. Ind. Sept. 23, 2022) (quoting *Gen. Accident Ins. Co. of Am. v. Gonzales*, 86 F.3d 673, 675 (7th Cir. 1996)).

When it comes to the third Restatement factor, the Plaintiffs' case, in its assertions of negligence, private nuisance, and battery, all undermine a finding in Plaintiffs' favor.  To suggest that Amphenol did not exercise, but should have exercised, reasonable care — because, if it had, the risk of the type of harm for which recovery is sought would have been eliminated — is to argue that there existed an *ability* to eliminate the risk by the exercise of reasonable care, not an *in*ability.

The fourth and fifth factors also favor Amphenol: TCE and PCE are industrial chlorinated solvents that are commonly used, and their handling and disposal is not unusual.  In *In re Behr Dayton Thermal Prods. Litig.*, an Ohio case involving TCE and PCE used for degreasing and parts cleaning, the district court found that, during the relevant time period, which overlaps with the relevant period in this case, "TCE and PCE were commonly used as solvents in a wide variety of industrial settings, including dry cleaning, metal degreasing and parts cleaning . . . ."  2022 WL 3328407, at *10.  Given the nature of Bendix's operations, it cannot be said that it was inappropriate to use these chemicals in those facilities.  The fact that these industries were located directly north of the Glendale Area neighborhood does not change the equation.  *See id.*

The final factor to be considered is the extent to which value to the community is outweighed by its dangerous attributes.  Bendix, through its operations at the Site, provided employment to local residents.  As Plaintiffs allege, Bendix conducted various operations, including electroplating, machining, assembling and storing manufactured components, and inventorying raw materials and compounds required for production — all of which were valuable services.  On the other hand, the use and disposal of the chlorinated solvents posed significant risks to the people in the nearby homes.  This factor does not weigh heavily in favor of either party.

Having reviewed all the relevant factors, as well as Indiana case law addressing the question of what constitutes an abnormally dangerous activity, the Court concludes, as a matter of

law, that the use, handling and disposal of TCE and PCE does not fall within the very narrow scope of activities for which Indiana imposes strict liability.

Lastly, Plaintiffs argue in response to both BorgWarner and Amphenol that the issue of strict liability is inappropriate for summary judgment because of factual issues which the jury should decide (*see, e.g.*, Filing No. 419 at 20–21; Filing No. 417 at 19–20).  However, the issue of whether an activity is abnormally dangerous is a question of law for the court to decide.  *Erbrich Prods. Co.*, 509 N.E.2d at 857 (citing authority); *see also Ind. Harbor Belt R.R. Co.*, 916 F.2d 1174 (7th Cir. 1990).  Thus, the issue is appropriate for summary judgment.

The Court therefore **grants** Defendants' motions for summary judgment on this issue.

## I.      <u>Nuisance Claims</u>

Defendants differ slightly in their approaches in arguing for summary judgment on Plaintiffs' nuisance claims.  BorgWarner submits there is no continuing nuisance to abate at present and that Plaintiffs' claim against it fails as a matter of law since BorgWarner did not engage in activity creating the nuisance (*see* Filing No. 383 at 16).  Amphenol and Honeywell likewise maintain there is no continuing nuisance, but then take a different tack and argue Plaintiffs' evidence is not tied to any concrete harm.  The Court takes each in order.

### 1.      <u>Genuine Issues of Material Fact Exist as to Whether an Unremediated Condition Exists at Present</u>

The Court begins with the language of the statute which defines nuisance and sets out what can be done about it:

Whatever is:

(1) injurious to health;
(2) indecent;
(3) offensive to the senses; or
(4) an obstruction to the free use of property;

so as essentially to interfere with the comfortable enjoyment of life or property, is
a nuisance, and the subject of an action.

Ind. Code § 32-30-6-6.  An action to abate or enjoin a nuisance may be brought by any person

whose: (1) property is injuriously affected; or (2) personal enjoyment is lessened.  Ind. Code § 32-

30-6-7.  If a proper case is made, the nuisance "may be enjoined or abated and damages recovered

for the nuisance."  Ind. Code § 32-30-6-8.  "[T]he focus of the legislature was on protecting an

individual's right to enjoy property from infringement by any source."  *Gray v. Westinghouse Elec.*

*Corp.*, 624 N.E.2d 49, 53 (Ind. Ct. App. 1993) (citing in part 66 C.J.S. Nuisance § 83), *reh'g*

*denied*, *trans. denied*.

BorgWarner argues that a nuisance claim implies active conduct; after all, the "essence of

a private nuisance is the *use* of property to the detriment of the use and enjoyment of another's

property."  (Filing No. 383 at 16 (quoting *Yates v. Kemp*, 979 N.E. 2d 678, 682 (Ind. Ct. App.

2012)) (emphasis in original).)  Amphenol adds that, in this case, "the contamination-causing

activity itself ended a long time ago" — what remains are "the **effects** of that activity[,] the

injuries."  (Filing No. 386 at 40 (emphasis in original).)  In that respect, Amphenol reasons, the

continuing contamination does not amount to continuing nuisance here.

The Court disagrees with Defendants' insistence on active, or continuing, *conduct*.  As a

sister court has found:

> The plain language of the statute contemplates an ongoing/present offending
> activity or condition. Importantly, subsection (8) allows for nuisance to be
> "enjoined or abated and damages recovered for the nuisance."  In other words, this
> subsection does not provide for damages alone as would happen in a case of an
> activity or condition that had ceased; rather damages go hand-in-hand with enjoiner
> and abatement, further suggesting that the statute contemplates a present offending
> activity or condition.

*Hostetler v. Johnson Controls Inc.*, 2021 WL 5087261, at *13 (N.D. Ind. Nov. 2, 2021).  Active

conduct, though often sufficient, is not necessary; an active *condition* can just as easily satisfy

concerns that nuisances embody present, or existing, conflict of uses.  "[E]ven though a defendant stops polluting by the time the lawsuit is filed, a nuisance claim can proceed so long as the waste remains on the land unabated."[29]  *Id.* at *14 (citing *Reed v. Reid*, 980 N.E.2d 277, 284 (Ind. 2012)); *see also* 980 N.E.2d at 284–85 (although not addressing this point directly, summarizing facts that indicate clearly that any active conduct ended in 2004, years before the 2008 nuisance claim was filed).

Here, the 2022 Statement of Basis details at length a "present offending . . . condition" in the unremediated on-Site contamination that continues to plague Plaintiffs' properties off-Site. Still active, these persisting conditions have precipitated yet another attempt at remediation (under the authority of the most recent Consent Order), the continuation of which is itself "an indication that toxic materials are still present at the site." *Hostetler*, 2021 WL 5087261, at *14.  The Statement of Basis notes, with respect to the on-Site impacted soil, that treating the contaminated VOCs in portions of the source area "is important . . . to limit the future migration of VOCs to downgradient portions . . ." (Filing No. 388-8 at 57).  And, with respect to the on-Site Groundwater, the proposed remediation seeks to reduce the VOC groundwater impacts and "prevent the migration of VOCs at concentrations exceeding the [Vapor Intrusion Screening Levels]." *Id.* at 58.

With toxic materials still present at the Site, along with a remediation effort that, pursuant to the Court's understanding, is actively underway (*see* Filing No. 433-1 at 15, art. VIII ¶ 45), a

---

[29] Amphenol's reliance on *Elkhart Foundry & Mach. Co. v. City of Elkhart Redevelopment Comm'n for City of Elkhart*, does not change this conclusion; far from addressing Ind. Code § 32-30-6, *Elkhart* decided the question of whether the plaintiff's "nuisance claim was untimely under Ind. Code § 34-11-2-7(3)."  112 N.E.3d 1123, 1131 (Ind. Ct. App. 2018).  *LAJIM, LLC v. Gen. Elec. Co.* is distinguishable for similar reasons.  Like *Elkhart*, *LAJIM, LLC* evaluated whether "under the continuing tort doctrine, the five-year statute of limitations does not bar [plaintiffs'] claims."  917 F.3d 933, 951 (7th Cir. 2019).  In short, the Court finds the continuing tort doctrine in the context of tolling the statute of limitations to be distinct from Indiana's requirements for a "continuing nuisance" that form the basis of BorgWarner's argument.

genuine issue of material fact exists as to whether the pollutants are still migrating over to Plaintiffs' homes so as to constitute a nuisance that could be abated.  *See* 2021 WL 5087261, at *14.

**2.      Genuine Issues of Material Fact Exist as to Whether BorgWarner Contaminated Plaintiffs' Properties**

BorgWarner's next argument as to its own role (or lack thereof) in creating the nuisance is similarly unavailing.  In short, the crux of Plaintiffs' position is not that BorgWarner was actively polluting at the plant at, or leading to, the time they filed the lawsuit against it, but that the resulting contaminants were actively migrating from the Site towards Plaintiffs' properties *during its ownership*, that the condition was not investigated and remediated completely, and that the Defendants, including BorgWarner, failed to warn Plaintiffs of the existence of the contamination and its dangers.  Even if BorgWarner did not place the TCE or PCE in the ground in the first place, its conduct still forms a significant basis for the claims, akin to a property owner who has actual knowledge of another's nuisance occurring on the owner's property.  *See, e.g.*, *Neal v. Cure*, 937 N.E.2d 1227, 1232 (Ind. Ct. App. 2010) (reciting that, under Indiana law, a landlord who has actual knowledge of a tenant's nuisance can be held liable therefor), *trans. denied*.

Moreover, the evidence demonstrates BorgWarner's knowledge.  Among other evidence, Plaintiffs point to the 1990 Consent Order — for which FPP (BorgWarner's predecessor) was a respondent — which states that data indicated the regional ground-water flow direction is southward (*i.e.*, toward the Glendale Area) (*see* Filing No. 388-2 at 8).  A letter from the RCRA Enforcement Branch, dated February 9, 1993, indicates to FPP that "[t]he ground-water contaminant plume extends off-site and necessitates that ground-water sampling be performed in residential areas."  (Filing No. 420-5 at 2.)  In that BorgWarner knew, while owning the Site, that contaminants were extending off-Site and necessitating ground-water sampling in residential

areas, the Court finds, after careful review of the record, that sufficient evidence exists to raise a question of fact as to whether BorgWarner's conduct resulted in the contamination of Plaintiffs' properties.

In its reply, BorgWarner attempts to argue for the first time that, even if there were a continuing nuisance, it would not be liable because it no longer owns the Site (*see* Filing No. 427 at 14). In doing so, it points to its answer to the operative complaint, which contains the admission that "BorgWarner Peru is not currently an active company" and statement that "BorgWarner Peru was inactive prior to and at the time [BorgWarner] acquired Remy in 2015." (Filing No. 149 at 14.) Waiver notwithstanding, the Court finds that the evidence by BorgWarner on this point does not demonstrate it no longer owns the Site, and the Court therefore declines to grant summary judgment on these grounds. In any event, "the creator of a nuisance can also be required to abate the nuisance regardless of who owns the land." *Gray*, 624 N.E.2d 49, 53 (citing *Scott Construction Co. v. Cobb*, 159 N.E. 763, 766 (Ind. Ct. App. 1928)).

### 3. Genuine Issues of Material Fact Exist as to Whether the Contamination is An Obstruction to the Free Use of Property or Injurious to Health

Plaintiffs' nuisance count in part seeks monetary damages for "exposure to hazardous substances, annoyance, inconvenience, discomfort, displacement, fear of adverse health effects and economic loss" (Filing No. 143 at 32, ¶ 127).

Attacking a portion of Plaintiffs' nuisance count, Amphenol argues that, to the extent Plaintiffs "seek money damages for any annoyance or disruption", they lack the necessary evidence (Filing No. 386 at 40). Amphenol contends Plaintiffs' evidence of inconvenience or annoyance is not tied to any concrete harm; when it comes to "annoyance-based nuisance claims", Amphenol argues that the annoyance at issue "must be tied" to some concrete harm. *Id.* (quoting *Baker v. Westinghouse Elec. Corp.*, 70 F.3d 951, 955 (7th Cir. 1995)).

"Evidence of inconvenience, annoyance and discomfort can all be grounds for recovery of damages in a nuisance action." *Gray*, 624 N.E.2d at 54 (citing *Cox v. Schlachter*, 262 N.E.2d 550, 554 (Ind. Ct. App. 1970); *Keane v. Pachter*, 598 N.E.2d 1067 (Ind. Ct. App. 1992), *reh'g denied*, *trans. denied*).

Plaintiffs changed the use of their properties, as excerpts from their deposition testimony and interrogatory answers demonstrate.  For example, Plaintiff Denney swapped her inground garden for raised beds (*see* Filing No. 418-7 at 2), and restricted her granddaughter who lived with her from "doing anything in the soil" or enter the basement (Filing No. 388-12 at 7).  Plaintiff Terhune "ha[s] not been able [to] fully use and enjoy and recreate on [his] outdoor space" (Filing No. 418-9 at 6) or "work[] with [his] daughter in her fast pitch softball." (Filing No. 418-10 at 2.) Terhune additionally "cannot freely repair and do work on [his] property for fear of exposure to the hazardous materials" (Filing No. 418-9 at 6), in that he cannot "tear[] up the concrete behind [his] house and put[] new [concrete] down." (Filing No. 418-10 at 2.)  In the Court's opinion, these changes in use create an issue of genuine material fact as to whether Plaintiffs were, among other things, inconvenienced, annoyed, or disrupted in their usages by the alleged nuisance.

Plaintiffs' nuisance actions further cannot be said to be "based upon an allegation of annoyance alone." *Baker*, 70 F.3d at 955.  Having reviewed the regulatory findings by the Agency for Toxic Substances and Disease Registry ("ATSDR") (*see* Filing No. 353-1), the Court finds that the contamination's effect on properties in the study area (which encompasses Plaintiffs' residences) constitutes the "concrete harm" necessary to tie Plaintiffs' damages to the nuisance.

Denney's case highlights the link connecting alleged inconvenience, annoyance, and/or disruption to concrete harm.  She has experienced testing on her home since late 2018 by IWM, who annually checks that the mitigation system it put in works properly; notwithstanding this, the "contamination is still high in the clear out in the sewer outside [their] house." (Filing No. 418-8

64

at 4-5.) Numerous houses that were tested by the ATSDR exhibited results "greater than the cancer risk evaluation guide for soil vapor intrusion for sub-slab and near soil gas" (Filing No. 353-1 at 31; *see id.* at 31, Table 4). Not only do these results demonstrate a potential concrete harm, but they also, in the Court's assessment, create an issue of genuine material fact as to whether Plaintiffs were exposed to these hazardous substances for purposes of the nuisance claim.

While the Court is sympathetic to Amphenol's narrow argument concerning emotional distress damages, raising it for the first time in a reply brief leaves no chance for Plaintiffs to respond. It is well-settled in this Circuit that "arguments raised for the first time in a reply brief are waived." *Annie Oakley Enterprises, Inc. v. Amazon.com, Inc.*, 559 F. Supp. 3d 780, 806, 2021 WL 4147189 (S.D. Ind. 2021) (quoting *Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019)); *see also O'Neal v. Reilly*, 961 F.3d 973, 974 (7th Cir. 2020) ("[W]e have repeatedly recognized that district courts are entitled to treat an argument raised for the first time in a reply brief as waived."). Because Amphenol did not address the nuisance claims' emotional distress damages in its opening brief (it instead focused on activity vs. effects, and evidence of inconvenience or annoyance), any argument that Plaintiffs' nuisance claims should not be submitted to a jury, is waived.

Accordingly, the Court **denies** Defendants' motion for summary judgment on Plaintiffs' nuisance claims.

## IV. CONCLUSION

As discussed above, the Court **DENIES** Plaintiffs' Motion for Leave to Renew Plaintiffs' Motion for Class Certification and to Reconsider the Court's Order Denying Class Certification (Filing No. 428) and Motion to Strike Notice (Filing No. 438).

The Court further **GRANTS in part and DENIES in part** Defendants' Motions for Summary Judgment (Filing No. 382; Filing No. 385; Filing No. 387). The motions are **GRANTED**

as to 400 N. Forsythe, Plaintiffs' claims for injunctive relief and property damage, and Plaintiffs'

battery and strict liability claims.

       The Court **DENIES** the motions as to all other issues and claims.  The remaining case shall

proceed to trial or settlement.

       **SO ORDERED**.

Date:  7/3/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Christopher L. Gadoury
AMARO LAW FIRM
cgadoury@amarolawfirm.com

Christopher T. Nidel
NIDEL & NACE PLLC
chris@nidellaw.com

Jacob R. Cox
COX LAW OFFICE
JCOX@COXLAW.COM

Jonathan Barry Nace
NIDEL & NACE PLLC
jon@nidellaw.com

Robert Thomas Dassow
HOVDE DASSOW & DEETS LLC
rdassow@hovdelaw.com

Ryan D. Ellis
LANIER LAW FIRM
ryan.ellis@lanierlawfirm.com

Delmar R. Ehrich
FEAGRE DRINKER BIDDLE & REATH LLP
delmar.ehrich@faegredrinker.com

Emanuel McMiller
FAEGRE DRINKER BIDDLE & REATH LLP
manny.mcmiller@faegredrinker.com

H. Max Kelln
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
h.max.kelln@faegrebd.com

Kip S.M. McDonald
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
Kip.McDonald@Faegredrinker.com

Matthew Richard Elliott
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
matthew.elliott@faegredrinker.com

Paul A. Wolfla
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
paul.wolfla@faegredrinker.com

James E. Zoccola
LEWIS & KAPPES PC
jzoccola@lewis-kappes.com

Richard S. VanRheenen
LEWIS & KAPPES PC
rvanrheenen@lewis-kappes.com

Tabitha Lucas Balzer
LEWIS & KAPPES PC
tbalzer@lewis-kappes.com

Thomas R Jones
LEWIS & KAPPES
tjones@lewis-kappes.com

Donald J. Kelly
WYATT TARRANT & COMBS
dkelly@wyattfirm.com

Lisa K. Rushton
WOMBLE BOND DICKINSON (US) LLP
lisa.rushton@wbd-us.com

Matthew Lewis Bunnell
WYATT, TARRANT & COMBS, LLP
mbunnell@wyattfirm.com

Matthew F. Tilley
WOMBLE BOND DICKINSON (US) LLP
matthew.tilley@wbd-us.com